```
 1            IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF OREGON

 3   CALISTA ENTERPRISES LTD.,      )
                                    )
 4            Plaintiff,            )   3:13-cv-01045-SI
                                    )
 5       vs.                        )   November 19, 2013
                                    )
 6   TENZA TRADING LTD.,            )   Portland, Oregon
                                    )
 7            Defendant.            )

 8

 9

10

11

12            TRANSCRIPT OF PROCEEDINGS

13      BEFORE THE HONORABLE MICHAEL H. SIMON

14        UNITED STATES DISTRICT COURT JUDGE

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          APPEARANCES

 2   FOR THE PLAINTIFF:      Valentin David Gurvits
                             Matthew Shayefar (via phone)
 3                           Boston Law Group, PC
                             825 Beacon Street, Suite 20
 4                           Newton Centre, MA  02459

 5                           Sean Ploen (via phone)
                             Ploen Law Firm, PC
 6                           100 South Fifth Street, Suite 1900
                             Minneapolis, MN  35402
 7

 8                           Thomas Freedman, Jr.
                             Pearl Law LLC
 9                           522 SW Fifth Avenue, Suite 1100
                             Portland, OR  97204
10
     FOR THE DEFENDANT:      Paul Nathan Tauger
11                           Anna M. Vradenburgh (via phone)
                             The Eclipse Group LLP
12                           2020 Main Street, Suite 600
                             Irvine, CA  92614
13
                             Devon Zastrow Newman
14                           Schwabe Williamson & Wyatt, PC
                             1211 SW Fifth Avenue, Suite 1600
15                           Portland, Oregon  97204

16

17

18

19

20

21

22   COURT REPORTER:        Dennis W. Apodaca, RDR, RMR, FCRR, CRR
                             United States District Courthouse
23                           1000 SW Third Avenue, Room 301
                             Portland, OR  97204
24                           (503) 326-8182

25
```

```
 1                    (November 19, 2013)
 2                 P R O C E E D I N G S
 3           (Open court:)
 4           THE COURT:  Good afternoon.
 5           COUNSEL:  Good afternoon.
 6           THE CLERK:  Your Honor, this is the time set for
 7  oral argument in civil case No. 13-1045-SI, Calista
 8  Enterprises Ltd, versus Tenza Ltd.  For the record, we
 9  have by phone Anna Vandenberg (sic), Sean Ploen and
10  Matthew Shayefar.
11           Counsel in court, please identify yourselves for
12  the record.
13           MR. GURVITS:  Good afternoon, Your Honor.  Val
14  Gurvits for Calista.  With me, I have Thomas Freedman.
15           THE COURT:  Very well.
16           MR. TAUGER:  Good afternoon, Your Honor.  Paul
17  Tauger for Tenza.  With me is our local counsel, Devon
18  Newman.  I would like to clarify that it is Anna
19  Vradenburgh with us on the phone.
20           THE COURT:  Thank you.
21           All right.  We are here on Plaintiff Calista's
22  motion to stay this litigation while the petition for
23  cancellation that is under consideration at the Trademark
24  Trial and Appeal Board proceedings.
25           I have read the materials that you all have
```

1   provided to us, including the supplemental exhibit in

2   support of defendant's opposition that was filed

3   yesterday, November 18th, Docket 35.

4           I do have some questions for both sides, but

5   Calista is the movant.  If there is anything you wish to

6   add at this time to what has already been briefed, and you

7   don't need to repeat the briefing, but you are welcome to

8   do so.

9           MR. GURVITS:  Thank you, Your Honor.  Just a

10  30-second synopsis of what happened and why we are all

11  here.  My client, Calista, owns 13 domains.  For several

12  years they were working together with Tenza in sending

13  traffic from those domains to Tenza's website.  At one

14  point Tenza apparently decided that they didn't want to

15  share that revenue and filed the UDRP proceeding.  What we

16  did in response is we filed a proceeding for cancellation

17  with the TTAB and then asked for the UDRP proceeding to be

18  stayed until the TTAB resolves the issue whether the

19  "PORNTUBE" trademark is valid or not.  Our position is

20  that, at best genericide happened to it.  It is simply a

21  combination of two generic claims.  Our position is that

22  if that trademark is not a valid trademark, the rest of

23  the case goes away.

24          THE COURT:  Even the common law trademark?  If

25  the TTAB rules that it is generic, that would also then

automatically dispose of the common law trademark claim?

MR. GURVITS:  We believe it would.  We might need to file a motion for summary judgment on it, but, yes, we believe it would be dispositive.

We ended up losing the UDRP proceeding.  The one voting in our favor -- arbitrator -- felt the UDRP proceedings should go forward and then they could figure things out.  The only way for us then, under the UDRP rules, to prevent the domains from being automatically transferred to Tenza is to file the present action for declaratory judgment, and we did that.

We did that in accordance with UDRP rules, but then we ended up being in a situation where there are two essentially competing procedures going on; one with TTAB and one here.  We didn't know which one would go forward. Our feeling is that the TTAB proceeding is certainly less expensive, more efficient, for most judicial efficiency and economy.  So we wanted to see, and we continue to want to see the TTAB proceeding going forward.

There is also some case law that we cited supporting the proposition that the issue of validity of the trademark should be decided by the administrative body that issues those trademarks.

Indeed, we filed the other day a motion to extend discovery in the TTAB proceeding, and we did that

because that was last day on which discovery could be
served.  We don't know which process is going forward, so
we have not filed discovery in either case.  But again, we
feel that this type of dispute lives or dies based on
whether the "PORNTUBE" mark is truly valid.

THE COURT:  Can you tell me with specificity
what discovery has already taken place in the TTAB action?

MR. GURVITS:  None whatsoever.  We have had some
preliminary disclosures and nothing else.  Curiously
enough, I should mention that neither side took any
discovery in the TTAB proceedings.  But if this case is
not going forward, then, of course, we needed to make sure
that we had the opportunity for discovery, which is why we
filed the motion to extend discovery.

THE COURT:  Am I correct that in the TTAB
procedures, absent an agreement by both sides, that a
deposition of an out-of-country company or witness is not
necessarily going to be taken by oral deposition in person
of that witness?

MR. GURVITS:  That is my understanding.  I am
going to ask Sean Ploen to respond to the Court.  Sean, do
you have a better feeling than I do on this?

MR. PLOEN:  Of course.  Your Honor, this is Sean
Ploen on behalf of Calista.  As Attorney Gurvits stated,
or indicated, we have about one month to go in the

1    currently scheduled discovery period at the TTAB.  Both

2    sides, as Val said, have served their initial disclosures,

3    which is a condition precedent to service of discovery

4    requests themselves at the TTAB.

5            To answer your specific question about the

6    manner in which depositions are conducted, it is the case,

7    unless both sides consent to the taking of oral

8    depositions of parties who are located in foreign

9    countries, or unless the Board orders it sua sponte, then

10   depositions in a TTAB proceeding like this one would be

11   taken on written questions as opposed to conducting oral

12   testimony.

13           THE COURT:  Thank you.  Am I correct in my

14   understanding that Tenza wants to take the oral deposition

15   of a corporate representative for Calista, not just simply

16   a deposition on written questions, and that Calista's

17   position is to oppose that and insist on a deposition only

18   on written questions?  Am I correct in that understanding?

19           MR. GURVITS:  No, Your Honor, we do not oppose

20   in-person depositions.  In fact, we have one scheduled --

21   in the present case we have one scheduled for

22   January 16th.  But we would not oppose an in-person

23   deposition.

24           THE COURT:  So whose deposition is scheduled for

25   January 16th, 2014?

1          MR. GURVITS:  It is a 30(b)(6) for Calista.

2          MR. PLOEN:  Your Honor, just to be clear, what

3     is being spoken of right now is the 30(b)(6) deposition in

4     the civil litigation.  At the TTAB, we have not yet

5     received a formal request from Tenza as to depositions,

6     and we have had an indication of intent from Tenza as to

7     its intention to take oral depositions.  But as noted,

8     that is going to require either consent or a go-ahead from

9     the Board itself.

10          As Attorney Gurvits said, once we receive that

11    particular request, we are happy to act on it, but we have

12    not taken a formal position in the absence of any kind of

13    formal request from Tenza.

14          THE COURT:  I'm confused about what

15    Attorney Gurvits just said, because according to Exhibit D

16    to the declaration of Mr. Tauger, at Docket 30 in this

17    case, page 35 of 56, I see an e-mail from you, Mr. Ploen,

18    to Mr. Tauger dated October 17th, 2013, 8:16 p.m., in

19    which it appears that you are saying or that on behalf of

20    Calista you are taking the position that Tenza will have

21    to move the Board -- move the TTAB -- and show good cause

22    for his preference to take an oral deposition as opposed

23    to a deposition on written questions.

24          Have I misunderstood my reading of that e-mail?

25          MR. GURVITS:  No, Your Honor, you have not.  We

```
 1   have changed our position since then, since they have
 2   served us with the deposition or since they have asked to
 3   depose him in this case.  We have said, fine, if you want
 4   to depose him in person, that's fine.  Our internal
 5   position was that, having agreed to it in this case, we
 6   will agree to it in the TTAB case as well.
 7              THE COURT:  What will happen if I stay this
 8   case?
 9              MR. GURVITS:  I'm on record as promising that we
10   will not oppose an in-person deposition in the TTAB
11   proceeding.
12              THE COURT:  All right.  Anything further,
13   Mr. Gurvits or Mr. Ploen?  I have one more question for
14   you.  Could you take me through what will be the prejudice
15   to Calista if I deny the motion to stay?
16              MR. GURVITS:  We will then be involved in
17   extensive discovery having to do with the counterclaims
18   with the damages, and it is quite a large amount of
19   discovery on issues that, again, I believe would be
20   disposed of if this trademark is canceled.
21              THE COURT:  If the trademark is canceled by the
22   TTAB, does Tenza have the legal right to seek de novo
23   review of that decision before this Court?
24              MR. GURVITS:  I do not know the answer to that
25   question.
```

1          Sean, do you know the answer to that question?

2          MR. PLOEN:  I think it depends in part upon what

3    happens with this particular proceeding in the meantime.

4    Ordinarily the right of review de novo would go to the

5    federal circuit.

6          THE COURT:  I thought it would go to the federal

7    circuit only if all affected parties wanted it to go to

8    the federal circuit.  But if either the petitioner or any

9    other affected party who is a party to the TTAB wants it

10   to go to a district court, it goes to the district court.

11         Am I mistaken?

12         MR. PLOEN:  No, I don't believe you are

13   mistaken, Your Honor, but I also think it depends in part

14   upon the status of the corresponding civil litigation.  In

15   other words, I think there are situations in which the

16   corresponding civil litigation has been stayed, and the

17   parties agree that any appeal of the TTAB decision should

18   go to the federal circuit.

19         THE COURT:  I don't disagree with you there,

20   where you said the parties disagree.

21         So let me ask you this hypothetical:  Let us

22   assume that I stay this action and the TTAB rules in favor

23   of Calista on the trademark cancellation issue; Tenza does

24   not agree -- I'm asking you to assume this for

25   hypothetical purposes -- that that appeal should go to the

1    federal circuit, but, instead, would prefer to have me

2    lift the stay and resolve all of the issues in this

3    lawsuit -- all of the issues in this lawsuit that are

4    pending, including reviewing de novo the TTAB decision.

5              Would Tenza have such a right?

6              MR. PLOEN:  Are you addressing that question to

7    counsel for Calista?

8              THE COURT:  Yes.  Either you, Mr. Ploen, or

9    Mr. Gurvits.  From the facial expression of Mr. Gurvits, I

10   think he is expecting you would answer that.

11             MR. GURVITS:  Or at least hoping.

12             THE COURT:  Hoping.

13             MR. PLOEN:  Yes, I believe Tenza would have that

14   right.  In other words, I think there is nothing Calista

15   could do to prevent the question from being reviewed by

16   your court, Your Honor.

17             THE COURT:  Okay.  Now, the last question for

18   Calista, and then we will hear from Tenza.  Tenza argues,

19   in opposition to the motion to stay, that if it is right

20   on the trademark cancellation issue, and/or even if it is

21   wrong, it has the right to proceed on other claims, it

22   would suffer irreparable injury if this case were to be

23   stayed by virtue of the delay that would be caused in

24   having the TTAB decision proceed and then basically

25   starting fresh, anew and de novo in this court and that

1    delay then would have continued infringing use, so argues

2    Tenza, continuing for a longer period of time.

3          What's Calista's response to that argument?

4          MR. GURVITS:  It is clearly not irreparable

5    harm.  I would acknowledge it is harm to the extent that

6    their trademark is valid and that our laches defense

7    doesn't work, then there is harm quantifiable in money

8    damages.  Take into consideration the fact that for two

9    years they were working with us, receiving our traffic.

10   Clearly they don't even view that harm on the

11   business-side to be irreparable.  To the extent there is

12   harm, it is easily quantifiable in monetary damages.

13          THE COURT:  Go ahead, Mr. Ploen.

14          MR. PLOEN:  If I could just supplement that

15   answer.  As well, Your Honor, I would point out that a

16   request for de novo review is different than the granting

17   of a de novo review.  I can't say it is common, because I

18   don't think this particular fact pattern arises quite

19   commonly, but I think, certainly in keeping with precedent

20   for a judge finding himself in the position you would be

21   in at that point, to say:  You know what, we have had

22   three judges at the TTAB look at this particular question

23   in detail for some time.  I am going to exercise

24   considerable deference with regard to the determination

25   that has been made, after presentation of evidence, as to

1    whether this particular phrase "retained income source

2    identifying capacity" or "source identifying

3    significance."

4            So in other words, it may be the case that

5    deference will be given to the Board's decision to

6    designate source, but instead we are proceeding then in

7    terms of questions about damages or any related claims.

8            THE COURT:  I understand.  Frankly, my

9    hypothetical assumes that Tenza ultimately prevails,

10   because obviously if Tenza is wrong on the merits, it has

11   not suffered any legally cognizable damages.

12           MR. PLOEN:  Right.

13           THE COURT:  But following up on the point that

14   Mr. Gurvits just said, you say easily quantifiable, how do

15   I quantify that?  Let's assume we get to that stage, and I

16   find that -- or the TTAB finds that the trademark should

17   not be canceled; that there was infringement.  How easy is

18   it for me to quantify the damages?

19           MR. GURVITS:  There is an amount of money that

20   is being made from this traffic.  The defendants know what

21   that amount is for two years.  They have been looking at

22   the traffic, and they were paying to Calista some money

23   for the traffic.  The traffic is easy to track.  You know

24   exactly how many people clicked on this button; you know

25   exactly how many people came.  So it is possible to see

1    what kind of revenue Calista received from this traffic.

2         I should also point the Court at Section 3 of

3    our reply to defendant's opposition where we point out the

4    presumption of irreparable harm does not apply here.

5    Tenza has not put forth any evidence of irreparable harm.

6    Without getting into the specifics, there is a very

7    focused argument as to why there is no presumption in this

8    case of irreparable harm.  I mean, we're speaking

9    hypothetically right now.

10        THE COURT:  Sure.  I understand.  If the damages

11   are as easy to measure and as quantifiable without

12   controversy, as you state, why do you think Tenza is

13   asking for an accounting remedy?

14        MR. GURVITS:  Tenza, insofar as I can tell, has

15   thrown the kitchen sink at us.  I think Tenza at some

16   point decided it is better to take the domains away than

17   to pay for them, and that's why we are here.  I don't have

18   a better answer.

19        THE COURT:  All right.  Very good.  Thank you

20   very much, Mr. Gurvits.

21        Who is speaking for Tenza?

22        MR. TAUGER:  Thank you, Your Honor.  Where to

23   begin.  We have briefed extensively the law that applies.

24   Unlike Calista, we have included in our brief case

25   citations, including quotes.  I am going to briefly cover

1    what the law is, because it has been completely

2    misrepresented here.  Calista argues first that the TTAB

3    proceeding --

4           THE COURT:  One second.  The folks on the

5    telephone, can you hear sufficiently Mr. Tauger?  If not,

6    I will invite Mr. Tauger to speak closer to the microphone

7    or be seated.  Can the folks on the telephone hear

8    Mr. Tauger?

9           MR. PLOEN:  Thank you for asking.  Yes, I can.

10          MS. VRANDENBERG:  Yes, I can hear.

11          MR. TAUGER:  I forgot I had that national

12    audience.  I will speak louder.

13          Calista is arguing that the TTAB proceeding is

14    somehow dispositive, and that is flat out not the law.  I

15    am just going to mention one cite that we cited in our

16    opposition pleading.  It is the Estate of Coll-Monge,

17    524 F.3d 1341 at 1347.  I quote, "The registration does

18    not create the trademark."  Trademark rights are not the

19    result of a registration.  They result from use in

20    commerce of a mark and a consumer association therewith.

21    It is completely wrong and unsupported by any case law to

22    say that cancellation of a registration somehow robs Tenza

23    of trademark rights that have accrued in its mark.

24          No. 2, Calista is arguing that this Court is

25    somehow not competent to make the determinations as to

1   whether a trademark has been invalidated because it has

2   become generic.  Again, that is not the law.  We have

3   cited the law in our opposition brief that says that this

4   Court is absolutely qualified by Congress to make that

5   determination.  So that's also not true.

6          Calista has argued that it is more efficient to

7   litigate this trademark before the TTAB.  Tenza has

8   already conducted extensive discovery.  We have served

9   interrogatories.  We have served an answer and production

10  of documents and other tangible things, and we have served

11  requests for admission.  Calista has responded.  We have

12  done all of this.  We have noticed the deposition of

13  Calista in Prague for January.

14          I have to address this sudden change of heart

15  that has just been announced to the Court that now they

16  will not oppose our taking the deposition of Calista in

17  person.  These kinds of flip-flops, I believe, just go to

18  illustrate that the intent of Calista in this matter is

19  simply to delay this adjudication as long as they possibly

20  can.

21          Calista is an adjudicated infringer.  The UDRP

22  panel, which is the entity vested with both the power and

23  authority to make that determination, found that they

24  infringed our rights.  They don't like that decision.

25  They admit that they filed this proceeding solely so that

1    they could block the transfer, and this is relevant to

2    their contention that there is no irreparable injury.

3             First, as a matter of law, they are wrong.

4    Trademark infringement presumes irreparable harm.  That's

5    black letter law.  That's in the case law we cited.

6             Their objection is, well, that case law comes

7    from a preliminary injunction.  Well, of course, it does.

8    That's when the issue gets raised.  But that is exactly

9    what they achieved by filing the instant action.  They

10   were able to block the ordered transferred domain names to

11   Tenza without showing a probability of success on the

12   merits, without posting a bond.  They have stonewalled us

13   completely, and we're incurring irreparable harm as a

14   result.  It is a de facto preliminary injunction that they

15   achieved.

16            Finally, the question that I would ask, why did

17   they do nothing on the TTAB proceeding?  It was filed back

18   in April.  They admit it was filed in an effort,

19   unsuccessfully, to state a UDRP proceeding.  Then they did

20   absolutely nothing on it.  It is now seven months later,

21   and they are first telling the TTAB that they need an

22   extension of discovery.  They argue, I think

23   disingenuously, that they need time to complete discovery.

24   They haven't even commenced discovery.

25            I would also point out that the burden of proof

1   is on them in the TTAB proceeding.  We have discovery

2   responses that constitute admissions, and we can use them

3   if we have to with the TTAB.  They have nothing and cannot

4   meet their burden of proof.

5           One other thing I have to mention about

6   irreparable injury.  Counsel Gurvits stated that we have

7   not introduced any evidence of irreparable harm.  It is a

8   presumption.  The presumption shifts the burden.  They

9   haven't introduced any evidence that we're not irreparably

10  harmed.  They are trying to turn the law on its head, and

11  I would submit that they are not doing it successfully.

12          THE COURT:  What's your best estimate of how

13  long it would take before we get a resolution from the

14  TTAB?

15          MR. TAUGER:  Well, I would prefer to defer this

16  to Counsel Anna Vradenburgh.  She is the TTAB expert.  I

17  am the litigator.

18          THE COURT:  Ms. Vradenburgh.

19          MS. VRADENBURGH:  Your Honor, I think we have

20  (indiscernible; audio very loud.)  We currently have a

21  motion before the Board to extend discovery until April,

22  and it is supposed to end in December.  So once discovery

23  ends, then we will have a testimony period for both

24  parties.  If that doesn't get extended, then I'm guessing

25  we will be looking possibly for a decision sometime in

1    2015, depending on how fast the Board actually reviews the

2    case and issues an order.  If there are other delays, then

3    this could go on even longer than that.

4              THE COURT:  You said 2015.  Did I hear that

5    correctly?

6              MS. VRADENBURGH:  Sean, if you disagree with me,

7    go ahead and speak.

8              THE COURT:  That's sort of my role, but I was

9    going to invite Mr. Ploen to do that.

10             MS. VRADENBURGH:  I'm sorry.  I apologize.

11             THE COURT:  That is where I was going to go

12   next.  Mr. Ploen or Mr. Gurvits.

13             MR. PLOEN:  Sorry for interrupting.  I would say

14   that, of course, TTAB proceedings can or may last years,

15   as my sister counsel points out, so can district court

16   proceedings.  I think that the estimates given to you are

17   on the far side in terms of duration.

18             THE COURT:  So what's your estimation,

19   Mr. Ploen?

20             MR. PLOEN:  I would say by fall of 2014.

21             THE COURT:  All right.  Let me ask both sides

22   now, and we will start with defendants --

23             MS. VRADENBURGH:  Your Honor, I don't know if I

24   would agree with that, simply because once discovery ends,

25   then there is a 30-day period and then the testimony

1  period will begin for the other side.  Then there is

2  another 30-day period, and then the testimony period

3  begins for the respondent.  Then after that, there will be

4  briefing due.  The briefings are usually 60 days after the

5  testimony period has ended, assuming there are no motions

6  filed.  So that's April -- we're already into well beyond

7  the fall of next year before the Board would even get

8  briefs.

9           THE COURT:  Thank you, Ms. Vradenburgh.  One

10 second, Mr. Ploen.  I guarantee everyone here, if anyone

11 has anything they want to say, they will be entitled to

12 say it before we close this proceeding.

13           First of all, let me say to Ms. Vradenburgh,

14 even though I recognized your voice from the introduction,

15 will everyone on the telephone please state their name

16 before beginning speaking, because that will assist our

17 court reporter here.

18           Mr. Ploen, did you wish to say something?

19           MR. PLOEN:  This is Sean Ploen.  I simply am

20 noting that we currently have a schedule in place with the

21 Board which calls for those rebuttal periods to end as of

22 July 1st, 2014.  At that point we would have the briefing

23 period, as Attorney Vradenburg notes.

24           So in other words, right now the Board is

25 scheduled to receive its briefs in the fall of 2014.

1    Decisions can come very quickly, or they can take some

2    time, depending on the complexity of the case and the

3    panel deciding it.

4                THE COURT:  Mr. Ploen, the schedule you are

5    referring to, is that the schedule that right now is

6    currently subject to the motion to extend?

7                MR. PLOEN:  That's right, yes.

8                THE COURT:  That motion was filed by whom?

9                MR. PLOEN:  The motion to extend discovery at

10   the TTAB was filed by Calista.  There is also at the TTAB

11   pending a motion to suspend the TTAB proceeding that was

12   filed by Tenza.

13               THE COURT:  I know that.  That's not what I

14   asked.

15               All right.  Let me ask, Mr. Tauger, if I were to

16   deny the motion to stay, tell me what remains to be done

17   before discovery can be concluded in this case from

18   Tenza's perspective, and then in a moment I will ask the

19   same question for Calista's counsel.

20               MR. TAUGER:  We will complete the deposition of

21   Calista, and I will say that Calista was quite forthcoming

22   in their written responses to our written discovery.  We

23   don't contemplate at this moment any motions to compel in

24   that regard.  If their witnesses are forthcoming, then

25   that will probably complete most of the fact discovery

1  that we would need to do.

2      I assume that we are both going to identify

3  expert witnesses.  It will be the standard expert witness

4  depositions.  But as far as I'm concerned, we would be

5  ready for trial very shortly thereafter.

6      THE COURT:  And that's the deposition scheduled

7  for January 16, 2014?

8      MR. TAUGER:  That's correct.

9      THE COURT:  Now, let me ask, whoever wishes to

10  speak for Calista, whether that be you, Mr. Gurvits, or

11  you, Mr. Ploen, assuming I were to deny the motion to

12  stay, tell me what the balance of the nonexpert discovery

13  needed by Calista would look like.

14      MR. GURVITS:  We would need to serve our own

15  interrogatories and document production requests, and

16  there is a deposition we will need to take, I believe, in

17  Spain of the owner of Tenza.  So other than that, it would

18  be surveys and all the other standard stuff.

19      THE COURT:  Sure.  So if you serve your

20  interrogatories next week and requests for productions, we

21  should see responses by middle of December.  If anyone has

22  any discovery disputes, you would be welcome to call my

23  chambers, and I will get on the telephone with you all and

24  resolve them immediately.  No need for briefing on that.

25  We may decide in the telephone call briefing may help, but

1  no need to file a written motion to compel.  Send an

2  e-mail or telephone call to my courtroom deputy, and I

3  will get involved and talk our way through these discovery

4  disputes.  Maybe we will need some briefing; maybe we

5  won't.  We will talk our way through it.  If there is not,

6  you should get your interrogatory answers in December and

7  your documents in December.

8          If you do that, would you be able to -- let me

9  turn this over to Tenza -- would Tenza be able to produce

10  the witness at some point in the later half or around

11  January 16th, or the latter half of January?

12          MR. TAUGER:  Not only could we do that, but we

13  actually offered to do that, when we spoke to

14  Attorney Shayefar and asked him if he would like to take

15  our witnesses, but he declined.

16          THE COURT:  Okay.  Let me also ask both sides

17  the following procedural question, which I think I know

18  the answer, but let me see if anybody disagrees on this.

19  Assuming hypothetically that I deny the motion to stay, we

20  have two corporations that have consented to jurisdiction

21  of this Court:  Calista Enterprises, because it filed the

22  lawsuit here, and Tenza Trading, because it filed a

23  counterclaim here.  Not only does that mean that you

24  really don't have to, I think, use the Hague Convention

25  for discovery purposes, although it may depend upon some

specifics of the individual country's laws, I'm not aware

of any specifics that require that here, and you could

very well use and I very well could order you to use the

Federal Rules of Civil Procedure.

That said, if I learn that there are any

problems in terms of the scheduling of the timing and/or

the place of deposition, I could order the 30(b)(6) of

Calista's corporate representative and the 30(b)(6)

deposition of Tenza's representative to take place in the

District of Oregon in this courtroom while I preside.

Now, I'm not thinking I'm going to do that, unless there

are problems and someone wants me to do that.

Does anyone disagree that I have the legal

authority to do that?  First, plaintiff, Calista.

MR. GURVITS:  No, Your Honor.  The only issue,

to the extent that there are other deponents that are not

the 30(b)(6) deponents, then we might have an issue.

THE COURT:  I understand.

MR. GURVITS:  If I may, Your Honor.  I wanted to

remind the Court, we wanted to discuss this during the

telephone hearing last time, we are in the middle of a

large trial in Miami.  Right after this, I am on the

red-eye back to Miami.  I am here to appear in front of

you.  We would simply not be able to prepare the discovery

before we are finished.  That was the issue with

1    scheduling in November and December for the depo.  That's

2    why we ended up doing it.  But we did respond to the

3    interrogatories, as my brother pointed out.  We are not

4    delaying; we are simply involved in another process right

5    now.

6                THE COURT:  Calista filed with the Trademark

7    Trial and Appeals Board, April 10th, 2013, right?

8                MR. GURVITS:  Correct.

9                THE COURT:  Why didn't Calista take any

10   discovery between April 10th and now?

11               MR. GURVITS:  Specifically because if -- we knew

12   if we lost the UDRP, we would have to file this lawsuit.

13   If we had to file this lawsuit, then there would be

14   possibly double work that we would have to do.  It was

15   simply improper for me to be churning my client like that.

16   That's the only reason.

17               But with respect to my brother's allegations of

18   intentional delay, when we filed this lawsuit, we asked

19   them twice to accept service of process.  They refused

20   twice.  We ended up having to deal with -- looking for

21   motions for alternative service, and before that, to look

22   at the Hague Convention.  We are not intentionally

23   delaying anything.  Frankly, they want to do things on an

24   expedited basis, and when we reasonably say no, they

25   accuse us of intentional delay.  They should move in the

1  ordinary course.

2          THE COURT:  The ordinary course in the District

3  of Oregon is fairly rapidly.

4          All right.  Does anyone have anything further to

5  say with respect to the pending motion to stay?  First,

6  the movant, Calista?

7          MR. GURVITS:  No, Your Honor.

8          THE COURT:  The defendant, Tenza?

9          MR. TAUGER:  Your Honor, if I may just address

10  the point that you made prior to asking your most recent

11  question, which is whether anyone would have any objection

12  to your exercising your discretion for the depositions to

13  take place here.

14          This was a fight that was brought to us by

15  Tenza.  The only reason that we filed an answer and

16  counterclaim was because they had blocked transfer of the

17  infringing domains to us pursuant to the UDRP decision.

18          I cannot say it is easy or convenient for my

19  clients to come to the United States.  Neither of them, to

20  my understanding, are citizens of the United States.

21  Neither of them reside here.

22          If I also may address one claim that was made by

23  my brother counsel here, and that is on our refusal to

24  accept service of process.  We were advised on

25  June 26th at the TTAB discovery conference that they had

filed the suit.  We were not served with it.  We had never

seen it.  In fact, we have never been served.  In fact, I

think we got it by going on PACER and downloading it.  At

that point I mentioned I was not authorized to accept

service of process, and that was true.

        The implication that we are somehow expected to

do their litigation for them is truly troubling.  We are

not obligated to accept service of process.  They are the

ones who had submitted to the jurisdiction of the UDRP

panel, just by registering their domain names.  ICANN

controls it and ICANN says where it is going to occur.

        We filed an answer and, yes, we filed our

counterclaim because we think under Rule 19 we had to.

Otherwise, we would have to lose our claims.  We filed the

answer, because we could not continue allowing them to

resist the UDRP order just by having gone through the

motions of filing the instant action.  That's it.

        Thank you, Your Honor.

        THE COURT:  Does anyone else wish to speak to

the pending motion?  Seeing no hands and hearing no

voices, I am going to issue a written opinion and order.

I may get it out today.  If not, you will get it tomorrow,

but I'm telling you now that I'm denying the motion to

stay.

        Now, let's talk about discovery close and the

1    balance of what needs to be done in this case.  It looks

2    to me and sounds to me as if everyone acts reasonably

3    diligently, we can get fact discovery closed by

4    January 31st.

5              Am I mis-hearing something?  First, Calista.

6              MR. GURVITS:  Again, Your Honor, we respectfully

7    request that we be allowed to have some time in

8    formulating our discovery requests, which we simply don't

9    have the bandwidth to do until our trial is over.  Our

10   trial is over on December 20th.  My entire legal team

11   right now is in Miami.  We are buried in this litigation.

12             When we initially spoke to Tenza regarding a

13   calendar, close of discovery by April seemed to be an idea

14   that everybody was onboard with.  So I would propose that

15   discovery be closed by April, which would give us the

16   opportunity to really sit down with our clients, or at

17   least over the phone, and think about the questions that

18   need to be asked and do a good job with it, serve it, give

19   them the opportunity to respond to it and not do it in a

20   rush.

21             THE COURT:  That does sound like it takes too

22   long to me, especially since this lawsuit was filed in

23   June -- I think it was filed June 21st, 2013.  I want to

24   see if we can get this resolved by a trial within 12

25   months from filing.

 1          Let me ask Tenza, when do you propose then?  I

 2  assume, from what I heard before, that you could live with

 3  January 31st.  But in light of what Mr. Gurvits has said,

 4  and I know counsel have been and want to be reasonably

 5  cooperative with each other, what would you suggest for a

 6  close of fact discovery?

 7          MR. TAUGER:  Your Honor, we would like discovery

 8  to close as soon as possible.  I understand Mr. Gurvits'

 9  concern and his problem.  I would say it is up to the

10  Court to determine how to accommodate that.  We would like

11  to move along this litigation as quickly as we can.

12          THE COURT:  Well, it seems to me that if you can

13  formulate your discovery requests in mid-December or

14  sometime in December, you are taking your chances that you

15  may not have much time to deal with discovery disputes.

16  But then again, all counsel here, including Mr. Tauger,

17  are getting a sense of how I am going to deal with

18  discovery disputes.  So there might not very well be any

19  discovery disputes.

20          If you serve your discovery request

21  mid-December, you will get responses mid-January.  You

22  take your depositions sometime in February.  So fact

23  discovery is going to close on February 28th.

24          If fact discovery closes on February 28th, I

25  think it is reasonable to expect, if there is going to be

1    any dispositive motions -- you need to do some expert

2    discovery.  Fair enough.

3            So what's your preference?  Has each side talked

4    about it?  There are two traditional ways of doing expert

5    discovery.  One way would be for you each to do

6    simultaneous filings of your expert reports and then a

7    short while later simultaneous filings of any rebuttal

8    expert reports.  We can either put expert depositions in

9    between those two periods, or after the rebuttal reports,

10   or we can do it purely sequential.

11           Let me share with you before I get your

12   response, since we have really an atypical situation --

13   normally I would expect a plaintiff to file a report first

14   in a sequential mode.  But here, we really have

15   infringement claims that are in large part driving a

16   number of the issues that have to be resolved.  It strikes

17   me, rather than going sequential, the right to do is have

18   a deadline for the simultaneous filing of expert reports

19   followed by a short period for expert depositions of each

20   side -- either that or then followed by rebuttal expert

21   reports or the depositions take place after rebuttal

22   reports.  That may be best in these circumstances.

23           Yes.

24           MS. NEWMAN:  Your Honor, Devon Newman.  If I

25   might suggest that each party file simultaneously on the

1    burden of proof for which they have.

2         THE COURT:  Right.  That's what I'm thinking.

3         What I'm thinking about out loud, and I will be

4    glad to take comments from anyone, whether we should hold

5    off expert depositions until after any pending rebuttal

6    reports so that the depositions can focus, not only on the

7    original comments, but also on rebuttal comments.  I think

8    that makes sense.

9         MR. GURVITS:  That would be my inclination,

10   Your Honor, so we can have the benefit of seeing both

11   documents before.

12        MR. TAUGER:  Not to be contrary, Your Honor.

13   The issues in this case, I think, are relatively clearly

14   defined.  So to this extent counsel is correct that to a

15   great degree it is going to turn whether or not our mark

16   is generic.  Of course, we contend it is not.  I don't

17   know that this is an issue where, for example, in a

18   products liability context you would want to have analysis

19   of the suspect of the accused product or something like

20   that.  I think this is something that we can each do

21   independently.

22        Clearly, they are going to produce experts who

23   are going to say:  Oh, yes, it is generic and it is

24   descriptive, and clearly we are going to produce experts

25   that say the contrary.  I don't know that having rebuttals

1    are going to be necessary before we can proceed.  I would

2    suggest, again, I would like to move forward as quickly as

3    we can.

4                THE COURT:  Certainly, no one has to file a

5    rebuttal report if they don't want to.

6                I'm even rethinking now what I said in response

7    to Ms. Newman.  I'm not sure it should be just simply

8    focused on the parties' issues where they have the burden

9    of proof.  I mean, it is pretty clear what each side needs

10   to contend and respond to here.

11               Let me put the following schedule out to you all

12   and see what you all have to say about it.  I think that

13   the fact discovery closes on February 28th, 2014.  Within

14   two weeks both sides should submit their opening expert

15   reports.  That would be on March 14th.

16               Each side submits their opening expert reports.

17   Two weeks thereafter, March 28th, each side submits their

18   rebuttal reports expressing what they agree or disagree

19   with the other side.  Then I will give you each two weeks

20   to take depositions of each other's experts.  So expert

21   depositions need to be completed by April 18th.  Then two

22   weeks after that, if anyone wants to file any dispositive

23   motions, motions for summary judgment or partial summary

24   judgment, that would be two weeks thereafter, or May 2nd.

25               Does anyone think that schedule is either too

1  slow or too fast?

2         MR. GURVITS:  I think it is a bit fast,

3  Your Honor.

4         MR. PLOEN:  Your Honor, this is Attorney Ploen.

5  I think in particular the proposed deadlines for

6  dispositive motion seems awfully hard on the heels of the

7  expert work.

8         MR. GURVITS:  To add to that, Your Honor,

9  experts are not parties, and they are not -- we don't

10 control them as much as we control ourselves.  It is

11 difficult to be able, without knowing their own schedule,

12 to pin them down to this kind of a schedule.

13        THE COURT:  We have about six months before we

14 need them.  So you can contract with them in enough time

15 to see if they can work within your schedule.

16        Mr. Tauger.

17        MR. TAUGER:  Your Honor, the only concern I have

18 with there being essentially two weeks between the expert

19 depositions and the dispositive motion cut-off is that we

20 have to get transcripts.  That can take a little time to

21 prepare.  I don't want it to be very much more extended.

22 I think it would be reasonable to have a couple more

23 weeks.

24        THE COURT:  Mr. Ploen and Mr. Gurvits, what were

25 you thinking of in terms of the time to conclude expert

1    depositions and when you want to file dispositive motions.

2            MR. GURVITS:  Instead of the two-week schedule

3    Your Honor gave us, a month.  So in other words --

4            THE COURT:  You didn't really answer my

5    question.  Just generally, do you think three weeks or 30

6    days after depositions to file?

7            MR. GURVITS:  30 days, please.

8            THE COURT:  30 days.  Mr. Tauger, that sounds

9    pretty much what you were asking for as well.

10           MR. TAUGER:  That's correct, Your Honor.  Either

11   5-16 or 5-18.

12           THE COURT:  I did hear about Mr. Gurvits wanting

13   four weeks between these periods versus two.  What's your

14   view on that?

15           MR. TAUGER:  I believe the schedule Your Honor

16   has set is absolutely appropriate.  Again, we do not want

17   to delay this any further.  There is a de facto

18   preliminary injunction against us.  We are incurring

19   irreparable harm.  We want to move.

20           THE COURT:  I will give Mr. Gurvits what he was

21   asking for with respect to the 30 days.  So 30 days after

22   April 18th will put us at dispositive motions being due

23   May 19th.

24           Now, in this court we have -- frankly, under the

25   federal rules, three weeks after dispositive motions are

due responses are due.  So three weeks after May 19th is
June 9th.  A reply is due two weeks thereafter, June 23rd.
Would I be guessing correctly if I said both sides would
prefer an oral argument?

   MR. TAUGER:  Yes, Your Honor.

   MR. GURVITS:  Yes, Your Honor.

   THE COURT:  I want at least two weeks to prepare
for oral argument.

   MR. GURVITS:  I would be happy to agree to a
month, Your Honor.

   THE COURT:  Probably July 4th weekend is a mess.
That's a pain.

   Can you do oral argument on Friday, July 11th?

   MR. TAUGER:  That works for us, Your Honor.

   MR. GURVITS:  Yes.

   THE COURT:  Since you are traveling out of town,
I am reasonably open that day right now.  Would you prefer
argument in the morning or in the afternoon?  What's
easier for your travel?

   MR. GURVITS:  Either way is fine, because I'd
come in the night before.  It is a three-hour difference
for me.  For you, it might be an afternoon.

   MR. TAUGER:  For me, it will be morning.  I did
come in this morning, and it was actually quite a
challenge.  I got up at 4:00 a.m. to make it.  I would

1    stay overnight.

2        THE COURT:  What would you all prefer?  If you

3    both agree whether you want a 9:30 oral argument or a 1:30

4    oral argument, if you can both agree.

5        MR. GURVITS:  Let's do 1:30 to make sure we have

6    some time in the morning to prepare.

7        MR. TAUGER:  I was going to suggest 9:30 because

8    I would want to catch a flight back that day.

9        THE COURT:  Would you rather have it 10:30 or

10   11:00?

11       MR. GURVITS:  Sure.  Eleven o'clock would be

12   great, Your Honor.

13       THE COURT:  Oral argument on summary judgment on

14   Friday, July 11th, at 11:00 a.m.  By the way, with this

15   schedule, do not expect that if anyone moves to extend the

16   briefing schedule, even if it is unopposed, do not expect

17   it to be granted, because I'm giving myself a relatively

18   tight time here.  Now, that said, if someone asks for a

19   one-day extension, that's fine.

20       By the way, let me tell you too, I have decided

21   I was too loose previously allowing in cases motions to

22   exceed page limits.  It is not necessary.  You can all

23   live within your page limits.  Frankly, it has not

24   improved the quality of briefing, when I get a 50-page

25   brief, that should have been done in 35.  Don't plan on

1   asking for extension of page limits.

2          I don't think I should schedule anything further

3   past July 11th, but I will tell you this, at the oral

4   argument I might be prepared to rule from the bench.  I

5   might not.  So please bring your trial calendars to the

6   oral argument on July 11th just in case.  It is my plan

7   and expectation to be fully prepared.  So we will see

8   where we go on that.

9          By the way, I assume this is to a jury, correct?

10          MR. GURVITS:  Correct.

11          THE COURT:  Assuming that everything goes

12   forward to the jury, do you have a sense of how many trial

13   days you might all need?

14          MR. TAUGER:  I would really have to think about

15   this a little bit.

16          THE COURT:  That's fine.  Will you all make sure

17   you've thought about it.  You can answer that question

18   come July 11th.

19          All right.  The one date that I haven't

20   scheduled is the date to file an ADR, or alternative

21   dispute resolution report.  Let me ask you for your

22   suggestions of when it should be.  Frankly, in a case like

23   this with sophisticated lawyers on both sides, you don't

24   need me to put in an ADR deadline for the most part.

25          Here is my experience of why an ADR deadline is

1  not a bad idea:  Some lawyers -- and I think they are

2  wrong -- but some lawyers think it is a sign of weakness

3  to discuss settlement, to be the first one to broach the

4  possibility of settlement with the other side.  I

5  practiced 30 years before taking the bench two and a half

6  years ago.  I think that's wrong.  Some lawyers feel that

7  way.

8       One benefit of an ADR deadline, which has to be

9  filed jointly, it forces the parties to talk settlement

10  and not to simply let that opportunity slip by because

11  neither side wanted to be the first to raise it.  So I

12  think it is not a bad idea.

13       Now, whether or not you have that discussion and

14  you file your ADR report at about the time that fact

15  discovery closes and before everybody puts in the effort

16  and expense of dealing with expert discovery -- that's one

17  possibility -- and that's not a bad idea.  In some cases,

18  however, you are better off doing it after the expert

19  depositions have taken place so each side knows where each

20  other is, but before everyone puts the time and money into

21  briefing summary judgment.

22       So if you both agree, I will give you both what

23  you want.  Would you rather have the ADR report due

24  sometime in early March, after fact discovery closes but

25  before you have really put a lot of time and money into

experts?  Or would you rather have it due, say, sometime

late April or early May before you put the time and money

into dispositive motions?  What do you all think makes the

most sense?

MR. TAUGER:  With the understanding that this is

not a display of weakness of any kind, I like the earlier

date.  I think it helps narrow issues.

THE COURT:  Calista's counsel?

MR. GURVITS:  No objection to that.

THE COURT:  So let me schedule ADR reports due

March 7th, a week before your expert reports are due but a

week after your fact discovery is closed.  You don't need

to wait until March 7th to broach the topic about what do

you want to do about ADR.  As the case progresses, if you

want to do private mediation or do it the old-fashioned

way, lawyers to lawyers, or there are other possibilities.

It probably would not be particularly convenient

for you, but I'll give you the offer anyway.  We have an

outstanding staff mediator in this district.  She is a

former Oregon Supreme Court justice.  Her name is

Sue Leeson, and she is an outstanding mediator.  She has

got superb mediation skills, and she's very, very smart on

the law.  She is a former state Supreme Court justice, and

she is free of charge.  Her mediation book books up fairly

early.  So if you want her, probably the best time to

1    contact her and reach out is January or so, probably not

2    much later, or you are not going to get her by the March

3    time frame.  If you want to go that route, just send an

4    e-mail or call my courtroom deputy, Mary Austad, and we

5    will enter an order simply referring the case to the staff

6    mediator.

7           That will not stop any our deadlines, but it

8    will at least get you on her dance card, if you will, and

9    you will have that going.  Otherwise, you can get your own

10   private mediator, or you can do it without a mediator and

11   talk amongst yourselves.

12          My style is not to twist anyone's arms to

13   settle.  I think that most cases should settle, because it

14   is less expensive and more certain an outcome than not

15   settling.  That said, some cases don't settle, and that's

16   totally fine with me.

17          We were just counting it up this year, 2013.  I

18   tried nine trials.  One was a bench trial; eight were jury

19   trials.  Of those eight jury trials, three were criminal;

20   five were civil trials.  We don't mind trying cases here.

21   Frankly, I think when the parties can't resolve it

22   themselves, it is not a bad way to resolve a dispute.  So

23   we are willing to try it.  I'm not going to twist anyone's

24   arms to settle it, but nor am I going to let this case

25   drag on forever.

1          And I am totally serious about discovery

2     disputes.  If you have a discovery dispute that you can't

3     work among yourselves, obviously we insist that you have a

4     good-faith, meaningful conference with each other where

5     you talk it through.  But if you can't resolve it, send an

6     e-mail or phone call to my courtroom deputy, Mary Austad.

7     Tell her you have a discovery dispute.  I will make the

8     time to get on the phone and work my way through it.

9          I will give you have a general sense as to how I

10    approach discovery disputes.  Some discovery disputes

11    really have tough legal questions that are associated with

12    them, whether they be privilege issues or other types of

13    legal questions, that's fine.  The Court has to decide,

14    and that's what we're here for.

15         Other types of discovery disputes seem to me to

16    be one side being more unreasonable with the other than

17    the other side is being.  My general approach on that is

18    not to split the difference, but to simply agree with

19    whichever side is being more reasonable.  That said, I

20    know I have given an over-generalization.  If that gives

21    you insight how I approach discovery disputes, it is not a

22    bad idea in front of me to treat it like a baseball

23    arbitration:  The one that's most reasonable will probably

24    get what he or she wants.

25         We will get our opinion and order, if not today,

```
 1   then tomorrow.
 2           But as long as you are all here and/or on the
 3   phone, is there anything else that I can do to assist you
 4   all in this lawsuit while we're all here together right
 5   now?  I will start with counsel for the plaintiff.
 6           MR. GURVITS:  No, Your Honor.
 7           THE COURT:  Defendant?
 8           MR. TAUGER:  Nothing further, Your Honor.
 9           THE COURT:  Anything from anyone on the phone?
10           MR. PLOEN:  No, Your Honor.
11           THE COURT:  All right.  Safe travels.  Thank
12   you.  Very good.
13           MS. VRADENBURGH:  Thank you, Your Honor.
14           (Court adjourned.)
15
16
17
18
19
20
21
22
23
24
25
```

--oOo--


      I certify, by signing below, that the foregoing

is a correct transcript of the record of proceedings in

the above-entitled cause.  A transcript without an

original signature, conformed signature or digitally

signed signature is not certified.


/s/ Dennis W. Apodaca                    December 4, 2013
DENNIS W. APODACA, RDR, RMR, FCRR, CRR                DATE
Official Court Reporter