```
1           IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF OREGON

3

4   CALISTA ENTERPRISES LTD.,        )
                                     )
5           Plaintiff,               )   3:13-cv-01045-SI
                                     )
6       vs.                          )   June 17, 2014
                                     )
7   TENZA TRADING LTD.,              )   Portland, Oregon
                                     )
8           Defendant.               )

9

10

11

12

13            TRANSCRIPT OF PROCEEDINGS

14      BEFORE THE HONORABLE MICHAEL H. SIMON

15       UNITED STATES DISTRICT COURT JUDGE

16

17

18

19

20

21

22

23

24

25
```

```
 1                        APPEARANCES

 2   FOR THE PLAINTIFF:    Evan Fray-Witzer
                           Ciampa Fray-Witzer, LLP
 3                         20 Park Plaza, Suite 505
                           Boston, MA  02116
 4
                           Matthew Shayefar (Via telephone)
 5                         Boston Law Group, PC
                           825 Beacon Street, Suite 20
 6                         Newton Centre, MA  02459

 7                         Thomas Freedman, Jr.
                           Pearl Law LLC
 8                         522 SW Fifth Avenue, Suite 1100
                           Portland, OR  97204
 9
     FOR THE DEFENDANT:    Devon Zastrow Newman
10                         Alexandra Bodnar
                           Schwabe Williamson & Wyatt, PC
11                         1211 SW Fifth Avenue, Suite 1600
                           Portland, OR  97204
12
                           Paul Nathan Tauger
13                         The Eclipse Group LLP
                           2020 Main Street, Suite 600
14                         Irvine, CA  92614

15

16

17

18

19

20

21

22

23   COURT REPORTER:       Dennis W. Apodaca, RDR, RMR, FCRR
                           United States District Courthouse
24                         1000 SW Third Avenue, Room 301
                           Portland, OR  97204
25                         (503) 326-8182
```

```
 1                      (June 17, 2014)

 2                  P R O C E E D I N G S

 3          (Open court:)

 4          THE CLERK:  Your Honor, this is the time set for

 5   oral argument in civil case 13-1045-SI, Calista

 6   Enterprises, Ltd., et al. versus Tenza Trading, Ltd.

 7          For the record, we have appearing for the

 8   plaintiff by phone Matthew Shayefar.

 9          Counsel, in court, would you please identify

10   yourselves for the record.

11          MR. TAUGER:  Good morning (sic), Your Honor.

12   Paul Tauger, for moving party, Tenza.

13          THE COURT:  Good afternoon.

14          MR. TAUGER:  Good afternoon.

15          MR. FRAY-WITZER:  Good afternoon, Your Honor.

16   Evan Fray-Witzer for Calista Enterprises.

17          MR. FREEDMAN:  Good afternoon, Your Honor.

18   Thomas Freedman for Calista Enterprises.

19          MS. NEWMAN:  Good afternoon, Your Honor.

20   Devon Zastrow Newman for Tenza.

21          MS. BODNAR:  Good afternoon.  Alexandra Bodnar

22   for Tenza.

23          THE COURT:  Welcome.  Good afternoon.  Please be

24   seated.

25          There are several items on my agenda that I
```

1  would like to discuss with you all today, but I think we

2  should take up the first item being the pending motion by

3  Tenza to dismiss the complaint of Plaintiff Calista

4  essentially for lack of standing.  I have read the papers;

5  I have read the exhibits.

6          Is there anything further that Tenza would like

7  to add to its written materials?

8          MR. TAUGER:  Yes, Your Honor, briefly.  Thank

9  you.

10          Calista has framed its declaratory relief action

11  under the ACPA for essentially non-violation of 15 U.S.C.

12  1125(d).  There are two sections of trademark statutes

13  that deal specifically with domain names.  One is 1125(d),

14  which is what Calista brought its action under.  The other

15  is 15 U.S.C. 1114(2)(D).

16          1125(d) addresses actions that are brought for

17  registration or use of a domain based on, one, a bad faith

18  intent to profit where, two, the mark that is alleged to

19  be infringed is either distinctive or famous, and the

20  domain is confusingly similar to it.

21          The UDRP provisions have different elements.

22  The UDRP has the following three requirements:  It needs

23  to be identical or confusingly similar to the registered

24  domain -- I'm sorry -- the registered domain has to be

25  identical or confusingly similar to the registered

1      trademark.  I misspoke.

2              THE COURT:  I'm following you.

3              MR. TAUGER:  And the registered trademark has no

4      requirement that it be either distinctive or that it be

5      famous.

6              The second requirement is that the registrant

7      has no rights to the name.  This is a completely

8      independent requirement from 1125(d).

9              Then the third is that the registration was in

10     bad faith.  It has no requirement that the registration be

11     in bad faith with an intent to profit.

12             Accordingly, a determination of non-violation of

13     1125(d) has no effect on the UDRP provisions.  The UDRP

14     panel could still find violation on the part of Calista,

15     whereas this Court might find no ACPA violation, because,

16     for example, although there might have been a bad faith

17     intent, the intent was not to profit.

18             The relevant section, and the section we

19     maintain should have been applied in this case, is

20     15 U.S.C. 1114.  That is the section that specifically

21     references registrants.  1114(2)(D) says, "An action . . .

22     is any action of refusing to register or removing from

23     registration or transferring or temporarily disabling or

24     permanently canceling a domain name."  It says that the

25     registrant, whose domain name has been suspended,

1    disabled, or transferred, may bring an action.

2        1114 is a retrospective harm statute.  Both the

3    language used and the relief that the Court is authorized

4    to provide anticipates retrospective harm.  The Court can

5    issue orders requiring re-transfer or re-enabling or

6    un-suspending a domain name.  That assumes those actions

7    have already been taken.  The actions have not been taken.

8        So there are two issues here independent of

9    whether or not Calista is the owner.  The first is that

10   they brought the action under the wrong section.  They

11   brought it under 15 U.S.C. 1125(d).  15 U.S.C. 1125(d),

12   not only doesn't confer standing on Calista just by virtue

13   of the UDRP action, but it has completely different

14   requirements than the UDRP proceeding.

15       The second issue is 1114, which is the statute

16   they should have brought the action under.  That statute,

17   by its plain language, only addresses retrospective harm,

18   harm they have already incurred, not prospective harm,

19   harm they will incur if in fact the Court doesn't rule.

20       Thank you.

21       THE COURT:  Now, the first argument, the

22   retrospective, that's 1125(d); is that right?

23       MR. TAUGER:  1114 is the retrospective argument.

24       THE COURT:  Okay.  That's what you say they

25   didn't satisfy, correct?

1        MR. TAUGER:  I'm saying they didn't bring an

2   action under 1114.

3        THE COURT:  Because they didn't bring an action

4   under 1114(d), what's the consequence?

5        MR. TAUGER:  The consequence is you have to look

6   at standing from the standpoint of what they did plead.

7        THE COURT:  Right.

8        MR. TAUGER:  They pled 1125(d).  1125(d) has

9   nothing to do with the UDRP proceeding.

10        THE COURT:  Okay.

11        MR. TAUGER:  So the authorization of a

12   registrant to proceed doesn't apply to 1125, only 1114,

13   where the term "registrant" is expressly used.

14        THE COURT:  Can you call to my attention where

15   in your opening memorandum, Docket 74, where you make this

16   argument.

17        MR. TAUGER:  That argument is not in my opening

18   memorandum.

19        THE COURT:  Okay.  Then it is denied.

20        Can you cite any court in this district or what

21   other districts allow people to make new arguments not

22   raised in an opening memorandum?

23        MR. TAUGER:  Your Honor, no court does to my

24   knowledge.  I can explain that.  We did not discover this

25   until we were actually looking at the complex in the

1    context of the MSJ that both sides prepared.  Can I make

2    one more point?

3          THE COURT:  You may make whatever point you

4    want, but I am not going to consider an argument not made

5    in an opening motion.

6          MR. TAUGER:  Your Honor, the bench does have

7    discretion to do sua sponte review of standing on a

8    12(b)(1) motion.

9          THE COURT:  I understand that.  But I also

10   believe in fair litigation, and I don't think that it is

11   fair and appropriate for you to stand here now and make an

12   argument that was not raised in the opening motion.  So

13   that is done.

14          Let me also ask you this, and this sort of goes

15   back to, can I trust the counsel that are before me?  On

16   page 3 of your opening memorandum, Docket 74, I see the

17   following sentence:  "Calista now admits it does not have

18   standing to pursue this matter."  That's the statement

19   right above points and authorities.  Do you see it?

20          MR. TAUGER:  Yes, I do, Your Honor.

21          THE COURT:  I looked everywhere.  I couldn't

22   find Calista making that admission, that they did not have

23   standing.  You didn't cite to anything.  But where did

24   Calista admit that it does not have standing to pursue the

25   matter?

 1          MR. TAUGER:  The collective statements made by

 2     Calista constitute an admission that it does not have

 3     standing.

 4          THE COURT:  No, I don't think so.  Is this what

 5     you meant to say:  "That the collective statements made by

 6     Calista result in the implication and the legal conclusion

 7     that they do not have standing"?

 8          MR. TAUGER:  I would agree with the first part

 9     of that sentence.  I would say it is not a question of a

10     legal conclusion, but establish the facts that.

11          THE COURT:  Isn't there a difference between

12     saying "a particular party admits it doesn't have

13     standing" versus saying "a particular party admits facts

14     X, Y, and Z; and therefore, they don't have standing."

15          Isn't there a difference?

16          MR. TAUGER:  I think, Your Honor, the bench has

17     a different view of introductions to pleadings than

18     counsel.  I can certainly accept instruction in that.  But

19     my understanding of introductions has always been it is a

20     summary of your argument; what you are going to describe

21     to the Court.

22          THE COURT:  All right.  Let me ask you this:

23     For the argument that you did make in your opening

24     memorandum in support of your motion to dismiss,

25     Docket 74, do you now withdraw that argument, in light of

1  the facts presented by Calista in their response?

2          MR. TAUGER:  I do not, Your Honor.

3          THE COURT:  Okay.  Very good.

4          Then let me ask you some predicate questions to

5  make sure I understand what that argument really means.

6          Can you explain to me what is the definition of

7  a "registered name holder"?

8          MR. TAUGER:  A "registered name holder" is a

9  contractual definition as between ICANN, its registrars

10 and its registrants.  Per ICANN, it is whoever identifies

11 themself as the registrant when the application for a

12 domain name is made.

13         THE COURT:  Whoever identifies themselves as the

14 registrant?

15         MR. TAUGER:  Yes.

16         THE COURT:  What is the registrant?  Is that the

17 entity that owns or holds a domain name?

18         MR. TAUGER:  Sometimes it is; sometimes it is

19 not.

20         THE COURT:  Then what is a "registrant"?

21         MR. TAUGER:  A "registrant" is the entity that

22 makes the application.  Again, it is a contractual policy

23 as between ICANN, the registrars, and the registrants.

24 Whether it has legal meaning in the context of owner or

25 not is a separate question.

1          THE COURT:  Now, can there be a situation where

2     a registered name holder is different than an account at

3     the registry?

4          MR. TAUGER:  Oh, yes.  It is my understanding it

5     can.

6          THE COURT:  Now, the evidence I see here with

7     respect to your motion, it looks to me as if Oklax is the

8     account holder of the account at the registry of Moniker.

9          Am I reading it the same way you are?

10         MR. TAUGER:  Yes, that's correct.

11         THE COURT:  Do you have any evidence that Oklax

12    is the registered name holder of any of the disputed

13    domain names?

14         MR. TAUGER:  I'm not sure what the Court is

15    asking.  That it is the registrant?

16         THE COURT:  Well, I was going to take it one

17    step at a time.  It looks to me from the facts that Oklax

18    is the account holder at the registry known as Moniker,

19    and it looks to me as if Calista is the registered name

20    holder for the various disputed domain names, and I wanted

21    to know if, in your opinion, I was missing any facts.

22         So are there any facts to show that either

23    Calista is not the registered name holder of Moniker or

24    that Oklax is the registered name holder of any of the

25    disputed domain names?  That's the only thing we care

1    about.

2          MR. TAUGER:  I apologize, because I'm honestly

3    at a loss as to how to address the term "registered name

4    holder."  There is evidence that Oklax is the owner of the

5    domain.  That evidence is Mr. Zhukov's statement at his

6    deposition that Oklax owns domains.

7          When Calista submitted, under compulsion, their

8    supplemented response to discovery, they identified Oklax

9    as the holder of the account name -- I am sorry -- of

10    accounts, including the accounts for the

11    Calista-infringing domains.  Counsel clarified in the

12    opposition that, oh, Oklax owns some domains, but not the

13    infringing domains.

14          THE COURT:  Right.

15          MR. TAUGER:  However, in point of fact, Oklax is

16    not the registrant, the registered name holder, if I

17    understand how you are using the term, for any domains.

18    So that representation is either not true or, in this

19    instance, the account holder is the same as the owner.

20          THE COURT:  Now, I understand your statement

21    that you have been unable to locate any domain names for

22    which Oklax is the registrant.

23          MR. TAUGER:  That's correct.

24          THE COURT:  Whether they are the disputed domain

25    names or others.  Putting that aside, do you have any

1   evidence that Oklax is the registrant of any of the

2   disputed domain names?

3            MR. TAUGER:  No.  We concede that Oklax is not.

4            THE COURT:  Okay.  Very good.  All right.

5            Anything further on these issues, Mr. Tauger?

6            MR. TAUGER:  Nothing further.

7            THE COURT:  All right.  Let me first ask

8   Calista, what is the story with the factual representation

9   from defendant that Mr. Zhukov said in deposition that

10  Oklax owns some domain, not necessarily the domain names

11  -- frankly, not necessarily -- not the disputed domain

12  names, but that they own other domain names, yet now Tenza

13  tells us they did a search, and they tell us they can't

14  find Oklax as the registrant of any domain names.

15           What's Calista's view on this?

16           MR. FRAY-WITZER:  I have at least two responses

17  for you on that, Your Honor.  The first is that, with all

18  respect to my Brother, the fact that he couldn't find the

19  ownership or the registration doesn't mean that it doesn't

20  exist.  I would submit that the website that my Brother

21  used is less than useless.

22           THE COURT:  Which website was that, by the way?

23           MR. FRAY-WITZER:  That WAS WHO.IS.US.

24           THE COURT:  Okay.

25           MR. FRAY-WITZER:  So the Court knows, this

morning I went to WHO.IS.US, and I ran a search for Tenza,

which apparently doesn't own a single domain in the world

either.

THE COURT:  By the way, I did the same search

and came up with the same result.

MR. FRAY-WITZER:  I also searched, Your Honor,

for myself, because I know that I own at least a dozen

domains.  I apparently don't own any domains as well.

THE COURT:  I didn't do that; I didn't search

for you.

MR. FRAY-WITZER:  As a starting point, the site

is of no value.

THE COURT:  Do you know why that is?

MR. FRAY-WITZER:  I really don't.  It is not a

site that I have used in the past.  It is not a site that

I recognize.  I know WHO.IS.NET, but I have never seen

WHO.IS.US.  I just don't know who they are.

THE COURT:  Okay.

MR. FRAY-WITZER:  More than that, Your Honor,

even if you were to run a search, you wouldn't necessarily

find Oklax's domains, even if you did it at a site that

searches these things, because Oklax uses privacy

services, like almost every other website of this sort in

modern times.  So those aren't necessarily going to show

up.

```
 1            The overwhelming evidence that is in the record
 2    is that Calista is the registrant for every single one of
 3    the relevant domains.  The complaint alleges it.  The
 4    deposition testimony says it.  Every bit of discovery says
 5    it.  And here is what the Ninth Circuit says about
 6    registration --
 7            THE COURT:  Which case?
 8            MR. FRAY-WITZER:  First, Office Depot, Inc. v.
 9    DS Holdings.  It is, Your Honor, 596 F.3d 696.  I
10    apologize.  I'm at that age where I have to take off my
11    glasses to read to you.
12            The Ninth Circuit goes through the players in a
13    registration and says, "There are three primary actors in
14    the domain naming system.
15            "First, companies called 'registries' operate a
16    database (or 'registry') for all domain names within the
17    scope of their authority.
18            "Secondly, companies called 'registrars'
19    register domain names with registries on behalf of those
20    who own the name.  Registrars maintain an ownership record
21    for each domain name they have registered with the
22    registry.  Action by a registrar is needed to transfer
23    ownership of a domain name from one registrant to another.
24            "Third, individuals and companies called
25    'registrants' own the domain names."  Period.
```

1          THE COURT:  That's my understanding, too.  I

2    thought, and correct me if I have misunderstood, but I

3    thought that the ICANN registrar accreditation agreement

4    and things related like that are all in place so that a

5    member of the public can find out who really does own the

6    domain name, who is the registrant.  Am I right?

7          MR. FRAY-WITZER:  Correct, Your Honor.

8          THE COURT:  So how does it work with these

9    privacy designations?  How can someone actually own a

10   domain name yet evade ICANN's procedures for being

11   revealed as the registrant?

12         MR. FRAY-WITZER:  ICANN allows registrars and

13   third parties to offer privacy services to the registrant

14   of a domain.  Essentially they have set up rules for their

15   registrars to enable the registrar, so long as the

16   registrar keeps the records of who the owners are and

17   agrees to pass along any relevant information, you can

18   keep the name of the registrant itself out of the public

19   record.

20         There are a lot of reasons to do that.  For one

21   thing, people get spammed all the time if they are owners

22   of domains.  In this particular industry certainly

23   sometimes people don't want to publicize that they own

24   domains that deal with adult entertainment.  But in any

25   event, there is an entire system and set of rules that

1    ICANN set up for privacy companies or for the registrars.

2    I mean, GoDaddy itself and every one of the registrars

3    nowadays, when you register a new domain, gives you the

4    option if you would like to keep your own information

5    private.

6              So it is not nefarious.  There is a system set

7    up by which people can find out or the information gets

8    forwarded.  Certainly this Court knows.  This Court

9    ordered the information to be turned over, and that's what

10   happened in this case.

11             THE COURT:  Okay.  I do want to close that loop

12   earlier on Mr. Zhukov's testimony though, and I'm not

13   going to ask you to name the names, but is it correct what

14   he said, that Oklax owns some domain names?

15             MR. FRAY-WITZER:  Yes, Your Honor.

16             THE COURT:  Okay.  I will leave it at that.

17             You know what, I want to be fair on this.  Since

18   I did criticize Tenza's brief on a point, let me call to

19   your attention something that I noticed in Calista's brief

20   that either I misunderstood or there was less than candid

21   briefing.  I am willing to assume that I might have

22   misunderstood something.

23             On page 11 of Calista's brief, when we are

24   talking about Moniker, that third full paragraph, "The

25   Moniker service agreement between Moniker and its

1 customers indicates that an account holder is not

2 necessarily the domain name registrant, devoting

3 Section 25 to cases where the account holder is an agent

4 for a third party," and then it continues.

5       I read Section 25 very closely, and it just

6 simply talks generally about agents.  Granted, this

7 Moniker service agreement was in fine print, but I did

8 think I tried to read it closely.

9       Where in the Moniker service agreement does it

10 state or indicate that an account holder is not

11 necessarily a domain name registrant?  I got that, by the

12 way, from the ICANN stuff.  That's fine.  But I couldn't

13 find that in the Moniker service agreement.

14       MR. FRAY-WITZER:  My apologies, Your Honor.  I

15 don't have the service agreement in front of me.

16       THE COURT:  Well, you will in about ten seconds,

17 because I would like to find out.

18       MR. SHAYEFAR:  Your Honor, Matthew Shayefar.

19       THE COURT:  You may, as soon as I get it open.

20 It is Exhibit 10.

21       Go ahead, sir.

22       MR. SHAYEFAR:  It is a very general reference to

23 agents purchasing services from the domain name registrant

24 on behalf of other parties.

25       THE COURT:  Where do I find in the Moniker

service agreement the phrase "account holder"?

   MR. SHAYEFAR:  Not in that section, Your Honor.

   THE COURT:  Fine.  Then what section of the agreement?  Give me another section.  I read the entire fine print, and it looked like it is 30 pages.  It is not good for my eyes.  I couldn't find the phrase "account holder."

   MR. SHAYEFAR:  Your Honor, this entire agreement is with the account holder and any of the parties with whom the account holder is registering names.

   THE COURT:  Where does it say the phrase or the words "account holder"?

   MR. SHAYEFAR:  I don't believe that it is in there.  We were not -- speculating the instant phrase to account holder.

   THE COURT:  Well, I agree with you.  I didn't see it in there either.  I think it is disingenuous and not helpful to the Court to refer the Court to the Moniker service agreement and say that it indicates that an account holder is not necessarily the domain name registrant, because you get both the judge and the law clerk reading a long fine-print document looking for that.  That's not the type of advocacy that is accepted in the District of Oregon.

   All right.  Mr. Fray-Witzer, you may continue

1    with whatever response you wish to make to what Mr. Tauger

2    had argued.

3              MR. FRAY-WITZER:  Your Honor, I would note that

4    my Brother argues that under 1114(2)(D)(v) the only relief

5    the Court can order is retroactive relief; and therefore,

6    the only standing that is available is once the domain has

7    already been transferred away, and the harm has been done,

8    with all due respect, each of the circuit courts that have

9    considered that argument, and to date there are three of

10   them, the First, the Second, and the Fourth, each of them

11   has considered that precise argument.  Each of them has

12   rejected that precise argument.

13             THE COURT:  Would you give those cases, please.

14             MR. FRAY-WITZER:  The Second Circuit case,

15   Storey v. Cello Holdings, L.L.C., 347 F.3d 370 at page

16   383.

17             THE COURT:  And the Second Circuit, what year?

18             MR. FRAY-WITZER:  That's Second Circuit, 2003.

19             THE COURT:  Thank you.

20             MR. FRAY-WITZER:  Sallen v. Corinthians

21   Licenciamentos.

22             THE COURT:  Corinthians is good enough.

23             MR. FRAY-WITZER:  273 F.3d 14 at pages 18 to 25.

24   It is a First Circuit case from 2001.

25             Barcelona.com v. Excelentisimo --

1          THE COURT:  That's fine.  I know the Barcelona

2    case.

3          MR. FRAY-WITZER:  That's 330 F.3d 617.  It is a

4    Fourth Circuit case from 2003.

5          THE COURT:  F.3d at what page?

6          MR. FRAY-WITZER:  617.  The relevant discussion

7    is at pages 626 to 27.

8          In each of those cases, the Court acknowledges

9    the language of the statute and says that once the UDRP

10   has ruled that the domain should be turned over, that's

11   the moment that the registrant can file in court.  That's

12   the moment that the federal courts have jurisdiction over

13   the case.  That's the moment that there is standing to

14   bring the claim.  So that would be the response to that

15   argument, Your Honor.

16         THE COURT:  All right.  Thank you.  Since I said

17   I'm not going to entertain an argument that was not raised

18   in the opening motion, I'm not going to rule on this

19   issue.  If it is raised in a future motion, we will

20   address it at the appropriate time, but I do remind

21   everybody of their obligations under Rule 11, but we are

22   not going to address it substantively at this time.

23         So is there anything further that either side

24   thinks we should talk about with respect to Tenza's motion

25   to dismiss; namely, Docket 74, or should we move on to

other things?

MR. FRAY-WITZER:  No, Your Honor.

MR. TAUGER:  Briefly, Your Honor.

THE COURT:  Sure.

MR. TAUGER:  This was raised in our moving papers.  As we have argued in the pending motion to enter Mr. Zhukov's default and in the motion for leave to add Mr. Zhukov as a defendant in the first place, Mr. Zhukov hides behind a variety of corporate entities for which he is the sole owner and sole employee.

He uses Wiblax to hide his money.  He uses Oklax to hide the domains.  He uses AlexZ Traffic, which is responsible for the templates that are used on these domains.  And he uses Calista as the shell corporation that supposedly operates the domains, but all of them are Mr. Zhukov.

We respectfully submit that our motion, and to the extent that there is any confusion engendered by the motion, is the result solely of Mr. Zhukov's activities in this case.

Thank you.

THE COURT:  All right.  Thank you.  I will take that motion under advisement.

Let's talk about a couple of other things on my agenda, and then I'll be glad to turn to anything else

1    that you want to talk about.

2            One moment, please.

3            Speaking of Mr. Zhukov, we have a motion for

4    entry of default judgment as to counter-defendant

5    Alexander Zhukov.  That's Docket 90.  It was filed on

6    June 9th, 2014.  I think there was an inquiry from counsel

7    to my courtroom deputy asking when a response is due.  I

8    believe the response that was given was a response will be

9    due in two weeks plus the three days.  I'm not going to

10   ask for any substantive response now, but can I get an

11   indication from Calista's counsel, if you know, will I be

12   hearing from Mr. Zhukov, do you expect, including by a

13   special appearance or otherwise?

14           MR. FRAY-WITZER:  Yes, Your Honor.  You will in

15   some respects be receiving an opposition to the motion.

16   The thrust of the opposition is that there hasn't been any

17   service or attempted service on Mr. Zhukov.  There has

18   been no request to this Court for alternate service.

19   There has been no prior request that Mr. Zhukov be deemed

20   served.  Before a default can be entered, there has to be

21   some sort of service on Mr. Zhukov, and there hasn't been.

22           THE COURT:  We don't need argument on it now,

23   and I'm certainly not ruling on it now.  But I will offer

24   the following observation, because you all know the minute

25   order that I sent out.  I did receive and I did appreciate

1    Tenza's response.  That's Docket 93.  I have read the

2    cases that Tenza has cited.  At least I'll share my

3    perception.

4          There is a difference between personal

5    jurisdiction and service of process.  Now, before I got

6    Tenza's response, my general background and knowledge was

7    that if there is personal jurisdiction over usually a

8    corporation or an entity, then there would also be

9    personal jurisdiction over someone found to be an

10   alter ego of that person or entity.  If I'm wrong, by the

11   way, and anybody is welcome to show me authority that I'm

12   wrong, but that was my general background and knowledge,

13   that personal jurisdiction would follow an alter ego

14   finding.

15         But it was also my background and knowledge,

16   which may not be correct, but I don't know.  But it was

17   also my background and knowledge that before you can

18   actually haul someone into court and expect them to defend

19   a claim that they are an alter ego of someone else and

20   should be liable for that other's obligations, you had to

21   effect service, consistent with Rule 4 of the Federal

22   Rules of Civil Procedure.  That's why I put in the minute

23   order that I did, and I must admit I was surprised to see

24   in some of the cases cited by Tenza -- frankly, many of

25   the cases cited by Tenza are just personal jurisdiction

cases; they are not helpful.

But I do note that some of them do have, without much analysis, but they do have these statements that appear to say:  Well, if somebody is the alter ego for someone else, service on that someone else is sufficient for service of process.  Analytically, I haven't quite figured out how that could be.  I'm not positive that we have seen all of the thorough case discussion of that, but I'm interested in that point.

MR. FRAY-WITZER:  Your Honor, of the eight cases cited by Tenza in response to your request, six of them deal with nothing but personal jurisdiction -- six of them.

THE COURT:  I agree.

MR. FRAY-WITZER:  Of the remaining two, the first is a 30-year-old case that was one paragraph long that said:  Where the National Labor Relations Board has already found that the alter ego theory is appropriate, has already pierced the corporate veil, we deem that the service on the corporation in this limited circumstance of this kind of Board proceeding, we deem that to have been effective on the individual.

The second case, which cites to that first case, Your Honor, is actually mostly a personal jurisdiction case also.  It is ruling on personal jurisdiction.  In

1    passing, they happen to mention this case, but what's

2    entertaining about that case is basically they cite to the

3    National Labor Relations Board case.  In the second case

4    they say there was an agreement, a written agreement with

5    the corporation, as to how service would be effectuated.

6    The corporation agreed that service by Federal Express

7    would be sufficient.  They don't say, "We didn't serve the

8    individual."  They said that they served him by FedEx.

9    Because he was already found to have been the alter ego,

10    they said that the individual was bound by the same rules

11    that the corporation had agreed to, and so the service by

12    FedEx was proper.  So that leaves you with really one

13    one-paragraph case.

14        But in every single one of the eight cases, the

15    Court had already found that they needed to pierce the

16    corporate veil.  Our argument is going to be that that

17    hasn't happened here.  All the Court did was allow Tenza

18    to plead it.  They pled it, and that's fine.  But they

19    still need to effectuate service in some respect.

20        THE COURT:  I'm not going to rule on it.  I am

21    sharing some of my thinking so it will help frame your

22    arguments.  But have you found case law to the contrary

23    yet?

24        MR. FRAY-WITZER:  That, I can't answer.  I do

25    not recall, Your Honor.  I'm not sure that there are cases

```
 1   where people haven't attempted service on the individual.
 2   I will be looking for them.
 3           THE COURT:  Because I read the nine cases, or
 4   the eight cases.  I agree that most of them are personal
 5   jurisdiction.  I read the two that you've just talked
 6   about.  Then I decided to do about 10 or 15 minutes of
 7   quick research myself to see are there cases on the other
 8   side.  I couldn't find any.  After about 15 minutes of
 9   research, I said:  Ah, that's your job.  You find it.
10           MR. FRAY-WITZER:  Fair.
11           THE COURT:  Analytically, here is what's
12   troubling me about it, and I'm worried about the meld-over
13   into a due process concern.  Imagine the following
14   hypothetical, ignoring the parties here and the claims and
15   counterclaims:  Just imagine a plaintiff versus a
16   corporation, and the corporation is relatively
17   judgment-proof.  It doesn't have much money.  Plaintiff is
18   suing for some money, and the plaintiff makes the same
19   argument and says:  Person X, human being X, is an alter
20   ego, and here is some of my evidence that they are an
21   alter ego of the corporation.
22           Let's assume for my crazy hypothetical that they
23   are not.  There is just no connection, except human
24   being X has some money; it has a deep pocket.
25   Corporation X, because there is no real connection, no
```

loyalty to person X, doesn't care what happens to

person X.  So the corporation may either not fight it.  We

have the motion by plaintiff to bring in person X as an

additional defendant alleging that they are an alter ego.

The corporation chooses not to fight it or doesn't fight

it very diligently, so there is no real fight to show that

they are an alter ego.  So the Court really doesn't have

the benefit of seeing another side.  So the Court says:

Okay, fine.  They are an alter ego.  That person is now

in, even though there has been no personal service on

person X.  Now, let's go ahead with the litigation.

Corporation X knows it is in deep trouble on liability, so

it either doesn't fight very much or it loses; and

therefore, we now have a judgment against corporation

defendant and human being X.  The judgment is now there.

The Court has found alter ego.  Now, a judgment is being

registered wherever person X, human being X, has some

assets, and the plaintiff is now going to go after person

X's assets.  Person X says:  I have never heard of this

lawsuit.

         Now, obviously that's not the situation here.

But I'm thinking in my hypothetical:  Person X has never

heard of this lawsuit, has never had a fair opportunity to

challenge that finding of alter ego, yet has marshals or

sheriffs selling their property.  That just can't be

1    right.  That can't be the way Rule 4 operates.  That can't

2    be the way that due process would allow litigation to

3    operate.

4              If I'm wrong, show me the cases, and I will

5    learn something.  But that's my concern about this pending

6    motion, not from a personal jurisdiction perspective, but

7    from a service perspective.  We all know that there are

8    plenty of ways and plenty of power that a Court has to

9    effectuate alternative service against a defendant who is

10   trying to evade service and who otherwise would have

11   notice of a claim.

12             But I think just simply filing a pleading that

13   has a third-party claim and some evidence that says you're

14   an alter ego, surprised me.  So I look forward to fleshing

15   this out, unless the parties can figure out some other way

16   of dealing with this problem that might make that motion

17   moot.  If you can't, I will figure it out when you give me

18   the authorities.

19             MR. TAUGER:  If I may be heard briefly.

20             THE COURT:  Absolutely.

21             MR. TAUGER:  I want to clear up any confusion.

22   We were quite clear, I thought, in the supplemental

23   pleading that we filed with the Court that the six cases

24   that dealt only with personal jurisdiction, in fact, did

25   not deal with service and only dealt with personal

1  jurisdiction.

2          What we were construing was the limitation in

3  the Ninth Circuit opinion that could have been deemed to

4  hold it only to administrative proceedings like the

5  National Labor Review Board, and here there were other

6  cases in which they were taking this holding that appeared

7  to be limited and applying it in the District Court.

8          I would like to comment briefly on the Court's

9  question about what concerns the Court.  There are other

10  instances, not this one, where people wind up with

11  judgments against them, not having notice of the

12  proceeding which took place.

13          I spent a short period of time assisting a

14  friend with foreclosures in California.  There are various

15  notice requirements that are satisfied by a presumption of

16  notice rather than proof of actual notice, and you had

17  plaintiffs that were coming in and saying that they were

18  wrongfully foreclosed, because they had not received

19  notice.  The way the statutes are written, you can't undo

20  a sale unless certain things happen.

21          So the vehicle for them is to set aside the

22  judgment.  You can attack any judgment by any court on due

23  process grounds, on lack of notice grounds, on lack of

24  service grounds.  It is done all the time.  There are

25  vehicles that are available.

1        The Court mentioned that there is some evidence

2   here that Mr. Zhukov is an alter ego.  I would submit what

3   makes this case distinguishable from, for example, these

4   foreclosure cases I'm talking about, is that that evidence

5   was provided by Mr. Zhukov himself.  So this is deposition

6   testimony, it is declaration testimony by the person who

7   we alleged to be the alter ego.

8        THE COURT:  Well, keep this in mind, though, and

9   this is what I will confront, if I have to, but we are not

10  there yet, and that's this:  I have dealt with alter ego

11  cases under Oregon law.  I'm not quite sure which law

12  would apply under these circumstances, whether it would be

13  the law of Oregon, because of the forum, or the law of

14  Calista, which I know nothing about, because it is a

15  Republic of Seychelles company, and I know nothing of how

16  they.

17       Let's' assume we apply Oregon law or what we

18  normally would think of as normal alter ego law in the

19  United States.  The fact that someone is a sole

20  shareholder, the fact that someone is a sole manager, and

21  directs all of the activities of a company only satisfies

22  a few, but less than all of the elements to be an alter

23  ego.  There are other elements, and then it depends if

24  we're doing a tort analysis or a contract analysis.  There

25  are other elements of what has to be shown in order to

1    make someone an alter ego.

2           I'm really not sure, but I have not done a

3    thorough analysis, and I would like to see Mr. Zhukov's

4    response, if we have to get there, that the evidence you

5    have provided really shows anything more than he was the

6    sole shareholder, he was the sole manager, the sole

7    employee, he directed all of their business, because we

8    all know individuals who are the sole shareholders, sole

9    employee of corporations, and that ipso facto doesn't make

10   them an alter ego.

11          MR. TAUGER:  With respect, Your Honor, we also

12   show that he uses his personal credit cards for the

13   various corporations.  We also show that he is taking

14   money intended for one, putting it in another, that he

15   claims is unrelated.

16          THE COURT:  Sure.

17          MR. TAUGER:  And that he has the ability to claw

18   back and put back in if we were to get a judgment.  I

19   think we did analyze both Oregon alter ego law as well as

20   federal alter ego law in our moving papers.

21          If I could make one other point.  We had said

22   early in this case that Calista's sole goal in filing the

23   instant action was to block the transfer.  We offered as

24   examples of the attempt they made to delay litigation of

25   this case their own motion to stay, but we also cited

1  their refusal to try and make any attempt to serve the

2  complaint once it was filed.  In fact, we waived service

3  and filed an answer and counterclaim.

4          They claimed that, oh, they had made attempts to

5  serve.  That attempt to serve was calling me up and asking

6  me:  Will you accept service of process?  Well, that is

7  exactly what we have done here.  We asked them:  Will you

8  accept service of process for Mr. Zhukov?  Are you

9  authorized to do that?  And they said no.  I really

10 believe what is good for the goose is good for the gander

11 here.

12         THE COURT:  I don't recall anybody asking me to

13 rule on an inadequate service of process motion until we

14 got to the Zhukov matter.

15         MR. TAUGER:  That's correct.  I'm only bringing

16 the facts of this matter to the Court's attention.

17         Thank you.

18         THE COURT:  Okay.

19         All right.  That's the second item on our

20 agenda.  I have two more, a third and fourth.

21         I noticed yesterday the parties started filing

22 cross-motions for summary judgment.  I know that we have

23 oral argument scheduled on July 28th at 11:00 a.m. on

24 those motions.  I have not yet begun to read those

25 motions, obviously.  Frankly, I will wait until we get

responses and replies and read them all together.  I did

glance at them.

Is the essence of these motions and

cross-motions, at least part of it, that the domain names

used by Calista either are or are not, depending on who is

making the motion, as a matter of law, confusingly similar

to Tenza registered mark for porntube?  Am I right that's

part of this?

MR. TAUGER:  That is part of Tenza's argument.

There is also uses of our trademark on the actual

websites.

MR. FRAY-WITZER:  From our point of view,

Your Honor, we start as a matter of law with the phrase

"porntube" is a generic phrase.

THE COURT:  That is solved.  That, I'm going to

be spending a fair amount of time on.  I am going to spend

a fair amount on everything.  But that one, I find

interesting.  We will look at the arguments, the evidence,

and I will look at the law.  I get that.

I am scratching my head over both sides arguing,

when Tenza argues as a matter of law the disputed domain

names used by Calista are confusingly similar to porntube,

and Calista arguing as a matter of law that they are not

confusingly similar, I am sort of scratching my head and

saying:  Why are people doing this?  Are those really

1    going to be matters of law?

2          By the way, has anybody submitted -- and I

3    haven't looked at your evidence yet -- but is there going

4    to be expert testimony to support each side's position as

5    a matter of law?

6          MR. FRAY-WITZER:  There is expert testimony on

7    both sides, Your Honor.  Obviously I would say that

8    obviously each side thinks they have sufficient evidence

9    to sway you that no reasonable juror could conclude the

10   other way.

11         As a personal matter, I think the stronger

12   arguments come in the questions of genericness as a matter

13   of law, because I think some of those can be dealt with

14   more easily as a matter of law.  Obviously both sides have

15   marshaled some evidence.

16         THE COURT:  Okay.  Obviously I am here to rule

17   on matters that properly come before me.  I don't mind

18   working hard, and I, frankly, find lots of what I do very,

19   very interesting.  That said, if as both sides are

20   preparing their response briefs, if you want to confer

21   with each other and decide to withdraw certain arguments,

22   because you think that although you may have the better of

23   the argument in terms of its persuasiveness to a jury,

24   maybe on hindsight, after reading what each other has

25   said, maybe they are not appropriate for summary judgment,

1  you are welcome to do so.  If you don't, I will rule on

2  what's before me.

3           That takes care of that item on my agenda.

4           My final item on my agenda, and then I will turn

5  to whatever else, if anything, you all want to discuss, is

6  the following:  Since you all are from out of town, you

7  probably don't know me too well.  I do not twist anybody's

8  arms to settle.  Last year, I tried nine trials in 2013.

9  Five of them were civil cases; four of them were criminal

10  cases.  Tomorrow, I start my fifth trial of this year.

11  That's in a civil CERCLA case.  I don't mind trying cases.

12          That said, I also think that litigants are well

13  served by their lawyers, if their lawyers at least advise

14  them about the possibility of settling a dispute, explore

15  it with the other side, and then the clients can make

16  knowing and informed decisions.  Sometimes cases settle;

17  sometimes they don't.  And sometimes they are assisted by

18  a very knowledgeable mediator.

19          Now with very, very rare exception, and I don't

20  consider this case an exception, but with a very, very

21  rare exception, I do not ever order parties to a

22  mediation.  There is sophisticated counsel here.  You know

23  whether your client wants to or should talk about

24  settlement.  You know whether or not there are mediators

25  that you could or should consult.  I am not going to order

anybody to mediation here.  You are on your own.  In about
in a minute or two, I'm going to even stop talking about
this topic.

But I bring it up for the following reasons:
About two months ago I met a fellow who I found very
impressive.  I didn't talk to him about this case
obviously, but we talked trademark law generally.  He is a
practitioner in the Bay Area.  In a few moments I am going
to give you his resume.

The conversation started because he was giving a
lecture to a number of federal judges as part of a program
that we all take on various topics.  I was down at
Old Law School for a week taking a course on patent,
copyright, and trademark law.  He was one of the
instructors on trademark law.  We had a casual dinner with
the instructors and the judges.  It was just all federal
judges from around the country.  There were about around
35 of us who were in the program.

We were having a casual dinner, and he was at
the table that I was at dinner.  He mentioned that he
recently gotten back from Europe where he had mediated a
trademark case.  Within the bounds of appropriate
confidentiality, he was telling me a little bit about the
case that he mediated.

I asked him does he do much trademark mediation.

He said pretty much that's what he is doing now about
three-quarters of his time.  He originally was a copyright
and trademark litigator, trying cases all over the
country.  He was one of the founders -- I will give this
to you in a few moments -- of the International Trademark
Association.  He is on their distinguished panel of
neutrals.  Frankly, he says he goes around the world
mediating trademark disputes.  So I asked him a little bit
about how that happens, and we had some interesting
conversations.  Again, he didn't tell me anything
confidential about his matter.  I did not talk to him
about this case other than to say I have got a trademark
cases before me, but one of them involves some
international players.

          I said, do you mind if I pass on them your name
and your bio material?  And he didn't mind.  So I'm
passing this out to you.

          Mary, will you pass this out.  Give two copies
to each table.

          His name is Peter Harvey.  He is in
San Francisco at the firm of Harvey Siskind.  This is his
bio statement that I'm passing out from his website.  I
will conclude with the following comment, and I'm quite
sincere with this.  You should not feel any pressure at
all from me.  I'm not intending to give any pressure to

1    either settle the case, mediate, or even if you choose to

2    mediate, mediate with Peter Harvey.  You have no pressure.

3    There is no obligation to do it.  Frankly, even if you

4    choose to mediate with him, and if it doesn't settle, I

5    don't even want to know necessarily that you called him.

6    That's not why I'm saying this.

7            I'm offering this as information that sometimes

8    parties may say:  Well, we would like to mediate, but

9    there are so many esoteric issues here, we really need an

10   expert in our field.  There are some interesting and some

11   esoteric issues with trademark with some international

12   dimensions to it.  This might be a very good person, but

13   that's for you to decide, for you to evaluate.

14           I'm totally sincere and serious you're under no

15   pressure from the Court to mediate or even to consider

16   Peter Harvey, if you choose to, or use anyone else, or not

17   at all.  I just offer this as a matter of information to

18   the extent that it may assist your clients.

19           Any questions about that?

20           Okay.  That concludes my agenda.

21           Anything that anyone else would like to raise?

22           MR. FRAY-WITZER:  No, Your Honor.

23           MR. TAUGER:  Nothing further, Your Honor.

24           THE COURT:  Have a good day.  Safe travels.

25           COUNSEL:  Thank you, Your Honor.

1          (Court adjourned.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

--oOo--

         I certify, by signing below, that the foregoing
is a correct transcript of the record of proceedings in
the above-entitled cause.  A transcript without an
original signature, conformed signature, or digitally
signed signature is not certified.

/s/ Dennis W. Apodaca                    June 23, 2014
DENNIS W. APODACA, RDR, RMR, FCRR, CRR              DATE
Official Court Reporter