IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **CALISTA ENTERPRISES LTD.**, *a Republic of Seychelles Company*, <br><br>  Plaintiff, <br><br> v. <br><br> **TENZA TRADING LTD.**, *a Cyprus Company*, <br><br>  Defendant, <br><br> v. <br><br> **ALEXANDER ZHUKOV**, *a Czechoslovakian citizen*, <br><br>  Counterclaim-Defendant. | Case No. 3:13-cv-01045-SI <br><br> **OPINION AND ORDER** |

Valentin David Gurvits and Matthew Shayefar, BOSTON LAW GROUP, PC, 825 Beacon Street, Suite 20, Newton Centre, MA 02459; Sean Ploen, PLOEN LAW FIRM, PC, 100 South Fifth Street, Suite 1900, Minneapolis, MN 55402; Evan Fray-Witzer, CIAMPA FRAY-WITZER, LLP, 20 Park Plaza, Suite 505, Boston, MA 02116; Thomas Freedman Jr., PEARL LAW LLC, 522 S.W. Fifth Avenue, Suite 1100, Portland, OR 97204. Of Attorneys for Plaintiff.

Paul N. Tauger and Anna M. Vradenburgh, THE ECLIPSE GROUP LLP, 2020 Main Street, Suite 600, Irvine, CA 92614; Devon Zastrow Newman and Catherine B. Brinkman, SCHWABE, WILLIAMSON & WYATT, P.C., 1211 S.W. Fifth Avenue, Suite 1900, Portland, OR 97204. Of Attorneys for Defendant Tenza Trading Ltd.

**Michael H. Simon, District Judge.**

In this action, Plaintiff Calista Enterprises Ltd. ("Calista") seeks declaratory and

injunctive relief. Defendant Tenza Trading Ltd. ("Tenza") has a trademark registration for the

mark "PORNTUBE," registration number 3,936,197 ("the '197 Registration"). Before this case was filed, Tenza initiated a proceeding under the Uniform Domain Name Dispute Resolution Policy ("UDRP") of the Internet Corporation for Assigned Names and Numbers ("ICANN"). In that UDRP action, Tenza sought the transfer to Tenza of 13 domain names, which Calista contends it owns, based on their substantial similarity to and alleged infringement of to the '197 Registration. A UDRP arbitration panel ruled in favor of Tenza, and Calista then filed this lawsuit. The filing of this lawsuit prevented the immediate transfer to Tenza of the disputed domain names pursuant to the UDRP panel's decision.

Tenza asserts that, during the course of discovery in this lawsuit, it found evidence that establishes that the Court lacks subject-matter jurisdiction over Calista's Complaint. Accordingly, Tenza moves to dismiss this lawsuit under Rule 12(b)(1) of the Federal Rules of Civil Procedure. For the reasons that follow, the Court denies Tenza's motion to dismiss.

## STANDARDS

"Federal courts are courts of limited jurisdiction." *Gunn v. Minton*, 133 S. Ct. 1059, 1064 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). As such, a court is to presume "that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377 (citations omitted); *see Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of "subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived." *United States v. Cotton*, 535 U.S. 625, 630 (2002). An objection that a particular court lacks subject matter jurisdiction may be raised by any party, or by the court on its own initiative, at any time. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006); Fed. R. Civ. P. 12(b)(1). The Court must dismiss any case over which it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3).

PAGE 2 – OPINION AND ORDER

A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction may be either "facial" or "factual." *See Safe Air for Everyone*, 373 F.3d at 1039. A facial attack on subject matter jurisdiction is based on the assertion that the allegations contained in the complaint are insufficient to invoke federal jurisdiction. *Id.* "A jurisdictional challenge is factual where 'the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction.'" *Pride v. Correa*, 719 F.3d 1130, 1133 n.6 (9th 2013) (quoting *Safe Air for Everyone*, 373 F.3d at 1039)). When a defendant factually challenges the plaintiff's assertion of jurisdiction, a court does not presume the truthfulness of the plaintiff's allegations and may consider evidence extrinsic to the complaint. *See Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012); *Safe Air for Everyone*, 373 F.3d at 1039. A factual challenge "can attack the substance of a complaint's jurisdictional allegations despite their formal sufficiency." *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1996) (citation and quotation marks omitted).

## BACKGROUND

**A. Internet Domain Names and ICANN**

In its most basic form, "the Internet is a collection of interconnected networks of computers." George B. Delta & Jeffrey H. Matsuura, LAW OF THE INTERNET § 1.02 (2014). The foundation of the Internet as we know it today is essentially a privatization and expansion of the U.S. Department of Defense's network, ARPANET, created in the 1970s. *Id.* The general structure of the Internet "consists of three basic parts: local networks, mid-level networks, and national 'backbone' networks." *Id.* Computers connected to the Internet have an assigned unique identifying number, known as an Internet Protocol ("IP") address. David Bender, *Computer Law* § 3D.05[1]. When connected to a network, computers use IP addresses to connect with one another. *See id.* Because of the difficulty in referencing and using a long string of numbers, entities that seek to maintain an Internet website reserve a location using an alphanumeric

PAGE 3 – OPINION AND ORDER

domain name that corresponds to an assigned IP address. *Image Online Design, Inc. v. Core Ass'n*, 120 F. Supp. 2d 870, 872 (C.D. Cal. 2000). As a result, individuals generally use these more colloquial domain names rather than a formal IP address to access other computers and websites. *Computer Law* § 3D.05[1].

The alphanumeric domain name, akin to a street address or telephone number, is typically organized in two levels: "a Second Level Domain and a Top Level Domain." *Image Online Design*, 120 F. Supp. 2d at 872 n.2; *see also Computer Law* § 3D.05[1]. The Second Level Domain ("SLD") of a domain name, typically "a term or series of terms," is followed by a Top Level Dopmain ("TLD") that describes the nature of the enterprise (such as ".com" (commercial) or ".gov" (government)). *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1044 (9th Cir. 1999); *see Computer Law* § 3D.05[1].

Historically, various entities managed or regulated the Internet, but as relevant to this case, ICANN currently plays a major role in managing the use of domain names. On November 25, 1998, the U.S. Department of Commerce and ICANN entered into a plan for the management of the domain name system (the "ICANN MoU"). *See Computer Law* § 3D.05[2]; ICANN MoU, *Memorandum of Understanding Between the U.S. Department of Commerce and Internet Corporation for Assigned Names and Numbers*.[1] Pursuant to the ICANN MoU, one of ICANN's management functions is policing the allocation of IP addresses and domain names. *Computer Law* § 3D.05[2].

For any given TLD, ICANN designates a "registry," which is the "official entity that maintains all official records regarding registrations in that top level domain." *Id.* § 3D.05[3]. "A registrar is one of several entities, for a given TLD, that is authorized by ICANN to grant

---

[1] *Available at* https://www.icann.org/resources/unthemed-pages/icann-mou-1998-11-25-en (last accessed July 23, 2014).

PAGE 4 – OPINION AND ORDER

registrations of domain names to registrants." *Id.* After documenting a registration by a registrant, the "registrars transmit their registration information to the registry." *Id.* "An accredited registrar assigns domain names on a first-come, first-serve basis," only considering whether another party has already registered the name as a domain name and not considering other potential issues such as who holds what rights under trademark law. LAW OF THE INTERNET § 8.02. Because each domain name is unique, the rights to domain names are valuable and often highly contested. *Computer Law* § 3D.05[1]; LAW OF THE INTERNET § 8.02

In the Registrar Accreditation Agreement ("RAA") between ICANN and each registrar, ICANN requires a registrar to maintain certain information regarding registrants. Shayefar Decl. Ex. 7, Dkt. 80-7 at 3 (Section 1.16 defining a "Registered Name Holder" as "the holder of a Registered Name (or domain name)"). ICANN also has particular requirements for entitles that pay for the registration of a domain name but are not themselves a registrant or "Registered Name Holder." *Id.* at 1-2 (Section 1.1 defining an "Account Holder" as "the person or entity that is paying for the Registered Name or otherwise controls the management of the registered name, *when that person or entity is not the Registered Name Holder*" (emphasis added)).

In order to determine the registrant of a domain name, ICANN mandates that registrars provide data for the "Whois Accuracy Program," which contains relevant information about a registrant (defined in the RAA as a "Registered Name Holder"). *Id.* at 7 (RAA requires public access to data regarding registered domain names through the "Whois" service). The "Whois Accuracy Program Specification" provides that the registrar will verify "the email address of the Registered Name Holder (and, if different, the Account Holder)" and "the telephone of the Registered Name Holder (and, if different, the Account Holder)." *Id.* at 39. In the event a registrar does not receive an affirmative response from a Registered Name Holder with the

PAGE 5 – OPINION AND ORDER

verification information noted above, a registrar is required to "verify the applicable contact information manually or suspend the registration, until such time as [the registrar] has verified the applicable contact information." *Id.*

Disputes related to the registration of domain names are governed by the ICANN UDRP, pursuant to private contracts. *Parisi v. Netlearning, Inc.*, 139 F. Supp. 2d 745, 747-48 (E.D. Va. 2001). The UDRP mandates that "[a]ll registrars must follow" the UDRP. ICANN, *Uniform Domain Name Dispute Resolution Policy: General Information*.[2] Moreover, all registrants are contractually bound to participate in the UDRP. ICANN, *Uniform Domain Name Dispute Resolution Policy*.[3] Further, "by applying to register a domain name," a registrant represents that it has made complete and accurate statements in its registration agreement, the domain name would not infringe upon the rights of a third party, the registration was not done with an unlawful purpose, and the domain name will not be used in violation of any applicable law or regulation. *Id.* Thus, the UDRP governs the relationship between the registrar and its customer (the domain name holder or registrant). Shayefar Decl. Ex. 7, Dkt. 80-7 at 1.

The UDRP also allows third-party complainants to challenge a domain name that may be violating the rights of that third party. UDRP ¶ 4(a). A complainant in a UDRP proceeding must prove that the disputed "domain name is identical or confusingly similar to a trademark or service mark in which the complainant has rights," that the registrant has "no rights or legitimate interests in respect of the domain name," and that the domain name "has been registered and is being used in bad faith." *Id.* The respondent in a UDRP proceeding is the registrant ("the holder

---

[2] *Available at* https://www.icann.org/resources/pages/udrp-2012-02-25-en (last visited July 23, 2014).

[3] *Available at* https://www.icann.org/resources/pages/policy-2012-02-25-en (last visited July 23, 2014).

of a domain-name registration against which a complaint is initiated"). *Id.*; *See ICANN, Archived Rules for Uniform Domain Name Dispute Resolution Policy* ("the holder of a domain-name registration against which a complaint is initiated.").[4] "If the [UDRP] panel rules in the complainant's favor, the only available remedy is for the registrar to cancel the domain name registration or transfer it to the complainant." *Parisi*, 139 F. Supp. 2d at 747. Registrars automatically implement a UDRP panel decision ten days after a panel decision is issued unless the aggrieved registrant commences "a lawsuit against the complainant in a jurisdiction to which the complainant has submitted." UDRP ¶ 4(k); *Parisi*, 139 F. Supp. 2d at 747.

### B. The Pending Lawsuit

Tenza is the owner of both an adult entertainment website at www.porntube.com and the '197 Registration. Tenza's business model is to route traffic to its website through an affiliate program, whereby operators of other adult entertainment websites ("affiliates") include links on their websites so that visitors to those websites "click through" to Tenza's website. Tenza then tracks each "click through" and compensates affiliates on a per-click-through basis. Calista participated in Tenza's affiliate program for two years. Calista contends that, with Tenza's knowledge and consent, Calista separately registered and operated 13 domain names (the "Disputed Domain Names") that include or refer to Tenza's '197 Registration. Tenza denies that it gave Calista any such consent.

On March 25, 2013, Tenza filed a complaint against Calista under the UDRP. After following its procedures, the UDRP panel issued findings and an order that the Disputed Domain Names be transferred to Tenza. On June 21, 2013, Calista filed in this federal action, alleging four claims for relief: (1) declaratory and injunctive relief pursuant to the Anticybersquatting

---

[4] *Available at* http://archive.icann.org/en/udrp/udrp-rules-24oct99.htm (last visited July 23, 2014).

PAGE 7 – OPINION AND ORDER

Consumer Protection Act,[5] 15 U.S.C. § 1125(2)(D)(5); (2) a declaration of non-infringement of the '197 Registration; (3) a declaration of no unfair competition; and (4) cancellation of trademark registration pursuant to 15 U.S.C. § 1119.[6] Pl.'s Compl., Dkt. 1, ¶¶ 67-95. In Calista's Complaint, it alleges that it is the owner of the Disputed Domain Names. *Id.* ¶¶ 6, 7, 8, 33, 43, 64.

In its Answer and First Amended Counterclaims, Tenza alleges seven counterclaims, in addition to various affirmative defenses. Tenza's alleged counterclaims are for: (1) trademark infringement under 15 U.S.C. § 1114; (2) federal unfair competition pursuant to 15 U.S.C. § 1125(a); (3) common law trademark infringement; (4) counterfeiting pursuant to 15 U.S.C. § 1116; (5) cybersquatting pursuant to 15 U.S.C. § 1125(d); (5) unlawful receipt of profits as constructive trustees related to the infringement and counterfeiting counterclaims; (6) accounting of profits received under 15 U.S.C. §§ 1116 and 1117; and (7) conversion of the '197 Registration. Def.'s Am. Answer, Dkt. 59-1.

---

[5] In 1999, Congress passed the Anticybersquatting Consumer Protection Act ("ACPA") as an amendment to the Lanham Act to prohibit cybersquatting. "[C]ybersquatting occurs when a person other than the trademark holder registers the domain name of a well known trademark and then attempts to profit from this by either ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder." *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 680 (9th Cir. 2005) (quoting *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 204 (6th Cir. 2004)).

[6] In addition to this lawsuit, and during the pendency of the UDRP proceeding, Calista filed a Petition for Cancellation of the '197 Registration before the Trademark Trial and Appeal Board ("TTAB") of the United States Patent and Trademark Office (the "PTO"). Calista requested that the UDRP panel defer its ruling to the TTAB, which the UDRP panel denied. Calista also filed a motion to stay the pending lawsuit in favor of the TTAB proceeding, which this Court denied. Dkt. 37. On October 14, 2013, Tenza filed a motion to suspend proceedings before the TTAB pending a final resolution of this lawsuit. On November 22, 2013, Tenza and Calista filed a motion stipulating to suspend the TTAB proceedings, which the TTAB granted on December 2, 2013. PTO, TTABVUE, Trademark Trial and Appeal Board Inquiry System, Proceeding No. 92057048, *available at* http://ttabvue.uspto.gov/ttabvue/ (last visited June 12, 2014).

The parties have been actively engaged in discovery. On January 8, 2014, Tenza served a deposition subpoena and a subpoena *duces tecum* on Moniker Online Services, LLC ("Moniker"), who serves as the registrar for the Disputed Domain Names. In response, Moniker produced a copy of the account profile for Account 30187, which is associated with the Disputed Domain Names. The "username" associated with that account is "alxzkat7," the first and last name on the account is "Alexander Zhukov," and the associated company name is "Oklax Inc." Tauger Decl. Ex. A, Dkt. 75-1 at 1. On January 8, 2014, Tenza deposed a representative from Moniker. Tauger Decl. Ex. E, Dkt. 75-5 at 2-4. Tenza asked the following question, and Moniker gave the following answer:

> Q: What domains has Calista registered through Moniker?
>
> A: In response to the subpoena, there was a list of five search terms that were given to us to identify names that were owned and operated by Calista. We did a search of our system and we identified a single user account. That's Account 30187.

*Id.* at 2. Tenza also asked if Calista provided Moniker with the user name, first and last name, company name, and other contact information for Account 30187. *Id.* at 3-4. Moniker responded that Calista did provide that information. *Id.*

On January 16, 2014, Tenza deposed Alexander Zhukov, Calista's corporate representative, in Prague, Czech Republic. Tenza asked Zhukov "[w]hat is Oklax" and if Zhukov had an ownership interest in Oklax. Tauger Decl. B at 25:3-11, Dkt. 75-2 at 2. Zhukov explained that Oklax is "a company" and that he had an ownership interest. Tenza next asked and Zhukov answered:

> Q: What does Oklax do?
>
> A: Company named Oklax is an owner of domain names.

*Id.* at 3, 26:2-4.

PAGE 9 – OPINION AND ORDER

On April 7, 2014, Calista provided its first supplemental objection and response to Tenza's request for production ("RFP") number three. Tauger Decl. Ex. C, Dkt. 75-3 at 2-5. Tenza requested, in relevant part, documents that establish information related to persons or entities that have "any responsibility for, or perform any functions or services in connection with, any website that is owned, controlled, or managed" by Calista and "include the words 'porn' and 'tube,' in any combination, in the domain name." *Id.* at 2. In response, Calista identified: "Oklax Inc., a Dominica corporation, . . . holds the domain name registrar account which include[s] Calista's domain names that include "porn" and "tube," in any combination." *Id.* at 4. On April 17, 2014, Tenza filed the pending motion to dismiss Calista's Complaint on the basis that the Court lacks subject matter jurisdiction and because Calista cannot state a claim under the Declaratory Judgment Act, 28 U.S.C. § 2201.

## DISCUSSION

### A. Article III Standing

Tenza argues that Calista lacks standing to bring this suit because Oklax Inc., not Calista, is in fact the owner of the Disputed Domain Names. As a result, Tenza contends that Calista is not asserting its own legal rights and interests and, instead, is resting its claim for relief on the legal rights or interests of the third party Oklax Inc. Def.'s Mot., Dkt. 74 at 9 (citing *Powers v. Ohio*, 499 U.S. 400, 410 (1991)). Calista responds that Tenza's interpretation of the evidence is factually inaccurate and that it does in fact have standing to assert its claims.

Article III standing "is [a] threshold [requirement] in every federal case," determinative of "the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The essential question is whether a plaintiff can satisfy the "case or controversy" requirement of Article III of the Constitution. U.S. Const. art. III, § 2, cl. 1; *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000).

PAGE 10 – OPINION AND ORDER

To satisfy the requirements of Article III, a plaintiff must demonstrate: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Laidlaw*, 528 U.S. at 180-81. "Standing is determined by the facts that exist at the time the complaint is filed." *Clark v. City of Lakewood*, 259 F.3d 996, 1006 (9th Cir. 2001). Article III's prerequisites apply to actions requesting declaratory relief. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126-28 (2007).

In addition to the Article III standing requirements, the Supreme Court also prescribes certain prudential standing requirements.[7] *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2663 (2013). One such requirement is that a party must "assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers*, 499 U.S. at 410; *see Rhoades v. Avon Products, Inc.*, 504 F.3d 1151, 1157 (9th Cir. 2007) (applying the rule from *Powers*). There are "certain, limited exceptions" to the rule on third-party interests, *Powers*, 499 U.S. at 410, none of which are argued by the parties in the pending motion.

The evidence submitted by the parties supports Calista's argument that it owns the Disputed Domain Names. Regarding the information provided by Moniker, the Court notes that

---

[7] The Supreme Court recently clarified that issues sometimes discussed in terms of "standing" are more appropriately viewed as interpretations of a statutory cause of action and analyzed the formerly-prudential standing inquiry related to the "zone of interest" test in such a light. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386-88 (2014). Justice Scalia, authoring the majority opinion, cabined his analysis and noted that the "limitations on third-party standing are harder to classify; we have observed that third-party standing is 'closely related to the question whether a person in the litigant's position will have a right of action on the claim.'" *Id.* at n.3 (quoting *Dep't of Labor v. Triplett*, 494 U.S. 715, 721 n.** (1990)). Because of this complication, the Court concluded that "consideration of that doctrine's proper place in the standing firmament can await another day." *Id.* As a result, this Court continues to analyze standing under the test established by the Supreme Court in *Powers v. Ohio*, 499 U.S. 400 (1991).

PAGE 11 – OPINION AND ORDER

there is a distinction between: (1) a registrant of a domain name; and (2) an account holder of a domain name on file with a registrar. *See supra* Background Section A. Moniker listed the "company" for the relevant account as Oklax Inc., but at no time stated that Oklax Inc. owned or was the registrar for the domain names. *See* Tauger Decl. Ex. E, Dkt. 75-5 at 2-4. Consistent with this information, Calista filed a supplemental response to Tenza's request for production, explaining that Oklax Inc. "holds the domain name registrar account" at Moniker that are associated with the Disputed Domain Names. Tauger Decl. Ex. C, Dkt. 75-3 at 4.

Calista provided the Court with sworn discovery responses stating that it is in fact the owner of the Disputed Domain Names. *See* Shayefar Decl. Ex. 1, Dkt. 80-1 at 4 (Calista's third supplemental objection and response to Tenza's Interrogatory No. 2: "[I]n the past 5 years Calista has owned, managed, or otherwise controlled the Internet domain names" in dispute); Shayefar Decl. Ex. 2, Dkt. 80-2 at 9 (Calista's objections and responses to Tenza's first set of interrogatories, including Interrogatory No. 2, explaining again that Calista "has owned, managed or otherwise controlled" a specific list of domain names that include the "word(s) 'porntube' or 'porn tube'"); *id.* at 11-12 (explaining that Calista "registered the domain name[s]" listed in response to Tenza's Interrogatory No. 2).

Calista also submitted the deposition transcript of Alexander Zhukov. Shayefar Decl. Ex. 2, Dkt. 80-3 at 1-7. At Zhukov's deposition, Counsel for Tenza asked Zhukov: "One of the domains that Calista owns that is at issue is KissPorntube.com; is that right?" *Id.* at 6, 83:25-84:2. Zhukov responded: "Correct." *Id.* at 6, 84:3. Zhukov further explained that Calista owns "LargePorntube.com" and "PipePorntube.com." *Id.* at 6, 84:10-22. Counsel for Tenza asked Zhukov: "Was it you or Calista who registered TubePornLarge, TubePornPipe and TubePornkiss.com." *Id.* at 7, 85:4-5. Zhukov responded: "Calista." *Id.* at 7, 85:6. Calista's

PAGE 12 – OPINION AND ORDER

evidence is further buttressed by the "Whois" domain name search data, which identifies "Calista Enterprises Ltd." as the registrant of the Disputed Domain Names. Shayefar Decl. Ex. 6, Dkt. 80-6.

Tenza's remaining arguments on this issue do not change this conclusion. Tenza contends that neither the Anticybersquatting Consumer Protection Act nor the ICANN and UDRP proceedings themselves can establish standing. Calista cited these sources in its response brief not to claim that they create subject-matter jurisdiction but, instead, to highlight the important distinction between a registrar, a registrant, and an account holder of domain name. *See supra* Background Section A. Further, various courts, in myriad of contexts, have acknowledged this distinction. *See Realty Executives Int'l Inc. v. Doe*, 2011 WL 5508840, at *1-2 (D. Ariz. Nov. 10, 2011) (analyzing a motion to quash a subpoena from plaintiff registrant to obtain information from the "Account Holder" of an "anonymously registered domain name"); *Verizon Cal. Inc. v. OnlineNIC, Inc.*, 647 F. Supp. 2d 1110, 1126 (N.D. Cal. 2009) (utilizing the "Whois" data to determine who the registrant was for a domain name in dispute under the ACPA); *Flentye v. Kathrein*, 485 F. Supp. 2d 903, 914 (N.D. Ill. 2007) (finding the defendants who registered the domain names to be registrants for the purposes of establishing liability under the ACPA).

The Court concludes that Calista has alleged an injury in fact because of the UDRP panel decision authorizing the transfer of the Disputed Domain Names from Calista to Tenza. *See Mears v. Montgomery*, 2004 WL 964093, at *15 (S.D.N.Y. May 5, 2004) (explaining that a competitor has standing provided it can "show more than a vague or general desire to use a name or mark that conflicts with another party's trademark right in order to create the requisite adversarial conflict") (citation and quotation marks omitted). Calista's alleged injury is fairly traceable to the challenged actions of Tenza seeking to transfer the Disputed Domain Names

from Calista to Tenza. *See Laidlaw,* 528 U.S. at 180. Finally, it is likely that Calista's injury will be redressed if there is a decision in favor of Calista. *See id.* at 181. Moreover, the Court is satisfied that Calista's consistent representations, made under the penalty of perjury, that it is the owner of the Disputed Domain Names refutes the notion that Oklax Inc. is in fact the legal owner. For these reasons, the Court denies Tenza's motion to dismiss based on lack of standing.

## B.  Declaratory Judgment Act

The Declaratory Judgment Act (the "Act") provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The use of the words "case" and "controversy" used in the Act refers to the "Cases" and "Controversies" referenced in Article III of the U.S. Constitution. *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240 (1937). Thus, the Supreme Court requires "the dispute be 'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it be 'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *MedImmune*, 549 U.S. at 127 (alteration in original) (quoting *Aetna Life*, 300 U.S. at 240-41).

Under Ninth Circuit trademark law, to satisfy the actual controversy requirement, the plaintiff must show "real and reasonable apprehension" that it would be liable for infringement if it continued marketing its product. *Chesebrough-Pond's, Inc. v. Faberge, Inc.*, 666 F.2d 393, 396 (9th Cir. 1982) (citing *Societe de Conditionnement en Aluminium v. Hunter Eng'g, Inc.*, 655 F.2d 938, 944 (9th Cir. 1981)); *see also Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1336 (Fed. Cir. 2008) ("[F]ollowing *MedImmune*, proving a reasonable apprehension of suit is one of multiple ways that a declaratory judgment plaintiff can satisfy the more general all-the-

PAGE 14 – OPINION AND ORDER

circumstances test to establish that an action presents a justiciable Article III controversy.");

*Rhoades*, 504 F.3d at 1157 (treating the controversy analysis similarly for patents and trademarks).

> In applying this standard, district courts focus on:
>
>> the position and perceptions of the plaintiff, declining to identify specific acts or intentions of the defendant that would automatically constitute a threat of litigation. The acts of the defendant [a]re instead to be examined in view of their likely impact on competition and the risks imposed upon the plaintiff, to determine if the threat perceived by the plaintiff were [sic] real and reasonable.

*Chesebrough-Pond's*, 666 F.2d at 396. If the plaintiff is engaged in the ongoing use of the allegedly infringing trademark, the showing of apprehension "need not be substantial." *Hunter Eng'g Co.*, 655 F.2d at 944.

Of the many allegations made by Tenza during the UDRP proceeding, several specifically accuse Calista of displaying Tenza's '197 Registration, registering Tenza's trademark to capitalize on the goodwill of the '197 Registration, and infringing Tenza's '197 Registration. Shayefar Decl. Ex. 5, Dkt. 80-5 at 4, 6, 7. Calista argues that these allegations establish a threat of litigation that is sufficient to satisfy the test set forth in *MedImmune*. Calista is correct.

Because both Calista, as the legal owner of the Disputed Domain Names, and Tenza each claim exclusive rights to the same domain names (and Calista denies liability to Tenza for trademark infringement), there is a live controversy that is appropriate for resolution. *See Surefoot LC v. Sure Foot Corp.*, 531 F.3d 1236, 1247 (10th Cir. 2008) (reasoning that "five separate TTAB oppositions combined with an extensive history of interactions between the parties in which the declaratory defendant expressly and repeatedly suggested historical and existing infringing activity by the declaratory plaintiff" established a controversy under the

PAGE 15 – OPINION AND ORDER

Case 3:13-cv-01045-SI    Document 145    Filed 07/24/14    Page 16 of 17

Declaratory Judgment Act); *Sallen v. Corinthians Licenciamentos LTDA*, 273 F.3d 14, 25 (1st Cir. 2001) (finding a live controversy where both parties were still "claiming exclusive rights to the same domain name"); *Loufrani v. Wal-Mart Stores, Inc.*, 2009 WL 3787941, at *4 (N.D. Ill. Nov. 12, 2009) (reasoning that "the fact that the parties have developed clear positions on the issue of infringement further demonstrates a substantial controversy and adverse legal interests of the parties"). For these reasons, the Court denies Tenza's motion to dismiss based on lack of jurisdiction under the Declaratory Judgment Act.

### C. Discretion under the Declaratory Judgment Act

In Tenza's reply brief on the pending motion, it requests that the Court decline to exercise jurisdiction over this matter. Def.'s Reply, Dkt. 85 at 8. The Declaratory Judgment Act "gave the federal courts competence to make a declaration of rights; it did not impose a duty to do so." *Pub. Affairs Assocs. v. Rickover*, 369 U.S. 111, 112 (1962); *see Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995) ("Consistent with the nonobligatory nature of the remedy, a district court is authorized, in the sound exercise of its discretion, to stay or to dismiss an action seeking a declaratory judgment before trial or after all arguments have drawn to a close."). Assuming the court's exercise of jurisdiction "passes constitutional and statutory muster," a district court has discretion to maintain a declaratory action. *Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1223 (9th Cir. 1998) (en banc).

A district court should consider whether the declaratory action would: "(1) involve the needless determination of state law issues; (2) encourage the filing of declaratory actions as a means of forum shopping; (3) risk duplicative litigation; (4) resolve all aspects of the controversy in a single proceeding; (5) serve a useful purpose in clarifying the legal relations at issue; (6) permit one party to obtain an unjust res judicata advantage; (7) risk entangling federal and state

court systems; or (8) jeopardize the convenience of the parties." *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1107 (9th Cir. 2011).

Tenza argues that the Court should exercise its discretionary authority and decline to entertain jurisdiction over the claims alleged in Calista's Complaint. Tenza's primary argument is that the "totality of Casita's conduct from the inception of the litigation" justifies Tenza's request. Tenza does not address any of the relevant factors noted in *Allstate*. In the instant case, there may be state law issues raised in Calista's Count III requesting a declaration of no unfair competition "under the Lanham Act or other applicable law," but Calista's Counts I, II, and IV all allege claims squarely under federal law. Regarding duplicative litigation, although Calista's Petition for Cancellation under consideration at the TTAB is pending, that action has been stayed pending the resolution of this lawsuit. The Court thus finds that the resolution of this case will "resolve all aspects of the controversy" and "serve a useful purpose in clarifying the legal relations at issue." *See Allstate*, 634 F.3d at 1107. As a result, the Court chooses to exercise its discretionary authority and entertain this matter.

## CONCLUSION

The Court DENIES Tenza's Motion to Dismiss (Dkt. 74).

**IT IS SO ORDERED**.

DATED this 24th day of July, 2014.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge

PAGE 17 – OPINION AND ORDER