```
1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF OREGON

3

4   CALISTA ENTERPRISES LTD.,       )
                                    )
5             Plaintiff,            )   3:13-cv-01045-SI
                                    )
6       vs.                         )   July 25, 2014
                                    )
7   TENZA TRADING LTD.,             )   Portland, Oregon
                                    )
8             Defendant.            )

9

10

11

12

13              TRANSCRIPT OF PROCEEDINGS

14      BEFORE THE HONORABLE MICHAEL H. SIMON

15       UNITED STATES DISTRICT COURT JUDGE

16

17

18

19

20

21

22

23

24

25
```

```
 1                        APPEARANCES

 2   FOR THE PLAINTIFF:     Evan Fray-Witzer
                            Ciampa Fray-Witzer, LLP
 3                          20 Park Plaza, Suite 505
                            Boston, MA  02116
 4
                            Matthew Shayefar
 5                          Valentin David Gurvits
                            Boston Law Group, PC
 6                          825 Beacon Street, Suite 20
                            Newton Centre, MA  02459
 7
                            Sean Ploen
 8                          Ploen Law Firm, PC
                            100 South Fifth Street, Suite 1900
 9                          Minneapolis, MN  55402

10                          Valentin David Gurvits
                            Boston Law Group, PC
11                          825 Beacon Street, Suite 20
                            Newton Centre, MA  02459
12
                            Thomas Freeedman, Jr.
13                          Pearl Law LLC
                            522 SW Fifth Avenue, Suite 1100
14                          Portland, OR  97204

15

16   FOR THE DEFENDANT:     Devon Zastrow Newman
                            Schwabe Williamson & Wyatt, PC
17                          1211 SW Fifth Avenue, Suite 1600
                            Portland, OR  97204
18
                            Paul Nathan Tauger
19                          Anna M. Vradenburgh (Via telephone)
                            The Eclipse Group LLP
20                          6345 Balboa Boulevard, Suite 325
                            Encino, CA  91316
21

22

23   COURT REPORTER:        Dennis W. Apodaca, RDR, RMR, FCRR
                            United States District Courthouse
24                          1000 SW Third Avenue, Room 301
                            Portland, OR  97204
25                          (503) 326-8182
```

```
 1                    (July 25, 2014)

 2                P R O C E E D I N G S

 3           (Open court:)

 4           THE CLERK:  Your Honor, this is the time set for

 5   13-cv-1045, Calista Enterprises Limited versus Tenza

 6   Limited.  This is the time set for oral argument on the

 7   parties' motions for summary judgment.  Appearing by

 8   telephone for the plaintiff, Mr. Sean Ploen.

 9           Mr. Ploen, can you hear me?

10           MR. PLOEN:  Yes, I can.  Thank you.

11           THE CLERK:  Appearing by phone for defendant,

12   Ms. Anna Erdenburg (phonetic).

13           MS. VRADENBURGH:  Yes.  It is Vradenburgh.

14           THE CLERK:  Thank you.

15           I will ask counsel, beginning with plaintiff's

16   counsel, to please identify yourselves for the record.

17           MR. FREEDMAN:  Thomas Freedman for Calista.

18           MR. GURVITS:  Val Gurvits for Calista.

19           MR. SHAYEFAR:  Good morning.  Matthew Shayefar

20   for Calista.

21           MR. FRAY-WITZER:  Good morning, Your Honor, Evan

22   Fray-Witzer for Calista.

23           MR. TAUGER:  Good morning, Your Honor.  Paul

24   Tauger for Tenza.  I would like to introduce

25   Juliette Horwitz, who is a paralegal who is assisting us.
```

```
 1              MS. NEWMAN:  Good morning.  Devon Newman for
 2   Tenza.
 3              THE COURT:  Good morning, everyone.
 4              We are here on cross-motions for summary
 5   judgment and specifically Calista's motion, which is
 6   No. 94, and Tenza's cross-motion, which was originally
 7   filed as Docket 100, which was amended and corrected and
 8   now appears as Docket 131.
 9              I have read your moving papers and many of your
10   exhibits.  By the way, I do want to say right now, on the
11   exhibits, and this is mostly directed to Calista, because
12   I think that's where I saw most of these, I didn't see the
13   need to have the explicit photographs included in the
14   exhibits.  I certainly understand what you are talking
15   about.  And if we have more motion practice, I would
16   appreciate a bit more effort to black things out, unless
17   it is truly necessary.  If it is, so be it.
18              But most significantly, if we do go to trial, I
19   expect all counsel will diligently and thoroughly black
20   out from the jury exhibits what the jury doesn't need to
21   see.  What the jury does need to see, so be it.  We will
22   talk about it in advance, and they can handle it.  But if
23   they don't need to see it, I would like some care and
24   attention by counsel to black things out so we can focus
25   on the relevant intellectual property issues.
```

1           I also have a beginning question, more of a

2    fundamental factual issue that's a little bit clear to me.

3    It is my understanding that there were 13 disputed domain

4    names at issue before the UDRP proceeding.  I see some

5    reference in the memoranda and the exhibits to maybe 14,

6    maybe 17, perhaps a 14th that was discovered during

7    discovery, perhaps three more that are not yet identified.

8    It is not clear to me exactly what is happening.

9           Can somebody explain that to me?

10           MR. FRAY-WITZER:  Yes, Your Honor.  The total

11    number is actually 14 that are at issue.  There were 13 in

12    the UDRP.  There was one additional domain

13    GoldPornTube.xxx that had been discovered late by Calista,

14    primarily because they hadn't been looking at that top

15    level of domain.

16           The references to 17, with all due respect, and

17    I can understand why it might have been confusing, but if

18    you were to read the portions of the testimony that my

19    Brother cites to for the 17, really that is not what the

20    parties were saying.  That's not what they were saying

21    through discovery.  They were saying that there were 17

22    additional domains that had somewhere in them the word

23    "porn" and the word "tube."  But, no, there are not 17;

24    there are 14 domains that are really at issue.

25           THE COURT:  The 14, in addition to the 13 that I

1    know from the UDRP action, is GoldPornTubeXXX.com.  Is

2    that correct?

3          MR. FRAY-WITZER:  No, Your Honor.  There is not

4    .com.  It is a top-level domain .xxx, which was created

5    specifically for adult entertainment.

6          THE COURT:  That's helpful.  Thank you.

7          One other area that I would like to ask about in

8    the beginning, and I will let you all argue.  This may be

9    in the category of low-hanging fruit, but I think it is

10   the only thing that is in the category of low-hanging

11   fruit.

12         I see that Calista's claims are set forth in

13   four counts:  Count 1, declaratory and injunctive relief

14   under the Anti-Cybersquatting Consumer Protection Act,

15   seeking to prohibit the transfer of the names to the

16   defendant, Tenza; Count 2, the declaration of

17   non-infringement of trademark; Count 3, the declaration of

18   no unfair competition; and Count 4, seeking the Court to

19   order cancellation of the trademark registration, the '197

20   trademark by Tenza.

21         There is a motion by Tenza to strike Calista's

22   request in its prayer for monetary damages.  I think

23   that's well taken.  I didn't see any response by Calista

24   in its moving papers.

25         Am I missing something?

 1          MR. FRAY-WITZER:  Your Honor, the one argument

 2    that I would make concerning damages, and maybe it is not

 3    something that would be typically considered "damages,"

 4    But under exceptional cases under the Lanham Act, the

 5    Court may award attorney's fees.  Exceptional cases are

 6    cases that have been defined as being obvious or

 7    straightforward.  It was always our contention that

 8    because we claim that "porn tube" is and could only be

 9    generic, that this may be one of those cases.  The only

10    claim for damages would be for attorney's fees, and maybe

11    that should be stated differently.

12          THE COURT:  That's okay.  That's really the only

13    area that I thought might be appropriate, and I think the

14    best way to phrase that.  So I'm inclined to grant the

15    motion by Tenza to strike the recovery of monetary

16    damages, but that's without prejudice to Calista's right

17    to, at the conclusion of the trial or conclusion of the

18    determinations where we are, if Calista prevails on the

19    Lanham Act claims, then Calista, within 14 days after

20    judgment, may move for attorney's fees.  As part of its

21    argument for why it is entitled to attorney fees under the

22    Lanham Act must show that it has satisfied the requisite

23    criteria under the Lanham Act.  So I am going to grant

24    that portion of summary judgment by Tenza without

25    prejudice to that issue on attorney's fees.  I think

1   that's it for low-hanging fruit.

2          Now, that said, we have cross-motions for

3   summary judgment, so both sides can argue.  Since Calista

4   is the plaintiff, if you would like to argue first, you

5   may.  You don't need to repeat what's in your briefs.

6   Frankly, what would be most helpful to me, although you

7   are welcome to argue anything you want, is to really focus

8   on what you believe are the strongest points that support

9   summary judgment in Calista's favor.

10         We don't need to get into arguing why Tenza

11  shouldn't be given summary judgment, except as it

12  logically follows from some of your arguments.  But if you

13  would give me some of your strongest points of what claims

14  and why Calista should get summary judgment in its favor,

15  why there aren't disputed issues of fact, that would be a

16  good place to start.

17         Then my plan would be to hear Tenza's response

18  to those arguments, and eventually we will work our way to

19  hearing Tenza's arguments for why it believes it should

20  get summary judgment on some of its claims or against some

21  of Calista's claims.  That would be most helpful to me.

22  That said, you can argue whatever you want.

23         MR. FRAY-WITZER:  Thank you, Your Honor.

24         Your Honor, despite the reams of paper filed by

25  both sides in this case, I really do think that the case

can be decided on summary judgment by answering a single

question:  Is the primary significance of the phrase "porn

tube," a combination of "porn" and "tube," is the primary

significance of that phrase to describe the type of

product or service offered?

          Because if that is the primary significance of

that phrase, Your Honor, the phrase is generic, and it

cannot be a valid trademark.  That's, of course, true

because as the cases tell us, to say otherwise, would be

to allow one competitor the exclusive right to describe

their product or service with the common everyday words

that tell a consumer what the service is.

          The only way that Tenza can survive Calista's

motion for summary judgment is if it can convince this

Court, and it tries mightily to do so, if it can convince

this Court that the words "porn" and "tube" mean something

other than "porn" and "tube."

          Now, although I'm going to discuss in a few

minutes, Your Honor, our evidence under the various

factors for why we believe the phrase "porn tube" is

generic, the place that I can't help but be driven to as a

starting point is not a single piece of evidence that

Calista has provided to the Court, but a piece of evidence

from Tenza.  Specifically I'm drawn to the declaration of

Christopher Jon Sprigman that was submitted by Tenza.  It

1    is document 115-9.  It seems to encompass our point so

2    well.  Just as a reminder, because there are so many

3    exhibits in the case.

4              THE COURT:  Hold on one second.

5              MR. FRAY-WITZER:  Christopher Sprigman was one

6    of the offers of a Freakonomics article that we had

7    previously provided to the Court as an instance of the use

8    of the phrase "porn tube" in what we contended to be a

9    generic manner.

10             Now, my Brother managed to get a declaration

11   from one of the authors, in which I will admit he does say

12   that he was not using it in what he believes to be a

13   generic sense, but he does also describe the manner in

14   which he was using it, and I think it is incredibly

15   relevant.

16             He starts by talking about and introducing the

17   subject, "A substantial amount of piracy" -- they were

18   writing an article on piracy -- "in the

19   adult-entertainment industry occurs on user-generated

20   content sites.  These sites, which include" --

21             THE COURT:  Read slowly; we have got a court

22   reporter.

23             MR. FRAY-WITZER:  "These sites, which include

24   XVIDEOS, RedTube, PornHub, YouPorn, PornTube, and others

25   are similar in the concept to YouTube, i.e., they provide

access to content that has been posted by the site's

users, except the content by the users of the sites, like

those mentioned in our blog posts, is pornographic.  In

our posts, we were trying to explain to our readers what

these user-generated content porn sites were and how they

worked.  I remember thinking in the process of writing and

entering the posts that many readers would not be familiar

with these sites and that Professor Raustila and I would

have to find a way to describe them."

THE COURT:  Why don't you spell the name now so

the reporter doesn't ask me.

MR. FRAY-WITZER:  R-A-U-S-T-I-L-A.

THE COURT:  Thank you.

MR. FRAY-WITZER:  "And as is always the case

when writing a blog post where space and reader attention

are limited, we were trying to explain as quickly and

efficiently as possible.  I was, of course, quite familiar

even at the time with YouTube, and I trusted that

virtually all of our readers wouldn't be as well.  My

recollection is that Professor Raustila and I used the

term 'porn tube' as a descriptor for the user-generated

content porn sites because we thought readers who were

familiar with YouTube would understand immediately from

the term "porn tube," that the sites we were describing

were very much like YouTube; i.e., they featured content

1    posted by users, but then unlike YouTube, the content was

2    pornographic.

3         "I do not recall at the time we wrote the post

4    that Professor Raustila and I were familiar with the

5    PornTube website and adopted the term 'porn tube' from

6    that website's name or whether we coined the term 'porn

7    tube,'" but I do recall as far as I was concerned, we were

8    using the term "porn tube" because we thought it was a

9    very good descriptor of what user-generated porn sites

10   were; that is, those sites were similar to and functioned

11   like YouTube, only with pornographic content."

12        That, Your Honor, despite the author's

13   contention that he had not been thinking of the term as a

14   generic, is the definition of a generic term.  It is a

15   term that, when used, will immediately tell the users, not

16   who produced the service, but what the service is.

17        Their own evidence -- their own declaration

18   submitted to the Court says:  We knew that instantly if we

19   used the term "porn tube," that everyone was going to know

20   what we were talking about.  In fact, he doesn't even know

21   if he knew that the PornTube.com website existed at the

22   time, and he clearly identifies a world of websites

23   similar to that site that he did know existed and says:

24   We were simply trying to give readers an easy, quick,

25   immediately understandable way to know what we were

1    talking about, and that was the phrase "porn tube."

2         Now, there are a lot of cases that have been

3    cited by both sides again, and I would suggest,

4    Your Honor, that, as you requested, if we give you sort of

5    our most powerful information, our most powerful fact, if

6    you could only read one case from Calista's side, and I

7    hope you read more, but if you could read one case, the

8    case comes from this Court originally, it is the

9    Surgicenter case, because in every respect that is

10   material to this argument, the Surgicenter case, the

11   District Court opinion in particular, is directly on

12   point.

13        Surgicenter was the combination of "surgical"

14   and "center," and the Court, first of all, looked at

15   "surgi," and said that everyone understands that "surgi"

16   is a short name of "surgical."  It is what everyone

17   intended, and it is what everyone understands.  Everyone

18   understands what a "center" is.  And when you put these

19   two words together, you are not coming up with anything

20   other than what any average consumer would think when they

21   hear "Surgicenter," a surgical center.

22        The Court said that we wouldn't certainly let

23   you trademark "surgical center."  That wouldn't happen.

24   We wouldn't let you trademark "hospital."  You can't

25   trademark the things that are the names for things.  The

1    Surgicenter case is also particularly relevant, because

2    the doctors in that case had gotten a trademark for

3    "Surgicenter," and it did not matter to the Court.

4           In fact, the evidence in Surgicenter also went

5    towards a lot of the factors that I'm sure my Brother will

6    discuss about having spent a lot of money on the name,

7    having advertised the mark, having used the mark, and the

8    fact that they were able to convince people that the mark

9    was affiliated with a particular provider.

10           The Court said, "Both parties agree that

11    'Surgicenter' was coined by the doctors who founded the

12    original corporation.  It is not necessary for me to

13    decide whether the term has since fallen into the public

14    domain, for they chose from the beginning a term that

15    defined their service.  Although it is regrettable that

16    they expended much time, energy, and money in the belief

17    that a valid service mark was being created, the outcome

18    was not thereby affected."

19           That is precisely, I would submit, and when you

20    look at the case, on almost every factor addressed,

21    precisely the case that you have before you today.  I

22    would note, of course, also, it was decided on summary

23    judgment.  It was upheld by the Ninth Circuit as a summary

24    judgment decision.

25           THE COURT:  Is "YouTube" a registered trademark?

1        MR. FRAY-WITZER:  It is, Your Honor.

2        THE COURT:  If I accept your argument and rule

3    consistent with what you have just argued, what does that

4    do to the validity of the trademark of YouTube, because

5    YouTube -- the same thing.  It is basically a generic term

6    that describes:  Go ahead and make some videos of yourself

7    and upload it to the site.

8        MR. FRAY-WITZER:  I actually think it is a

9    little bit different, Your Honor.  Obviously the "Tube"

10   portion is not different.  The "You" portion is different,

11   however.  With "PORNTUBE," you know that what you are

12   getting are pornographic materials at a tube site.  That's

13   it; that's the combination.

14       THE COURT:  Why is it with YouTube what you are

15   getting is something made basically by a non-professional

16   user who takes videos of themselves or their friends and

17   uploads it to a tube site?

18       MR. FRAY-WITZER:  Well, as one reason,

19   Your Honor, much of the content on YouTube is not user

20   generated, although it was more so at another time.  For

21   another reason, the term "you" is not a definitional term,

22   it is a suggestive term, which makes it different from

23   this case where "PORN" -- they try to say that "PORN"

24   really isn't porn, But if you go to the site, it is porn.

25       THE COURT:  Well, I haven't gone to the site,

but I'll take your word for it.  One of the things that Tenza is arguing is that "porn" has a different meaning and connotation than "pornography."  What do we make of that?

MR. FRAY-WITZER:  Well, I'm amused by it.  None of the definitions from any dictionary would agree with them.  The common usage of "porn" on the Internet anywhere would not agree.  The one area in which they try to extend that, they say, well, look at the term "food porn," for example.  Let's talk about "food porn," because "food porn" clearly is not pornographic.  It is a term generally used to describe one of two things:  Either fast food that is so high in calories that it is almost "pornographic" in nature.

THE COURT:  I must admit, I have never heard that term before this case or that briefing.

MR. FRAY-WITZER:  Or it is also used in highly stylized photographs of food that are so highly stylized that they are being analogized to pornography.  In fact, we cited and provided the Court with the Wikipedia article that tracks the etymology of the term "food porn," and it really is very clear that, although "pornography" is being used in a different context, it is still being used precisely to let the user know that this is something like pornography.  It is made to stimulate the mind.  It is

1   made to arouse the senses.  It is a tongue-in-cheek way of
2   saying pornography.

3          Quite honestly, in this particular case,
4   although they may say, "Hey, there are some times that
5   'porn' doesn't mean porn."  There are some times that
6   "porn" means porn.  That is with respect to Calista's
7   sites and Tenza's sites.  "Porn" clearly means porn when
8   we are talking about these sites and the millions of sites
9   that use the term "porn tube" to describe themselves.

10          THE COURT:  Now, that sounds like a fine
11   argument, maybe even persuasive, but don't they have
12   experts that say to the contrary?  Then why does that not
13   create a fact dispute on the meaning of "porn" or the
14   distinction between "porn" and "pornography"?

15          MR. FRAY-WITZER:  Because, Your Honor, they
16   could not stand before you and say:  We trademarked the
17   word "car," but when we say "car," everyone really thinks
18   "airplane."

19          "Porn" really does have a definition.  The cases
20   that decide these things on summary judgment, and in our
21   reply we have cited for you quite a number of them, in a
22   lot of those cases the same argument was made that the
23   word had been infused with some different or alternative
24   meaning.  The problem with that is -- for example,
25   WoolFelt is one of the cases in which the term was struck

1  down because the Court said:  You know, no matter what you

2  say, we understand what "wool" is, and we understand what

3  "felt" is.

4         Quite honestly, what we have is a case that

5  rises, if you look at the dictionary definitions, if you

6  look at the Internet usage, if you look at Tenza's usage,

7  if you look at the competitors' usage, if you look at the

8  media's usage, every one of the factors, "porn" means

9  "porn" and "tube" means "tube," and there is no way that a

10 rational jury could be persuaded that the words that are

11 in common usage mean anything other than the common usage

12 that they have been assigned.

13        THE COURT:  Now, "tube," I thought, really is

14 more colloquial for "television."  So is it really that

15 clear that "tube" in this context refers to basically

16 either videos that have been created, amateur videos,

17 things like that?  What's the evidence of that and why is

18 it undisputed?

19        MR. FRAY-WITZER:  Your Honor, if you have

20 available our reply.

21        THE COURT:  I do.  The brief or the exhibits?

22        MR. FRAY-WITZER:  The brief itself actually,

23 Your Honor.

24        THE COURT:  One moment.  Docket 134?

25        MR. FRAY-WITZER:  My copy of this is actually

1    unnumbered.

2              THE COURT:  July 22nd?

3              MR. SHAYEFAR:  134, yes.

4              THE COURT:  Okay.  I'm there.  I have got it in

5    front of me.

6              MR. FRAY-WITZER:  If you can turn, Your Honor,

7    to page 7.

8              THE COURT:  Internal 7?  You are probably

9    referring to internal 7.  Okay.  Bottom right-hand corner.

10             MR. FRAY-WITZER:  The bottom of the page.

11             THE COURT:  Yes.

12             MR. FRAY-WITZER:  Those two logos were historic

13   logos that appeared at PornTube.com.  The first one, I

14   don't think there is any question but that is a

15   television.  It still has the little rabbit ears on top of

16   it.  Quite honestly, given the first one, when they sort

17   of made it a little bit more stylized and added a devil's

18   tail and horns to it, it is still a television.

19             THE COURT:  Okay.  I agree with that.

20             MR. FRAY-WITZER:  I think also you will see --

21             THE COURT:  That's telling us that PornTube

22   gives you pornographic video.

23             MR. FRAY-WITZER:  Yes, Your Honor.

24             THE COURT:  Okay.

25             MR. FRAY-WITZER:  I think also that -- and this

was an interesting argument that was originally raised by

my Brother.  He comes down and says:  Well, the sites are

never, ever referred to as tubes.  They say that in their

motion.  We quoted precisely -- we took it directly from

page 14 of their motion for summary judgment where they

say:  The phrase "tubes" is never used independently to

refer to these sites.

Then we say:  Okay.  Well, if that's your

contention, and we came back with, not only media usage of

"tubes" or "the tubes," or "the tube," referring to these

sites, but references from one of their own former

high-level employees.  In the reply they come back and

they say:  Calista says that we say that "tubes" is never

used.  And that's absurd.  It is certain they say that.  I

scratched my head, because I went back and I said:  Did I

misquote them?  It is in their motion.

We were simply quoting their motion.  We

provided the evidence.  That is what tends to happen in

this argument more than I would have expected.  A

contention is made by Tenza, we do the research to

disprove the contention, and then it is denied that the

contention was ever made.  One of the most shocking things

to me, quite honestly, is that in my Brother's reply filed

just a few days ago, in response to our discussion of JT,

who was using the phrase "the tubes" all the time to refer

1  to these sites, they say:  Whoever this JT is, no

2  credibility for whomever this JT is.

3              But if you happen to have available document

4  137-2.

5              THE COURT:  Not by number.  Is it yours or

6  theirs?

7              MR. FRAY-WITZER:  It is ours, Your Honor.  It is

8  Exhibit 78 to the Shayefar declaration.

9              THE COURT:  One moment.  78.  One moment.

10              MR. FRAY-WITZER:  It was filed July 22nd.

11              THE COURT:  Yes.  The PornTube content

12  publishing program?

13              MR. FRAY-WITZER:  Yes.

14              THE COURT:  I have it.

15              MR. FRAY-WITZER:  Which, of course, is available

16  at the PornTube site and at the DreamStar site.  If you

17  look right next to the headline, the PornTube.com content

18  publishing program, which, by the way, is replete with

19  reference to "the tubes," there is a picture there by JT.

20  So I'm not sure how to respond to whoever this JT is; it

21  is their employee.  LinkedIn shows it is their employee.

22  Their blog announcing "the YouPorn guy is now the YouTube

23  guy," which we have also provided to the Court and talks

24  about bringing "JT aboard."  The news articles that we

25  have provided from the industry publications, which talk

1    about "JT joining PORNTUBE."

2         So I think that both their own historic logos,

3    demonstrate what "tube" is.  The usage of "tube" and

4    "tubes" in the media, in their own releases also

5    demonstrates what "tubes" is.  There, again, Your Honor,

6    "porn" and "tube," it is a combination -- and I will not

7    argue that simply because "porn" is generic and "tube" is

8    generic that "porn tube" is generic.  That's not what the

9    cases say.  What the cases do say is that if the

10   combination of the two words does not itself change the

11   generic nature, then the combination itself is generic.

12        There are six factors that have been identified,

13   Your Honor.  The first one is competitors' use.  We

14   provided the Court with and spoke about it at the last

15   hearing, a list of more than 3,000 domain names that used

16   "porn tube," exactly as it is, "porn tube" in the domain

17   title.  Another 800 -- more than 800 of them had a

18   hyphenated "porn-tube" in the title.

19        There are millions, as we have pointed out to

20   the Court.  We provided you with 500.  We didn't think you

21   wanted more than that.  But there are millions of sites

22   that identify themselves, and this is something that we

23   should talk about, because there is a little confusion

24   about what the metadata is for a title.

25        My Brother is generally correct when he says

that in general metadata is not something that a user

sees.  But as his own expert, Scott Rabinowitz, testified,

there is an exception to that.  There is something called

a metadata tag for titles.  When you put into a metadata

tag for a title information, that's the information that

shows up when you do a Google search and you get your page

of results.

THE COURT:  By the way, are you using Google

search generically or specifically?

MR. FRAY-WITZER:  I'm using it very

specifically, Your Honor.  I have tried Bing searches, but

they are really not as useful.

THE COURT:  I do occasionally ask people what

they think of doing a Google search on Bing, but that's a

different issue.

MR. FRAY-WITZER:  I'm looking for one other --

THE COURT:  Take your time.

MR. FRAY-WITZER:  Although we have provided the

Court with the Google searches that limit the use of "porn

tube," the exact phrase to instances in which that was

included in the title, and there were still millions of

results to that, and when you look at Mr. Rabinowitz'

testimony, you will see that he says that this is

information that the site has to actively choose to

include in the metadata title area so that Google then

1    shows it in the results.

2           If you look, Your Honor, at Calista's opposition

3    to Tenza's motion.

4           THE COURT:  One moment, let me get there.

5           MR. FRAY-WITZER:  It is Docket 113.

6           THE COURT:  Yes.  I have it.  What page?

7           MR. FRAY-WITZER:  On page 9, Your Honor.

8           THE COURT:  All right.  I'm there.

9           MR. FRAY-WITZER:  Although we provided you with

10   500 examples, at least, of other websites' use of the

11   phrase "porn tube" generically within their title, I'm

12   most entertained by PORNTUBE's generic use of "porn tube"

13   within its metadata for title.  These are the two results.

14   The first one is the Google result.  It says --

15   underneath, there is the name of the website.  There is

16   the URL right below it.  Then right below that is the

17   information that gets included in the title metadata.

18   "Watch free porn videos at PornTube.com with new porn

19   tube" -- lower case "p," lower case "t," two words --

20   "with new porn tube videos added daily."

21          Their Bing search result is identical.

22          THE COURT:  All right.

23          MR. FRAY-WITZER:  So not only do the competitors

24   use "porn tube" as the generic for this type of website,

25   Tenza itself uses "porn tube" generically.

1          Mr. Rabinowitz' testimony is also interesting

2   because he was asked, first of all, about how many adult

3   entertainment streaming websites he thought he had

4   personally viewed.  I don't think I envy the fact that his

5   answer was something like 3,000 or so.  He was asked, of

6   those sites, and of adult entertainment sites, I think

7   generally, how many in some respect describe themselves as

8   a porn tube, not a capital "P," as a porn tube.

9          By Mr. Rabinowitz' estimation, he said

10  conservatively somewhere between one-quarter and one-third

11  of all of these sites refer to themselves as a porn tube

12  but likely many more.

13          So the first factor, competitors' use, I think

14  is really overwhelmingly clear.

15          The second factor, Your Honor, is the

16  proponent's own use.  We provide the Court, and it is

17  attached to the Shayefar declaration, I believe the

18  original one, as Shayefar 29.  It is also document 98-12.

19          THE COURT:  One moment.  I have it in front of

20  me.

21          MR. FRAY-WITZER:  It is Exhibit 29, Your Honor.

22          THE COURT:  Yes, I have it.

23          MR. FRAY-WITZER:  At the time of

24  Mr. Rabinowitz's deposition, which was only a month or six

25  weeks ago, this was a collection of pages from the

PornTube.com website, as they existed at the time.  You

will see, Your Honor, that on every one of these pages

that we have provided to the Court, PornTube.com uses the

phrase "porn tube" as two words, lower case, separated

generically.

THE COURT:  As an adjective oftentimes

describing such things as the word "videos, fantasies,

collections," and the like.

MR. FRAY-WITZER:  Yes, Your Honor.  I will tell

you that my Brother had a grand time telling me that I

turned every shade of red available while reading these

excerpts to the witness at his deposition.  I think he is

right, but, nevertheless, that is PornTube.com's own usage

of "porn tube" as a descriptive adjective, as you put it.

Entertainingly, after Mr. Rabinowitz'

deposition, PornTube.com did a complete revamp of its site

and redesign of its site.  Those references have been

removed, and we've provided this to the Court, when it was

reported in the adult entertainment media, Xbiz.com.

There was a headline "PornTube.com Announces Redesign,

Adds New Features."  The article begins, "Popular adult

porn tube site, PornTube.com, has announced a new revamp

of the site's design and infrastructure."  It is how the

media uses it.  It is how PornTube uses it.

The dictionary definitions, Your Honor, we have

provided to you.  I don't think I have to discuss them at
length.

The media usage, my Brother argues that no
matter how many instances of the media using "porn tube"
as a generic or descriptive of the surface usage, that it
is never going to be enough, because he can point to --
and he can -- any number of instances in which these sites
are referred to as "tube" sites instead of "porn tubes."
I don't disagree with him that he can.

As we mentioned in our reply brief, we did a
little search on the New York Times Archive.  The word
"burger" --

THE COURT:  The word what?

MR. FRAY-WITZER:  "Burger."  It was cited over
9,000 times in the New York Times archive, whereas the
word "hamburger" was much lower.  I'm sorry -- it was
3,900.  That does not mean that "hamburger" is somehow not
something that people would use as a generic term to
describe the product.  It can be called a "tube" site.  It
can be called a "tube" site as many times as people like,
and it does not change the fact that it is also called a
"porn tube."

THE COURT:  Although a burger can be called a
"burger" generally without referring to something other
than a "hamburger."  I don't think one would refer to a

1    turkey burger as a "burger."  I don't think one would

2    refer to a veggie burger as a "burger."

3              Can one refer to a "tube" site that doesn't

4    refer to pornography?

5              MR. FRAY-WITZER:  Yes, Your Honor.

6              THE COURT:  What are the implications of that

7    then?

8              MR. FRAY-WITZER:  It actually, I think, bolsters

9    our argument that what you have here is the very

10   specification imputation of what -- not where -- but what

11   actually appears at these sites.  In fact, when we were

12   questioning Mr. Rabinowitz, and we were looking at some of

13   the Google results for tube sites, ironically, if you put

14   in "tube site" without the word "porn," one of the top

15   sites is from the Vatican.  Apparently they have a tube

16   site.

17             THE COURT:  What is it?

18             MR. FRAY-WITZER:  It actually, I believe,

19   Your Honor, the Vatican posts videos on YouTube, and so

20   that's their tube site.

21             THE COURT:  Okay.

22             MR. FRAY-WITZER:  There were lots of discussions

23   of "cathode ray tube" and the "London Tube," and it is

24   actually the fact that "porntube," as a combination, is

25   precisely what you have to do to describe what appears

1  there, not who creates it, but what appears there.

2  Otherwise, you might be at the Vatican site.

3            THE COURT:  So just like the word "hamburger" is

4  a generic term for that product, you might find instances

5  of "burger."  You might find people saying "turkey burger"

6  or "veggie burger," and so "hamburger" is the generic

7  term?

8            MR. FRAY-WITZER:  Yes.

9            THE COURT:  Your argument is that "porn tube" is

10 a generic term for the reasons you have described, and the

11 fact that we may find occasionally or even frequent

12 instances just to the word "tube" does not undermine that

13 conclusion?

14            MR. FRAY-WITZER:  Correct.

15            THE COURT:  I understand.

16            MR. FRAY-WITZER:  My Brother, again, just

17 recently in his reply, made the claim that, well, although

18 you may see references to "porn tube" sites, you never see

19 references to just "porn tubes" in the media.  Again,

20 although we didn't have the time to go through all of our

21 references, and certainly I would submit to you that the

22 vast majority of the articles that we submitted do have

23 such references.  Just one, for the Court, from

24 New York Magazine, which is one of the more legitimate

25 sources, and it is a document that we provide to the Court

1  as Document 114-10.

2       The article from New York Magazine reads, "It

3  was inevitable, once YouTube launched in 2005, that

4  someone would start a porn equivalent.  Sure enough, over

5  two months in the summer of 2006, three different sites

6  launched that would become major adult tubes."  These are

7  tubes PornTube, RedTube, and YouPorn.  Like YouTube, the

8  porn tubes were flooded with free content, some of it

9  licensed for pennies from older companies that didn't

10  understand the web, much of it pirated from paid sites.

11  The 'tubes' had a new business model."

12       The fifth factor, Your Honor, testimony of

13  persons in the trade.  You do have some competing

14  testimony.  Certainly Mr. Randazza says, in his expert

15  report, people refer to porn tubes all the time.  Everyone

16  knows what it means.  If someone were to come up to me and

17  simply say, "I was on porn tube," I would say to them,

18  "Which one?"

19       Mr. Rabinowitz initially said in the first day

20  of his deposition, I have never seen or heard anyone ever

21  use "porn tubes" ever generically.  It is always "tube

22  sites."  We went through 30 of the articles and said to

23  him, isn't this a generic or descriptive?  Yes, it is.

24  Well, how can you say you have never -- since he testified

25  that he was familiar with the articles -- how can you say

1    you have never seen, heard, used?

2          His explanations included that he meant only

3    in-person conversations that he had personally had; that

4    he thought that every single person who has ever used

5    "porn tube" in writing, which is wrong.  He is entitled to

6    that opinion, I suppose, but it doesn't negate the fact

7    that it is used in the industry.

8          He also identified for me -- it was the first

9    time I heard of a website that he called the industry's

10   leading water cooler place for people in the industry to

11   talk, GFY.com, and we supplied you the exhibits from that.

12   It is frequently used.  In fact, this case was discussed

13   apparently in a long thread on GFY.com, if Mr. Rabinowitz

14   is correct, with people in the industry expressing shock

15   that the UDRP had found "porn tube" to be anything but

16   generic since it was so obviously generic in nature.

17          The last point, Your Honor, on genericness that

18   I would discuss, the last factor is surveys.  However, as

19   we cite in our main brief, a lot of the courts, to

20   consider whether or not survey evidence is relevant in a

21   genericness test, has come out and said, no, no.  Survey

22   evidence is relevant if you are past generic, and you are

23   into descriptive or suggestive, and you need to know if

24   there is secondary meaning, if the words have developed a

25   new meaning, but it really doesn't matter for genericness,

because if the words are generic, they are generic.  No
matter how many times or how many people you may have
convinced otherwise, they cannot be anything other than
generic.

THE COURT:  Why wouldn't a survey of an
appropriately large, appropriate audience that asks them:
When you hear "Scotch Tape," do you think of a specific
brand of clear tape with some of adhesive on it?  Or do
you think of just generally the clear tape?  Why wouldn't
their answer to a valid survey be meaningful on the
question of genericness?

MR. FRAY-WITZER:  The reason, Your Honor, and
this is what I believe to be the flaw in the cases cited
by my Brother, is that none of the cases that come the
other way, and there are some that say, oh, yes, you can
indeed consider survey evidence in the question of
genericness.  Not one of those cases is involving common,
everyday words that seem to have a generally accepted
meaning.  Scotch Tape, as in your example, although they
do have on their label the little tartan, I don't think
that anyone prior to Scotch having released Scotch tape
would have said:  Oh, when you say 'Scotch' tape, of
course, you are describing a clear translucent tape.
"Scotch" doesn't mean clear or translucent.

None of the cases that say that survey evidence

is useful for the question of genericness, none of them

deal with the situation that you have here, which is

whether or not we have two words with a common meaning

that has simply been combined.

THE COURT:  If I'm hearing you right, your

argument seems to be shifting a bit.  Tell me if I'm

hearing it correctly, but I thought I heard earlier, and

maybe I misheard, but what I thought I heard earlier is

that survey evidence does not play a role on the question

of whether or not a challenged term is generic.

And now what I hear you saying is, well, survey

evidence may play a role in whether something is generic,

but only if it is a composite of two terms that are not

themselves generic, and we are trying to find out over

time whether that combination is generic.  But you are

saying here, where we have a combination term, where each

component is itself generic, a survey is not relevant.

Do I have that right?

MR. FRAY-WITZER:  It is slightly different,

Your Honor.  We think our cases are the persuasive ones.

We think that the cases that say that survey evidence is

irrelevant on the question of genericness are the ones

should follow.  They are well reasoned, and they say that

a generic word is a generic word.  In effect, it relates

to something that was said in the Surgicenter case.  "It

1  follows then that, even if the seller had educated people

2  to connect the term with the seller, if its primary

3  significance is still generic, the term is not

4  protectable."

5           There are cases, and we have cited them in the

6  brief, where there has been survey evidence.  It just does

7  not matter.  It doesn't matter to the question of

8  genericness.  So my first line of defense, Your Honor,

9  would be, those are the persuasive cases.  If you were to

10  disagree with me and say, well, what about the fact that

11  your Brother has cited cases that say that survey evidence

12  is relevant?  That's why I came into the second argument,

13  Your Honor.

14           The second argument is, hey, I think that the

15  reasoning, if you like those cases, or if you want to be

16  able to mesh those cases and fit them with the other

17  cases, in the cases cited by Tenza, those are not cases

18  that dealt with common words.  That's probably, in my

19  estimation, at least, why they came out differently.

20           That, Your Honor, really, I think, covers the

21  waterfront for me on genericness.

22           THE COURT:  All right.

23           MR. FRAY-WITZER:  I'm happy to move on to

24  likelihood of confusion.

25           THE COURT:  I'll tell you this, and you are

1    welcome to try to talk me out of it.  I'm struggling with

2    genericness.  I'm not struggling as much with likelihood

3    of confusion.  I think there is a disputed issue of fact

4    on that.  You are welcome to try to tell me why there is

5    not.  But if you want to just focus on genericness, that's

6    not a bad idea.

7            MR. FRAY-WITZER:  As much as I, like any lawyer

8    likes to hear myself talk, Your Honor, I will not run

9    through the likelihood of confusion argument in any

10   detail.  There are only two discrete facts that I will

11   mention with respect to likelihood of confusion, mostly

12   because they are things that come up in my Brother's

13   argument, and so I want to address them at least.

14           It is interesting to note, and this sort of

15   comes under the similarity of marks argument that I make,

16   it is interesting to note that, although today, as they

17   stand before you, they say that all that we're talking

18   about is the combination of "PornTube," as it is

19   "PornTube" combined together.  But the Court might

20   remember a discovery dispute in this case in which Calista

21   said:  Hold on, we're being asked, not just for all of

22   this information about sites that have "porn tube" in it,

23   but sites that have "tube porn" in it and sites that have

24   "porn" -- then something in between -- and "tube," and we

25   shouldn't have to provide them.

1          And Tenza came back and said:  No, no, no.  It

2     is all irrelevant, because those marks or those

3     combination are equally as similar.  And there are cases

4     that say just transposing doesn't change it.  There are

5     cases that say putting things in the middle doesn't change

6     it.  It is a land grab, Your Honor.  It is an attempt to

7     take the word "porn" and take the word "tube" off the

8     market, despite what Tenza might say to the contrary.

9          The only other point that I would like to

10    address --

11         THE COURT:  Although I'm not so much worried

12    about the likelihood of confusion issues with

13    maybe PornStarTube -- although I think that's

14    interesting -- what were some of those examples?  I will

15    do it from memory.  Such things as GoldPornTube,

16    BigPornTube, or whatever, things like that.

17         I mean, why isn't there a likelihood of

18    confusion as to source there?  You don't have to address

19    that if you don't want, but I think there is.

20         MR. FRAY-WITZER:  Well, I guess there are two

21    arguments, Your Honor.  The first is that Tenza actually

22    did what -- I'm sorry -- Calista actually did what Tenza

23    should have done.  It took the generic "porn tube," and it

24    added to it a suggestive or an arbitrary word.  That's

25    what makes a trademark, is the addition of something that

1    is suggestive or arbitrary, not the "porn tube" portion

2    itself.

3              The other argument is, I guess --

4              THE COURT:  But that goes to maybe genericness,

5    but it doesn't go to likelihood of confusion.

6              MR. FRAY-WITZER:  Well, it leads me to precisely

7    the second point that I was going to make in two ways.

8    The first is, these sites have operated for five years in

9    concert without there being any evidence of actual

10   confusion.  My Brother will tell me that I'm wrong about

11   that.  I am going to address that in just a second, but

12   there really has been no evidence whatsoever that there

13   has been confusion between the two sites.  In fact,

14   what -- there is interesting evidence of is a coexistence

15   agreement between PornTube.com and PornoTube.com.

16             THE COURT:  You can get there, but my reaction

17   is, there may be no evidence of confusion, in part,

18   because the consumers don't care whether it is the same

19   company or not.  I don't quite know what to do about this.

20   But if a consumer would be confused as to whether or not

21   PornTube, GoldPornTube, PornStar.Tube, BigPorn.Tube,

22   whether they are all from the same company or not, I think

23   that, on the one hand, there very well seems to be

24   evidence that they -- that there is confusion or could be

25   confusion as to whether it comes from the same source or

```
1    not.  But on the other hand, consumers don't care.  I
2    don't know what to do about that.
3           MR. FRAY-WITZER:  Quite honestly, I'm not sure
4    how confusion matters if consumers don't care.  If a
5    consumer says, "All I care about is getting free porn,"
6    and I think the consumer may say, "All I am concerned
7    about is getting free porn," then I'm not sure where
8    confusion really matters much at all.
9           THE COURT:  Me neither.  That's why my struggle
10   on this part is, is there a question of fact on whether
11   there is a likelihood of confusion, I think the answer is
12   yes.  However, how do I interplay that question with, and
13   what if the consumers don't care what the source is?  Then
14   does likelihood of confusion make any difference at all
15   for a trademark infringement claim?  I can't find any
16   precedent that says it doesn't.
17          MR. FRAY-WITZER:  Well, I think, Your Honor,
18   what it does say is -- aspirin.
19          THE COURT:  What?
20          MR. FRAY-WITZER:  Aspirin.  "Aspirin" was an
21   actually created word.
22          THE COURT:  Right.
23          MR. FRAY-WITZER:  Well, over time and through
24   usage it became generic precisely because the consumer
25   didn't care.  They just didn't care.  Aspirin was aspirin
```

1 was aspirin, no matter what you called it.  So to the

2 extent that you might be finding that the consumer doesn't

3 care, all that does is it says that the mark itself is

4 weak.  It is a mark that is incredibly weak.  That's how

5 it plays into likelihood of confusion.  It is an

6 incredibly weak mark that could not be given the

7 protection that Tenza seeks to give it.

8 　　　　The only piece of purported evidence that has

9 been offered by Tenza as to actual confusion, Your Honor,

10 is a single DMCA notice that they say they received that

11 was related to Largeporntube and not PornTube.com.  We

12 noted, of course, in our reply that it is at least

13 interesting that they did not mention the content that was

14 being complained of possibly infringing belonged to none

15 other than JT, and in response they submitted a

16 declaration from Scott Worsnop.

17 　　　　THE COURT:  Spell that.

18 　　　　MR. FRAY-WITZER:  W-O-R-S-N-O-P.

19 　　　　THE COURT:  Thank you.

20 　　　　MR. FRAY-WITZER:  And Mr. Worsnop is one of the

21 principals of a company called xTakeDowns, and xTakeDowns

22 is a company that monitors for infringements on the web

23 and then sends DMCA take-down notices when and if they

24 find them.

25 　　　　This may have been my second most favorite piece

of evidence from Tenza, because it is astonishing.  It
starts with Mr. Worsnop explaining, first of all, that
their system is fully and completely automated.  So to the
extent that anyone is having a confusion, it is a
computer, a badly programmed computer.

We utilize proprietary software that visits
various websites, scrapes data on those websites, and
compares it to our database of our client's intellectual
property.  When our software detects a match, it generates
a DMCA take-down notice.  That's all well and good.

Then he goes on to say, however, that everything
about this DMCA notice, not just the fact that it may or
may not have been misdirected, but every single thing
about this DMCA notice was incorrect.  The URLs that were
being complained of as infringing, he says:  Oh, those
weren't actually infringing.  The fact that it identified
Largeporntube.com as being the receiver was also a
mistake, they say, because "the URLs in this automated
e-mail were not, in fact, infringing and would have never
been sent, as we do not send DMCA take-down requests to
Largeporntube, as they only aggregate sources that host
materials and do not host themselves.  Largeporntube is
not in our database of possibly infringing websites and,
therefore, would never receive take-down requests.
PornTube.com, on the other hand, which hosts material on

1    their systems, was set in our system to receive take-down

2    notices, and this is how they received an incorrect

3    take-down notice."

4         The material wasn't actually infringing.  The

5    automation went wrong.  The client on whose behalf --

6         THE COURT:  I get it.

7         Okay.  Anything else at this time,

8    Mr. Fray-Witzer?  I would like to hear from Tenza and

9    their response to your arguments about genericness.

10        MR. FRAY-WITZER:  Thank you.

11        THE COURT:  Thank you, Mr. Fray-Witzer.

12        Either Ms. Newman or Mr. Tauger, or both.

13        MR. TAUGER:  Thank you, Your Honor.  I would

14   like to start by putting this case in the specific

15   context.  The industry in which both our client and my

16   esteemed colleague's client operates is one that is rife

17   with piracy, far more so than your typical commercial

18   enterprise that probably comes before this Court in a

19   trademark context.

20        The evidence that has been put in both by Tenza

21   and by Calista, and I would draw particular attention to

22   some of the articles that Calista has put in, supposedly

23   to site usage, those are about the problems of piracy in

24   our industry.  The material that we have put in, the

25   Free-speech Coalition video, the ABC Nightline report, the

```
1    CNN report, it is all about how there is a problem with
2    piracy, with infringement, with disrespect.
3              THE COURT:  But we don't have a piracy issue if
4    "porn tube" is generic.  So I am most interested in
5    hearing either that it is not generic or at least what the
6    fact dispute is.
7              MR. TAUGER:  It is not generic.  The point I
8    wanted to raise by talking about the industry was that
9    there is more -- we acknowledge that there is misuse of
10   our terms -- of our trademark.  We also acknowledge that
11   there is outright infringement of our trademark and
12   probably more so than in cases that I have done that don't
13   involve the adult-entertainment industry.  So I just want
14   to keep that in mind to give a context to what we are
15   talking about.
16             I would like to start with a description of the
17   Surgicenter case.  It is funny that this came up, because
18   when this case was first brought to me, the very first
19   thing that I discussed with my colleague, Anna
20   Vradenburgh, was how Surgicenter would or would not apply
21   to this case.  Frankly, it does not apply, and I'll
22   explain why.
23             First of all, the Surgicenter Court held that
24   "surgi" has no independent meaning in and of itself.  It
25   is merely a contraction for "surgical."  The Court also
```

held "center" is a noun, defined as a place, area, person, group, or concentration.  The definition goes on.

The commercial impression created by "surgical center" is identical to the commercial impression that is created by "Surgicenter."

That is not the case here.  "Porn" and "pornography" have two different colloquial contexts.  You don't find websites referred to as "pornography" sites.  You find them referred to as "porn sites" or "porn."  In the exhibits before you, you are not going to see that term "pornography" used, and the reason for it is very simple.  It is what Mr. Rabinowitz explained in his expert opinion and also in his deposition.

"Pornography" is clinical.  It is negative.  It is equivalent to the term "obscenity."  That's not what people want to see.  What they want to see -- the customers for our client and for my colleague's client want to see "porn," the thing that is a little friendlier, it is a little more fun, it is a little more playful, and it doesn't have this negative connotation.

So "porn" has a meaning that is different in this context than, for example, "surgical"; "surgical" just means surgery.

THE COURT:  Now, Calista's evidence on this point is to the contrary obviously.  I understand your

1    argument.  If I were therefore to agree that you both have

2    valid points on this, isn't that a question for the jury?

3    You moved for summary judgment too.

4        MR. TAUGER:  That's an interesting question,

5    Your Honor.  We believe that our evidence supports what we

6    are contending.  They have not put in evidence to the

7    contrary with respect to this distinction between "porn"

8    and "pornography" and how it is understood.  So I don't

9    believe there is a question of fact.  I believe the fact

10   that "porn" and "pornography" have different colloquial

11   meanings, particularly in the industry we are discussing.

12   I believe that's an undisputed fact and does not need to

13   be put to the jury.

14        THE COURT:  All right.

15        MR. TAUGER:  Now, with respect to "tube,"

16   Your Honor, "tube," they contend, means television.  Our

17   website is not a television.  It is an Internet web

18   presence.  The Court itself, Your Honor said yourself

19   "Okay, tube, that means videos."

20        "Tube" does not mean videos.  "Tube" means

21   television, at least that's what Calista contends.  If

22   this was porn videos, maybe they would have a point, but

23   it is not.  It is PornTube.

24        I want to get back to Surgicenter, because there

25   are two critical points they didn't mention.  The reason

1    that Surgicenter was found to be generic was because the

2    Court found that with respect to Surgicenter, the

3    consuming public, which is to say the target demographic

4    for the product that's offered "generally understands the

5    word to mean exactly what it says.  This is amply

6    demonstrated in the exhibits from the examination of the

7    45 exhibits offered by the respective parties.  We agree

8    with the District Court."

9        That's point 1.  That is not the case here.  The

10   evidence that we have put in shows that the consuming

11   public, and I would like to draw particular attention to

12   the Xbiz articles and to the AVN articles.  Nearly 1,000

13   of them, which writes to the consuming public, our target

14   demographic, they use the term "tube site."  They do not

15   use the term "porn tube."  The few times that "porn tube"

16   is used as a noun are either by one author -- I think

17   there were five articles they put in by the single author,

18   who made the same mistake five times.

19       THE COURT:  What about in PornTube.com's own

20   website?  They frequently -- not frequently -- some of the

21   examples given to me by Calista show PornTube talking

22   about to their members that they are adding "new porn tube

23   videos" or "attractions" or "fantasies" to their site

24   fairly regularly.

25       MR. TAUGER:  That's correct.  That shows that

1    PornTube may not be aware of how best to protect its

2    trademark, but it is not a generic use.  Mr. Rabinowitz --

3          THE COURT:  Slow down on that one, because I'm

4    not following that one.  It sounds to me as if PornTube is

5    using the two words, "porn" and then a space and then

6    "tube" to describe videos and fantasies and the like that

7    will be on its website in a generic or descriptive

8    fashion.

9          MR. TAUGER:  Mr. Rabinowitz testified, and we

10   put it in our brief, that the use of "porn tube" in this

11   context could mean a video that's on PornTube; a fantasy

12   that's on PornTube.  When I say that the client may not

13   know the best way to ensure protection of the mark, when

14   they started, they didn't put an "R" and a circle.  That's

15   something that they had to hear from their lawyers.  The

16   same with this.

17         THE COURT:  I will and I probably shouldn't, but

18   I'm going to say it anyway, but I think that's the weaker

19   of the two arguments as between you and Calista, but it

20   may be sufficient to create a disputed issue of fact on

21   the question.  I am still struggling with that issue.

22         MR. TAUGER:  If I have to choose between the

23   two, I'll take the latter, Your Honor.

24         THE COURT:  Understood.

25         MR. TAUGER:  Getting back to Surgicenter,

because there is one more very critical argument.  In
Surgicenter, the Court held that "the District Court
here" -- this is the Ninth Circuit reviewing the District
Court's decision.  "The District Court here properly
concluded that the term 'Surgicenter' had not acquired a
secondary meaning."

And, of course, that is clearly not the case
here.  We have surveys, not only by our expert, but by
Calista's expert that say unequivocally, without question,
beyond doubt, consumers recognize "PornTube" as a brand
name, not as a common name.  That's clearly -- if you
don't want to regard the generic, that's certainly
evidence of secondary meaning.  There is just no question
about that.

So Surgicenter is not going to be the
controlling case here, or if it is, it is going to result
in a finding in favor of "PornTube" being a protectable
mark as opposed to a generic mark.

While we are talking about survey evidence, I
understand why Calista is laboring mightily to try and
exclude the survey evidence of genericness.  We have put
in our case law.  They put in theirs.  The Court can
review it; the Court can determine which controls.  But I
want to point out that that argument has been raised, only
after their results came in.  When their expert found

1    that, in fact, yeah -- I mean, he was unequivocal.  He

2    said, "PornTube is a brand name; it is not a common term."

3    That's a direct quote from his deposition, and it is

4    supported by the evidence he provided.

5         Then it became essential for them to try to

6    exclude it, but not until then.  I would ask this

7    question, at least rhetorically, if they believe from the

8    inception that survey evidence was not appropriate for

9    determining genericness, why did they conduct one?

10        THE COURT:  The old belt and suspenders.

11        MR. TAUGER:  Well, they put on their belt and

12   suspenders, and they lost that gamble because it favors

13   us, not them.

14        THE COURT:  I understand.

15        MR. TAUGER:  With respect to competitors'

16   supposed use of the mark, this is where I have the biggest

17   problem.  As I started by saying we are in a unique

18   industry with respect to the disrespect shown by third

19   parties to the intellectual property of others, but that

20   doesn't mean it can't be protected.  That's why we are

21   here, because we are using the mechanism of law available

22   to us to protect our mark, as is appropriate.  There is no

23   free license to take intellectual property of others just

24   because a lot of people may be doing it on the Internet in

25   this particular industry.

```
 1            THE COURT:  Although this is going to walk into
 2   a laches argument.
 3            MR. TAUGER:  We can get to laches.  The laches
 4   argument, I think, is easily disposed of, and I think we
 5   addressed it in our moving papers.
 6            THE COURT:  I think you have too, except I'm a
 7   little worried about GoldPornTube and Mr. Matheson's
 8   knowledge of that, but we will get there.
 9            MR. TAUGER:  I can address it now or later.
10            THE COURT:  It is your choice.
11            MR. TAUGER:  Let me move on, and we will address
12   GoldPornTube, because I honestly don't see a real problem
13   with laches in this case.
14            The rules of evidence still pertain in this
15   case, and a Google search -- we have discussed at length
16   why a Google search is not competent evidence of a
17   competitor's use.  Just for fun, while Mr. Fray-Witzer was
18   talking, I did a Google search on the term "tube site,"
19   two words with a space in quotes.  The very first article
20   that comes up is, "The porn industry is being ripped apart
21   by tube sites."  Then the next one is, "Xbunker.com, the
22   world's largest XXX tube site."  And the third entry
23   happens to do with the care and feeding if you have had a
24   colostomy and the "tube site."  But it is clear, at least
25   from the search I performed, that "tube site" is referring
```

to the adult-industry tube site.

One of the things that we mentioned in our brief is that Google searches are unique to the party doing the searching.  On my computer there are probably cookies, which I don't know how Google does it, but Google knows it is me looking.  I am sure that Google knew it was Mr. Fray-Witzer, or whoever on his side performed the search.

In the deposition of Mr. Randazza, I asked him specifically, how did you ensure that this was not being influenced?  He indicated that he did the search on his office computer.  He also did the search on his home computer.  Mr. Randazza is an attorney that specializes in this industry, so presumably his search results would be very different than mine in that this is the only case in this industry I have ever done.

I would like to talk about JT, and this goes to the difference between admissible and inadmissible evidence.  Calista referred to a white paper that JT, a former employee of Dream Star Cash, not of Tenza, wrote. Some of the evidence that Calista has put in are transcripts of web forum where supposedly someone who identified himself as JT was saying things.  The white paper comes from our website.  That authenticates it.

THE COURT:  Ah, I see.  So your point is the JT

1  reference that Mr. Fray-Witzer identified for me, there is

2  no issue about authentication.  Whatever is in that

3  document, that's from Tenza's former employee?

4      MR. TAUGER:  That's correct.

5      THE COURT:  Your point is that other articles

6  that may be attributed to someone who identifies himself

7  or herself as "JT," you are objecting to as lack of

8  foundational evidence.  That is really the same JT; hence,

9  hearsay.

10      MR. TAUGER:  Absolutely.  On GFY.com all you

11  need to do to post is register under whatever screen name

12  you want to give.

13      THE COURT:  That's a fair point.

14      MR. TAUGER:  I wasn't going to say this.

15  Co-counsel suggested I remove it from my brief, but I am

16  going to say it anyway.  If anyone can go on there, for

17  all we know, it could have been Mr. Zhukov.  I am not

18  saying that he did, but I'm saying anyone could.

19      THE COURT:  It is a fair point.

20      MR. TAUGER:  Now, I would like to read from the

21  white paper that counsel says constitutes proof that

22  "tube" means only adult-entertainment streaming video

23  websites.

24      THE COURT:  Although somewhat inconsistent,

25  slowly but be brief on this point.

1          MR. TAUGER:  I will read one or two, and then I

2     will give you my count.

3          This is from the second paragraph of the

4     introduction.  "With the advent of adult tube sites back

5     in 2006, and the sheer horror to which they were received

6     by the adult industry," and it goes on.

7          Same page, "For the end user, visiting a tube

8     site with so much content readily available," and it goes

9     on.

10          Same page, "Living and breathing a tube site

11     every minute of the day."

12          Same page, "I'm not going to try and bluff you

13     and say throw a clip up on a tube site, and you will make

14     bank."

15          There were, I think, nine or ten discrete

16     references, including a chapter heading --

17          THE COURT:  I get the point.

18          MR. TAUGER:  Okay.

19          So, yeah, you'll find uses of "tube," but only

20     in the context where the author has first made it clear

21     what he is talking about, tube site.  That's what JT did

22     here.  What you will not find is JT not using the term

23     "tube site," and just saying that we all know what "tube"

24     means, and that's what you are talking about.  This is not

25     a competitor's use.

1    Media usage -- wow.  I think we are losing sight

2    of exactly what a word becoming generic means.  That is,

3    it is understood by the predominant consuming demographic

4    to refer to the "what is" rather than the "who is."

5    Calista has labored mightily to find every single example

6    of the use of term "porn tube" that they could find.  In

7    doing so, they have put into evidence a number of articles

8    from other countries, which is completely irrelevant to

9    the determination that we are going to make, a number of

10   articles that are from, I'll put it charitably,

11   questionable sources.  The Court can read them.  The Court

12   can make its own determination as to whether it should be

13   given any validity as to how the general consuming public

14   for this product regards the term.

15        But the bottom line is, they have come up with a

16   mere smattering of examples.  Are there examples of

17   improper use?  Yes.  And when Tenza finds improper use by

18   a relevant media source, it sends out corrected notices,

19   and those are in evidence.  We have briefed that as well.

20        So the fact that there is some usage is

21   meaningless and irrelevant.  We have put in the Xbiz

22   articles, the AVN articles.  We have put in mainstream

23   media, like ABC, CNN.  We have put in industry

24   organizations, like VFFC (phonetic).  None of them refer

25   to "PornTube" as a noun that defines what these kinds of

sites are.  All of them refer to "tube sites" as the noun

that defines what these kind of sites are.  It is very

hard to prove a negative.  You're not going to find an

article that says, "I'm not using the word "PornTube,"

because that's a trademark, so I'm instead using the

accepted generic "tube site."  You are going to find

people use "tube site," and that's what we have put in.

          THE COURT:  All right.  I think it would be

helpful for me if you speak briefly about the laches

issue.

          MR. TAUGER:  There are two instances that

Calista has brought before the Court.  There are two

instances that have been put into evidence in the form of

chat logs.  Now, the first chat log is interesting,

because when showing it to Mr. Matheson, he could not

remember the chat log.  Now, Mr. Zhukov has since

authenticated it.  He admits that the chat log is not

representative of what was actually received, because he

is the one who edited the names that would appear as

4Tube.  But the main point is that Mr. Matheson couldn't

recall it, and for that reason, couldn't authenticate.

That's one instance.

          Then there was a second instance in connection

it was 4Tube.com.  I was in the process of settling a case

a couple of weeks ago.  Opposing counsel's name was just

1    really familiar to me, and I asked him.  I said:  I know

2    you, don't I?  He says:  Yeah, I know you.  We have worked

3    together before.

4           We spent a good 15 minutes trying to remember

5    who were our clients and what was the matter, and we just

6    could not.  I have had, I don't know, maybe 50 clients in

7    my career, maybe 100.  That's not like Mr. Matheson, who

8    right now has hundreds that participate in the Webmaster

9    Program, and over the past decade or so since he has been

10   doing this, not just in connection with PornTube.com, but

11   also with 4tube.com and Fux.com, I think it is unrealistic

12   to expect that he had made any mental connection with

13   either of those two occasions that would have carried over

14   so that when he is in the process of administering the

15   PornTube website on behalf of Tenza he would have been

16   aware of it.

17          THE COURT:  All right.  I think that's

18   sufficient.

19          Let me ask you another question, a different

20   issue.  In Mr. Morgan's expert opinion, there seems to be

21   an issue or an interesting tension between his definition

22   of "adult streaming video," where he says it is realtime,

23   live, the ability to interact with or communicate with the

24   person being depicted on the video.

25          What do I make of that, what appears to be a

problem in the Morgan opinion?

MR. TAUGER:  First of all, he didn't mention interaction.  What he said was "realtime live video.""

THE COURT:  Right.

MR. TAUGER:  What he meant, and perhaps it wasn't expressed really well, was that it is streamable in realtime as opposed to something you have to download and look at later.  That was the distinction.

THE COURT:  I didn't see that distinction in either his deposition or opinion.  Did I miss it, or is that stated somewhere?

MR. TAUGER:  No.  The deposition, which was after the fact of the survey, he did get confused in what his response was.  But whatever he was confused about, the only question is, can you attribute his confusion to anything that appears in the survey.  Our contention is you cannot.  But there is a second point as well, Your Honor.  That is this:  Our demographic, the demographic of people who visit our site and who also visit Calista's site, are people who look at adult material on the Internet.

I don't see that, in terms of qualifying the relevant demographic, it matters whether they are looking at a live webcam, like Calista described, or they are looking at a video streaming website.  It is still adult

1    video, and that's what they want to see.  So it is not

2    like there is a subset of people who never go to adult

3    streaming video websites and only look at webcams.

4              THE COURT:  Okay.

5              MR. TAUGER:  May I make one other point about

6    the survey, Your Honor?

7              THE COURT:  Yes.

8              MR. TAUGER:  One of Calista's criticisms was

9    that there was a mention of "porn tube" in a subsequent

10   question after an earlier question which said which of

11   these are --

12             THE COURT:  I read that, and I'm not concerned

13   about it.

14             MR. TAUGER:  Thank you.

15             THE COURT:  Thank you.

16             Mr. Fray-Witzer, brief response on genericness.

17             MR. FRAY-WITZER:  Some very brief responses,

18   Your Honor.  My Brother talked about Mr. Rabinowitz saying

19   the reason that "porn tube" appears generically on the

20   PornTube.com website was for this reason, that reason, or

21   the other reason.  What Mr. Rabinowitz said is:  I have no

22   idea why it appeared that way, but I could guess that

23   maybe -- he can't know.  He didn't write it.

24             With respect to the Surgicenter case, my Brother

25   tries to distinguish it, because Surgicenter talks about

secondary meaning.  You are certainly right he talks about

secondary meaning.  The Court said:  I find this to be

generic.  Even if I hadn't found it to be generic, I

wouldn't let this go forward, because there is a secondary

meaning.

One of the phrases that my Brother used about a

word becoming generic, that's the problem with Tenza's

case.  This is not "aspirin."  It is not a word that

became generic.  It is a word that was always generic.

"Porn" and "tube" is the combination of two generic words.

It tells someone what is at the site.

THE COURT:  You know what, I don't think you

could make that argument persuasively before the advent of

YouTube.  Do you disagree?

MR. FRAY-WITZER:  I think that YouTube made it

abundantly clear, and it became incredibly clear what a

tube site was.  But remember, the application for the

registration of the mark was years after YouTube was

already incredibly successful.

THE COURT:  That's a different point.  I agree.

I am reacting to your argument simply about the

combination of those two words is inherently generic, and

it may be.  It may eventually get there.  I don't know.

But I just don't think it was before the advent of

YouTube.

```
 1              MR. FRAY-WITZER:  I think Your Honor is probably
 2    right, that YouTube is what certainly pushed it -- I think
 3    that YouTube, if you look at their logo as well, it is
 4    also a television.  So "tube" was something meant to show
 5    videos.  So I think you are there anyway.
 6              The final thing that I would say, Your Honor, is
 7    you are absolutely right about the Morgan survey.
 8    Mr. Morgan didn't just talk about it being live.  He
 9    talked about there being someone there who wants to talk
10    with you, which is interaction.  Not only that, more than
11    a hundred-some-odd respondents clearly had the same
12    impression what Mr. Morgan was citing, because they talked
13    about cam sites, and they talked about live sites.  I will
14    leave it there.
15              THE COURT:  All right.
16              First of all, I appreciate the briefing from
17    both sides.  I think this was well briefed by both sides,
18    well argued today by both sides.  I am not going to rule
19    from the bench.  I am going to take this under advisement
20    and expect that I will get you a written decision, I am
21    pretty darn confident, within 30 days.  I am going to ask
22    a few questions.
23              In Tenza's counterclaims, counterclaims 6 and 7,
24    constructive trust and accounting, that's for the Court,
25    correct?
```

1          MR. TAUGER:  That's correct.

2          THE COURT:  Everything else is for the jury.

3          MR. TAUGER:  It could be if the Court doesn't

4  want to rule on the summary judgment motion.

5          THE COURT:  Fair enough.  If summary judgment is

6  not granted, I need to figure out what requires a bench

7  trial and what requires a jury trial.  Trademark

8  infringement, unfair competition, under the federal law,

9  common law trademark infringement, counterfeiting,

10  cybersquatting and conversion.  If summary judgment on

11  both sides were denied, and that's an "if" that that

12  sentence begins with, those questions are for the jury; is

13  that correct?

14          MR. TAUGER:  That's correct.

15          THE COURT:  If all of those claims went to the

16  jury, how long do you estimate the trial would last,

17  either whatever you feel comfortable estimating Tenza's

18  case-in-chief or the full trial, and then I will ask the

19  same question of Calista.

20          MR. TAUGER:  Your Honor, we would estimate 14

21  days.

22          THE COURT:  Total?

23          MR. TAUGER:  Total.

24          THE COURT:  Do you agree with that?

25          MR. FRAY-WITZER:  We had estimated ten days,

1  Your Honor.  I think that it is somewhere in there.  My

2  impression is that this Court would try a streamlined

3  case, and so I think the ten days may be sufficient.

4        THE COURT:  I definitely try streamline cases.

5  That said, I also want to be realistic.

6        You are talking trial days obviously, so that

7  would put us into our third week, even if it was ten days.

8  We will be going into a third week of trial, if we do have

9  a trial.  Whether it be the full third week, four-fifths

10  or one-fifth of that third week, we are still talking

11  about telling a jury that we're going into a third week,

12  and we have to give them a fair amount of time to

13  deliberate.

14        If I were to deny the summary judgment motions

15  for each side, when would you all want to schedule a

16  three-week trial?  We will put it on the books for three

17  weeks.  I will try to force everybody to be more efficient

18  about it, but we will hold it open three weeks.  When

19  would you want it?

20        MR. TAUGER:  Your Honor, I think there are two

21  parts to that answer.  One, it depends on the guidance

22  that we get from the bench, assuming that motions for

23  summary judgment are denied.  If there's no adjudication

24  of any of the issues, then it is going to require more

25  preparation.

```
 1              THE COURT:  Assume the following:  Assume that
 2    Calista's money damages claim will be gone, except for the
 3    Court dealing with their claim for attorney's fees that
 4    they may be entitled to under a statute.  Assume
 5    everything else remains.  Assume that questions such as
 6    whether or not "porn tube" is generic and whether or not
 7    there is a reasonable likelihood of confusion is for the
 8    jury.  Frankly, assume that the remaining Tenza
 9    counterclaims -- frankly, assume that they would follow.
10    They would also raise questions for the jury, but,
11    frankly, I don't think they really add anything to the
12    jury.
13              If this is a jury trial, the jury will need to
14    decide essentially two things:  Is the term generic?  And
15    is there a reasonable likelihood of confusion?  That's
16    what I view as the primary struggle that the jury would
17    have if it is a fact question for them.
18              By the way, am I missing something?  Does
19    anybody disagree with that?
20              MR. SHAYEFAR:  Laches is also something that
21    might go to the jury.
22              THE COURT:  Okay.  Fine.  You are technically
23    right, but that's not going to be either that demanding in
24    terms of putting on evidence or time consuming.
25              Okay.  You are right.
```

1          MR. TAUGER:  Your Honor, I would anticipate if

2    everything is going to the jury as you've described, we

3    are going to be very busy writing motions in limine, as I

4    suspect so will Calista.  I think resolving them

5    particularly as early as possible would be really

6    essential for trial preparation.

7          THE COURT:  Here is what I'm planning on doing

8    with that, and this all assumes denial of summary

9    judgment.  What I would like to do now is pick a trial

10   date and set aside what I see as three weeks.  Then I

11   would envision two pretty significant pretrial

12   conferences, where at the first one we will deal with all

13   of the motions in limine that we possibly can.  Obviously

14   sometimes things need to be decided at trial.  Most

15   motions in limine, most evidentiary objections can be

16   dealt with at a pretrial conference.  At least that's my

17   style.

18          I generally issue rulings on motions in limine,

19   evidentiary objections to exhibits, and any objections to

20   witness testimony, lay or expert, at the pretrial

21   conference.  Maybe two or three percent of the objections,

22   I will reserve ruling on, depending on whether there are

23   foundations laid or how things come out at trial.  That

24   way, we minimize interruptions at trial, and we can have a

25   very efficient trial.

           This case is sufficiently complex that I think
it will benefit from two pretrial conferences:  One where
we tackle all of those issues and make a lot of progress
on jury instructions and then a second one a few weeks
later where we basically clean up whatever still needs to
be resolved and pretty much finalize jury instructions
before trial begins.  Maybe we can deal with some
demonstrative exhibits, things like that.

           I wouldn't expect you all to prepare
demonstrative exhibits before knowing how motions in
limine shake out.  But if you know how motions in limine
shake out at our first pretrial conference, by the time we
get to our second, we can deal with demonstratives.

           What I would envision, working backwards,
picking a three-week trial period and then maybe six weeks
before that having a pretrial conference.  Then maybe
three weeks thereafter, three weeks before trial, having a
second pretrial conference.  Then you have three weeks to
finalize and hone your trial presentation, and we have
time, if need be, for a third pretrial conference.  We
probably won't need it, but we might.

           So with that in mind, a three-week trial period,
and then we will have our first pretrial conference about
six weeks before that.

           When would you like to have a three-week trial?

 1          MR. TAUGER:  Your Honor, counsel and I had a

 2    brief conferral.  Late November or perhaps early December.

 3    I guess that's what we would be looking at.

 4          THE COURT:  Okay.

 5          MR. TAUGER:  One question is raised, Your Honor,

 6    with respect to timing, if I may.

 7          THE COURT:  You may.

 8          MR. TAUGER:  In granting Calista's motion for --

 9    I'm sorry -- which motion was that?  In denying our motion

10    for default -- that's what it was.  I beg your pardon.  It

11    is granting the motion for leave to amend.  The Court

12    indicated that we could take reasonable discovery, as

13    required.  I am hoping to get some clarification from the

14    bench from this.  We argued in our brief that the

15    discovery that would be required would be both written and

16    deposition.  I would like to try and head off an

17    unnecessary phone conference with the Court.  Perhaps we

18    could address that briefly, because that will also impact

19    the trial schedule.

20          We would like to take Mr. Zhukov's deposition

21    and, of course, Mr. Zhukov maintains residences in Prague

22    and -- I can't say the name -- I'll say Russia.

23          MR. GURVITS:  Your Honor, we have done in other

24    cases depositions like that, video conferencing.  That

25    saves everyone having to fly to Europe.

1          THE COURT:  That sounds like it solves the

2     problem, doesn't it?

3          MR. TAUGER:  It does, Your Honor.

4          THE COURT:  All right.  Very good.

5          Let me see when I can find three weeks.  It

6     looks to me as if it would be difficult for me to find

7     three consecutive weeks before February 2015.  So let me

8     ask you, how does February 2015 look for you all?

9          MR. TAUGER:  That, I think, would work for us,

10    Your Honor.  In fact, I just asked counsel if perhaps we

11    should push it into the new year so we don't step on

12    jurors' potential holidays.

13         MR. GURVITS:  Your Honor, the only issue for us

14    is that there's school vacation week starting on

15    February 15th or 16th.

16         THE COURT:  No.  School vacations are in March.

17    What school is this?

18         MR. FRAY-WITZER:  It is the East Coast.

19         MR. GURVITS:  We have longstanding plans to be

20    with family in Colorado starting on the 15th for one week.

21         THE COURT:  All right.

22         MR. GURVITS:  If this was a two-week trial, we

23    would have no problem.

24         THE COURT:  I can make it a two-week trial.

25    (Laughter.)

1              All right.  One moment.

2              I have a firm criminal case that very well might

3    go to trial that starts January 26th.  We can start this

4    February 2nd.  I will be glad to make lots of rulings in

5    advance, and we will try to keep this to ten days.

6              MR. GURVITS:  That would work for us.

7              THE COURT:  So I think to be safe, I will set

8    this, just for our calendaring purposes here, a 12-day

9    jury trial starting on Monday, February 2nd, 2015.  You

10   know what, that Monday, the 16th, is a federal holiday.

11   It is Washington's birthday.  I will be efficient.  I will

12   help you with this.  I will set this as a ten-day jury

13   trial starting February 2nd.  Then we will keep it to ten

14   days, and then Mr. Gurvits can leave for holiday.

15             MR. GURVITS:  Thank you, Your Honor.

16             THE COURT:  So a ten-day jury trial starting on

17   February 2nd, 2015.  Six weeks before then -- how does

18   Monday, December 22nd, work for you all for our first

19   pretrial conference?  It will be a half day.

20             Do you prefer morning or afternoon?

21             MR. TAUGER:  I prefer morning, Your Honor, if

22   that works.

23             MR. FRAY-WITZER:  That's fine.

24             THE COURT:  9:00 a.m., December 22nd, 2014

25   pretrial conference No. 1.

1           Three weeks later -- I may be in a trial on

2   January 12th.  That starts a week before.  How about

3   Tuesday, January 20th?  My trial will be over.  That's the

4   day right after the Martin Luther King holiday, the 19th.

5   The courthouse is closed.  So can we do our second

6   pretrial conference on Tuesday, January 20th.  Will that

7   work?

8           MR. TAUGER:  Yes, Your Honor.

9           MR. FRAY-WITZER:  Yes.

10          THE COURT:  Preference?

11          MR. TAUGER:  Morning.

12          THE COURT:  9:00 a.m., for pretrial conference

13  No. 2.  Hopefully we won't need a pretrial No. 3, but we

14  will talk about that at either 1 or 2.

15          Okay.  I will try to get you a decision on the

16  pending cross-motions for summary judgment certainly

17  within 30 days; maybe sooner than that.

18          Anything else that we need to talk about at this

19  time?

20          MR. FRAY-WITZER:  No, Your Honor.

21          MR. TAUGER:  Two very brief matters, Your Honor.

22          With respect to the order denying our motion for

23  default of Mr. Zhukov, you indicated that our contention

24  that he was an alter ego, and I quote, "as of yet an

25  unproved allegation."  I would like to get some guidance

as to whether the Court's objection was a procedural one

or an evidentiary one in that we have not met a burden of

proof.

THE COURT:  Procedurally we haven't yet resolved

whether he is or is not an alter ego.

MR. TAUGER:  Okay.

THE COURT:  I don't think it is fair to him or

to any third party to just simply assume that they are an

alter ego and therefore say:  Since we served your alter

ego, you have been served too.  If you really want to

bring him into this case, then what I think you need to do

is get him served properly, as soon as possible.  If you

do it promptly, I think it would be very difficult for him

to maintain an argument that he needs a lot more time to

prepare than having trial in February of 2015, but we will

see what he says when you get him served.

The other option, of course, too, is take your

case against Calista.  Then if you prevail, then you bring

a second case, if and when you get Mr. Zhukov served.

Then all you have to do is show alter ego.  If you show

alter ego, you already have claim preclusion.  You do what

you want.  I'm not giving you advice on that stuff.  I

just don't think it is consistent with due process to

default him on the state of the record that we have right

now.  That's all I think I can or should say on that point

at this time.

By the way, something else I would like you two to confer about, and maybe we will talk about it when we get a little closer to trial.  By the way, you will see when we send out a minute order on the trial dates, I will send you out my standard civil trial management order to see what everybody has to file and when.

Basically you have to file things approximately four weeks before our first pretrial conference -- frankly, let's talk about it right now.  Assuming a normal non-declaratory case, plaintiff has the burden of proof on the claims, and in my standard civil trial management order I require plaintiff, four weeks before the pretrial conference, to file things in what I call my first wave of pretrial filings.  You will see it described in my order. It is essentially plaintiff's trial memorandum, plaintiff's proposed exhibits, plaintiff's witness statements, lay and expert, plaintiff's motions in limine, plaintiff's deposition excerpts intended for substantive use, plaintiff's proposed verdict form, jury instructions, basically stuff like that.

Then one week later, in a typical case, I anticipate and ask defendants to, not only file the same documents from their perspective, but also to give me any objections they have to plaintiff's filings, objections to

plaintiff's evidence, objections to plaintiff's witness

statements, lay or expert, responses to motions in limine,

and defendant's motions in limine.

The following week the plaintiff has the bulk of

the filings back to them.  They are responding to

defendant's motion in limine.  They are responding to

defendant's objections, and they are making their own

objections to defendant's exhibits, witness statements,

and the like.  You will see all of that spelled out.  In

the normal case, it makes perfect sense.

I think that since Plaintiff Calista's case here

are all issues either for the Court, or arguably for an

advisory jury, but since they are essentially declarations

of non-infringement, I think the burden of proof is going

to be on Tenza on their claims such as trademark

infringement, unfair competition, common law trademark,

counter cybersquatting, and conversion.

The burden of proof will be on Tenza.  So I

think for purposes of trial we should consider Tenza to be

the plaintiff.  Frankly, I think even in front of the jury

we should consider Tenza as the plaintiff.  I will tell

the jury that Tenza has the burden of proof on those

claims.  Therefore, when you see in the first round of

required submissions, when it says "plaintiff," I think we

should treat that as referring to Tenza.  When the

defendant files their second wave, the "defendant" will

then refer to Calista.  Then for purposes of basically

trial preparation and trial, we should treat and consider

Tenza as the plaintiff; Calista as the defendant.

          Does anyone disagree?

          MR. FRAY-WITZER:  The only thing I would say,

Your Honor, to the extent that there are claims that

Calista is going to bear the burden, the way that trials

generally balance out, the fact that one side has the

burden, is that they also get a few advantages in the

trial.  They get to present first in opening statements.

They get to present last in closing arguments.  To the

extent that we still maintain the burdens, the offsetting

benefits may be removed.

          THE COURT:  I understand.  I frankly agree, but

I can't think of what, if anything, Calista would bear the

burden on other than an affirmative defense to one of

Tenza's claims.  Traditionally, you know, we have

plaintiff asserting claims, a defendant bears the burden

on an affirmative defense, but that doesn't change the

dynamics as you have just described.

          MR. FRAY-WITZER:  If Tenza is, I suppose,

required to bear the burden of showing that its purported

mark is not generic, then that would be fine.  I suppose

to the extent that we're having to prove the genericness

1    as our burden, it becomes questionable again.

2              MR. TAUGER:  Your Honor, we would bear the

3    burden of proof that we have a valid trademark, and the

4    response from Calista would be, no, you don't, because it

5    is generic.

6              THE COURT:  My understanding how this works, you

7    start out on the burden of production by showing that you

8    have a registered mark that creates a presumption of

9    validity.  Then Calista would bear the burden of basically

10   rebutting that presumption, like an affirmative defense.

11             Am I wrong?  Isn't that how it works?

12             We can talk about it a little bit more when we

13   get closer and in some of your pretrial motions.  But for

14   right now, when you see my standard pretrial order, which

15   I'm not going to modify for this case, when you see what

16   plaintiff has to do in phase one, what defendant has to do

17   in phase two and going forward, "plaintiff" will refer,

18   for those purposes, to Tenza.  "Defendant" will refer to

19   Calista.  To the extent that Calista wants to make some

20   requests for procedural modifications to make sure that

21   everything is fair to both sides, fine, we will talk about

22   it at our pretrial conference.

23             MR. TAUGER:  One more point, Your Honor, if I

24   may.  This involves the deposition transcript of

25   Scott Rabinowitz.  When his deposition was taken,

Mr. Fray-Witzer did a commendably thorough job in
researching him and preparing for it.  In doing so, he
came up with some information that is personally
embarrassing to Mr. Rabinowitz and that is not in any way
relevant to this proceeding.

          Mr. Fray-Witzer and I discussed it briefly at
the deposition, and I apologize if I'm misstating what I
thought we had understood, but it was going to wind up
sealed.  We have since communicated, I think primarily
with Mr. Shayefar with respect to what's going to happen
with that testimony.  The response we got back was
essentially:  We don't intend to use it right now.

          That is really not satisfactory either to us or
to Mr. Rabinowitz.  We would like to find a way -- of
course, I don't want to put on the record what it is.

          THE COURT:  That's fine.

          MR. TAUGER:  We can produce it in camera if the
Court likes.

          THE COURT:  Here is what we will do:  Have some
further conference about it.  If you can reach an
agreement, send me in a stipulation, a stipulated order,
and I will enter a stipulated order.  If you can't reach
an agreement, feel free to file whatever motion and
exhibits or declarations or explanations you want.  File
that motion under seal, if you want.  I will direct that

1   if you file that under seal, that any sensitive portions

2   of a response also must be filed under seal.  Then we will

3   deal with it.  We will get on the telephone and deal with

4   it.

5              MR. TAUGER:  Thank you, Your Honor.

6              THE COURT:  Anything else we need to talk about

7   at this time?

8              MR. FRAY-WITZER:  No.

9              THE COURT:  Okay.  Thank you all very much.

10  Safe travels.

11              (Court adjourned.)

--oOo--


        I certify, by signing below, that the foregoing

is a correct transcript of the record of proceedings in

the above-entitled cause.  A transcript without an

original signature, conformed signature, or digitally

signed signature is not certified.


/s/ Dennis W. Apodaca                    July 31, 2014
DENNIS W. APODACA, RDR, RMR, FCRR, CRR              DATE
Official Court Reporter