## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

**CALISTA ENTERPRISES LTD.**,
*a Republic of Seychelles Company*,

      Plaintiff,

      v.

**TENZA TRADING LTD.**,
*a Cyprus Company*,

      Defendant,

      v.

**ALEXANDER ZHUKOV**,
*a Czechoslovakian citizen*,

      Counterclaim-Defendant.

Case No. 3:13-cv-01045-SI

**OPINION AND ORDER**

Valentin David Gurvits and Matthew Shayefar, BOSTON LAW GROUP, PC, 825 Beacon Street, Suite 20, Newton Centre, MA 02459; Sean Ploen, PLOEN LAW FIRM, PC, 100 South Fifth Street, Suite 1900, Minneapolis, MN 55402; Evan Fray-Witzer, CIAMPA FRAY-WITZER, LLP, 20 Park Plaza, Suite 505, Boston, MA 02116; Thomas Freedman Jr., PEARL LAW LLC, 522 S.W. Fifth Avenue, Suite 1100, Portland, OR 97204.
Of Attorneys for Plaintiff.

Paul N. Tauger and Anna M. Vradenburgh, THE ECLIPSE GROUP LLP, 2020 Main Street, Suite 600, Irvine, CA 92614; Devon Zastrow Newman, SCHWABE, WILLIAMSON & WYATT, P.C., 1211 S.W. Fifth Avenue, Suite 1900, Portland, OR 97204.
Of Attorneys for Defendant Tenza Trading Ltd.

**Michael H. Simon, District Judge.**

This is a trademark dispute between two providers of Internet pornography. Plaintiff Calista Enterprises Ltd. ("Calista") and Defendant Tenza Trading Ltd. ("Tenza") are businesses that operate websites in the adult-entertainment industry and stream sexually explicit videos. The parties' claims and counterclaims concern U.S. trademark law under the Lanham Act, 15 U.S.C. §§ 1114-1125, as well as related claims under Oregon law. Calista moves for partial summary judgment on its claim for cancellation of Tenza's registered trademark, Calista's claim for declaration of noninfringement, Tenza's claim for counterfeiting, and for a finding that Tenza's claims are barred by laches. Tenza moves for partial summary judgment on its claims for trademark infringement, counterfeiting, cybersquatting, and for a finding that Calista may not recover money damages. For the reasons below, the Court denies Calista's motion for partial summary judgment and grants in part and denies in part Tenza's motion for partial summary judgment.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252,

255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

Where parties file cross-motions for summary judgment, the court "evaluate[s] each motion separately, giving the non-moving party in each instance the benefit of all reasonable inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard."). In evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Thereafter, the non-moving party bears the burden of designating "specific facts demonstrating the existence of genuine issues for trial." *Id.* "This burden is not a light one." *Id.* The Supreme Court has directed that in such a situation, the non-moving party must do more than raise a "metaphysical doubt" as to the material facts at issue. *Matsushita*, 475 U.S. at 586.

# BACKGROUND[1]

**A.  Tenza**

Tenza is the owner of an adult-entertainment website at www.porntube.com. The
www.porntube.com website was originally owned by EMC Ideas, Inc. In late 2010, EMC sold
the domain name to FUX Ltd., of which Steve Matthyssen is a shareholder. FUX contributed the
domain name bought from EMC to the newly formed Tenza, of which FUX is a shareholder.
Tenza's domain porntube.com is operated by non-party DreamStar Cash Ltd. ("DreamStar").
DreamStar is managed by Steven Matthyssen who, along with Michael Cardone, is a beneficial
co-owner of Tenza.

In May of 2005, the www.porntube.com website began streaming pornographic videos.
Content on Tenza's website is uploaded by content producers. Tenza's business model is to route
traffic to its website and generate revenue through two methods: (1) third-party advertising
displayed on the website; and (2) payments from the content producers when visitors click on a
hyperlink to the content producer's website and make a purchase from that content producer. In
order to promote visitors to its website, Tenza markets itself by using "search engine placement
services" to maximize the times when Tenza's website appears among the top results on a search
engine in response to user searches. Tenza also sponsors events, such as race cars in major races,
to promote its website. Tenza's primary marketing tool, however, is its affiliate program,
whereby operators of other adult-entertainment websites ("Affiliates") include links on their
websites so that visitors to those websites may "click through" to reach Tenza's website. Tenza

---

[1] The Court views the facts on a motion for summary judgment in the light most
favorable to the non-moving party. Because both Tenza and Calista move for summary judgment
on multiple issues, some of which overlap, the Court only briefly provides a background
description of the parties and their disputes for context. Relevant facts and disputed facts are
presented in the discussion below.

then tracks each "click through" and compensates Affiliates on a per-click-through basis. Tenza's website has a Global Alexa ranking, which estimates the popularity of a website based on the number of visitors and the number of page views on a site, of 1,110 globally and a ranking of 1,182 in the United States.[2]

Tenza also has a trademark registration for the word mark "PORNTUBE," registration number 3,936,197 ("the '197 Registration"). Tenza's predecessor in interest, EMC, filed an application for the '197 Registration on October 29, 2008. Tenza bought the rights to the pending application in late 2010 for $30,000. The application recited a date of first use of the "PORNTUBE" word mark of May 2005. After publication in the *Official Gazette* of the U.S. Patent & Trademark Office ("PTO"), WMM Holdings, LLC ("WMM") filed an objection to the application for the '197 Registration. The objection was dismissed after Tenza entered into a consent and coexistence agreement with WMM. The PTO issued the '197 Registration on March 29, 2011 without further objection.

**B. Calista**

Calista owns and operates several websites that that "categorize" and link to third-party websites that stream pornographic videos. Calista's sole owner and employee is Alexander Zhukov, a named counterclaim defendant in this action.[3] Several other corporations work with

---

[2] The Global Alexa rankings provide metrics on how popular a website is globally and within specific countries. Global rankings are "calculated using a combination of average daily visitors to this site and pageviews on this site over the past 3 months. The site with the highest combination of visitors and pageviews is ranked #1." *See Alexa Competitive Intelligence: Site Overview porntube.com*, *available at* http://www.alexa.com/siteinfo/porntube.com (last accessed July 25, 2014). These rankings are updated daily. *Id.* Ranks by country are also updated daily and are "calculated using a combination of average daily visitors to this site and pageviews on this site from users from that country over the past month. The site with the highest combination of visitors and pageviews is ranked #1 in that country." *Id.*

[3] Counterclaim defendant Zhukov made a limited special appearance in this matter in response to Tenza's motion for default judgment. The Court denied Tenza's motion.

Calista on its websites, including Oklax Inc. (which manages the domain name register accounts for the domain names in dispute in this litigation), Wiblax Ltd. (which serves as a payment agent for Calista), and AlexZ-Traffic s.r.o. (which develops software and templates used on Calista's websites).

Calista's relationship with DreamStar began in September of 2009. DreamStar and Mr. Matthyssen invited Calista to participate in the "webmaster affiliate program" for an adult-entertainment video website called 4tube.com. As an affiliate of the 4tube.com webmaster program, DreamStar paid Calista a commission to send traffic to 4tube.com. In February of 2010, Mr. Matthyssen also asked Calista to join the webmaster affiliate program for a new website called fux.com. On January 3, 2011, Mr. Matthyssen asked Calista to join the webmaster affiliate program for www.porntube.com ("Tenza Webmaster Program"). Calista participated in the Tenza Webmaster Program from January 3, 2011 through March 28, 2013. Calista was one of the most productive affiliates in the Tenza Webmaster Program.

Calista registered a number of domains containing the words "porn," "tube," or "porn" and "tube" in various combinations. Some of these domain names were used as a part of Calista's participation in the 4tube.com webmaster affiliate program, the fux.com webmaster affiliate program, and the Tenza Webmaster Program.

Calista registered its first domain name that included the word "porntube," www.freshporntube.com, in June of 2009. Between that time and before January 2011, Calista owned and operated 15 websites with domain names containing both "porn" and "tube" in various combinations. Between January of 2011 and August of 2013, Calista developed and operated at least an additional 17 domain names containing some permutation of the '197 Registration. In total, Calista has at least 14 domain names that include the

'197 Registration verbatim, including: freshporntube.com, goldporntube.com, lustporntube.com, bonusporntube.com, boxporntube.com, directporntube.com, largeporntube.com, pipeporntube.com, bookporntube.com, 69porntube.com, kissporntube.com, royalporntube.com, cubeporntube.com, and goldporntube.xxx. Shayefar Decl. Ex. 15 at 4, Dkt. 98-7 at 27.[4]

## C.  Dispute Between the Parties

On March 25, 2013, Tenza initiated a proceeding under the Uniform Domain Name Dispute Resolution Policy ("UDRP") of the Internet Corporation for Assigned Names and Numbers ("ICANN"). In that UDRP action, Tenza sought the transfer to Tenza of 13 domain names, which Calista contends it owns, based on their substantial similarity to and alleged infringement of to the '197 Registration. A UDRP arbitration panel ruled in favor of Tenza, and Calista then filed this lawsuit. The filing of this lawsuit prevented the immediate transfer to Tenza of the disputed domain names pursuant to the UDRP panel's decision.

## DISCUSSION

## A.  Evidentiary Disputes

Tenza relies on a survey completed by Donald J. Morgan in support of Tenza's motion for summary judgment. Tenza argues that this survey evidence demonstrates that it has a valid trademark and that there is a likelihood of consumer confusion related to its counterclaim for trademark infringement. Calista argues that consumer surveys are irrelevant in this matter because of the nature of the '197 Registration. Calista also argues that Mr. Morgan's survey results are "irretrievably flawed as to render" them irrelevant and inadmissible under Federal Rules of Evidence 401 or 402. Calista also argues that Mr. Morgan's survey methodologies are

---

[4] These 14 listed domain names are the central focus of the pending cross-motions for summary judgment. This exhibit also contains domain names that contain the phrase "tubeporn," "porn*tube," and "tube*porn."

inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579 (1993). In order for the Morgan survey to be admissible, Tenza must show that the survey is both relevant and reliable. *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988).

## 1. Relevance

Evidence is relevant if it has any tendency to make a fact of consequence more or less probable than it would be without the evidence. Fed. R. Evid. 401. Calista argues that consumer surveys are only relevant where the trademark at issue is a newly-coined or "fanciful term," or in the context of a descriptive term, to determine if the word has acquired "secondary meaning." *See Schwan's IP, LLC v. Kraft Pizza Co.*, 460 F.3d 971, 975-76 (8th Cir. 2006). The Court, however, looks not only to the component parts of a composite trademark, *i.e.*, by focusing on the words "porn" and "tube" in isolation but, instead, looks at the trademark as a whole. *See Official Airline Guides, Inc. v. Goss,* 6 F.3d 1385, 1392 (9th Cir. 1993); *Abercrombie & Fitch Co. v. Moose Creek, Inc.*, 486 F.3d 629, 636 (9th Cir. 2007). This is the correct approach because "[c]ombinations of old words to create new phrases can be just as specific product descriptive/nongeneric as new coined words." *Berner Int'l Corp. v. Mars Sales Co.*, 987 F.2d 975, 982 (3d Cir. 1993); *see also McCarthy on Trademarks and Unfair Competition* § 12:17.50 (4th ed. 2014) (explaining that "[t]o state that consumer perception is irrelevant for a non-coined 'generic' word (like SHELL, or IVORY or HARP) is to assume the result before making an analysis of that which is to be decided"). Because the combination of the words "porn" and "tube" could have nongeneric meaning to the consuming public, the Court finds that the Morgan survey is relevant because it relates to factual issues of consumer perception.[5] *See McCarthy on Trademarks and Unfair Competition* § 32:158.

---

[5] Calista argues that the Ninth Circuit's decision in *Surgicenters of America, Inc. v. Medical Dental Surgeries, Co.*, 601 F.2d 1011 (9th Cir. 1979), means that consumer surveys are

### 2. Reliability

Survey evidence is only admissible if it was obtained "in accordance with generally accepted survey principles" and "the results were used in a statistically correct manner." *Keith*, 858 F.2d at 480. Asserted technical inadequacies with a survey, "including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility." *Id.* If, however, there are substantial design defects in the survey or its execution is defective, then the survey could be excluded. *See Harolds Stores, Inc. v. Dillard Dep't Stores*, 82 F.3d 1533, 1544 (10th Cir. 1996); *Pittsburgh Press Club v. United States*, 579 F.2d 751, 759-60 (3d Cir. 1978); *accord Keith*, 858 F.2d at 480. The Ninth Circuit does not have a standard test to determine when a survey is conducted reliably, but the *Handbook of Recommended Procedures for the Trial of Protracted Cases* provides a list of important factors, including:

(1) The proper universe was selected and examined;

(2) A representative sample was drawn from that universe;

(3) The mode of questioning the interviewees was correct;

(4) The persons conducting the survey were recognized experts;

(5) The data gathered were accurately reported;

(6) The sample design, the questionnaire and the interviewing were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys;

(7) The sample design and the interviews were conducted independently of the attorneys; and,

---

only relevant if the disputed trademark is a "coined term" or if the trademark is descriptive and there is a question regarding secondary meaning. The Court analyzes Calista's erroneous reliance on *Surgicenters* in detail below, *see infra* Section B.2.

(8) The interviewers trained in this field had no knowledge of the litigation or the

purposes for which the survey was used.

Judicial Conference of the United States, *Handbook of Recommended Procedures for the Trial of Protracted Cases*, 25 F.R.D. 365, 429 (1960) ("*Handbook*"). The more modern *Reference Manual on Scientific Evidence* ("*Reference Manual*") enumerates similar considerations. *See* Federal Judicial Center, *Reference Manual*, *Reference Guide on Survey Research* 373-76 (3rd ed. 2011).

Calista argues that the Morgan survey is unreliable for three reasons: (1) Mr. Morgan is unfamiliar with the subject matter involved in this case and improperly defined a crucial term; (2) Mr. Morgan made several methodological errors; and (3) the order of the questions in the Morgan survey were leading and rendered portions of the survey meaningless.

### a.  Morgan's Familiarity

Calista argues that the Morgan survey is unreliable because it was Mr. Morgan's first consumer survey related to the adult-entertainment industry. Because Mr. Morgan had no exposure to the adult-entertainment industry before this litigation, he visited www.porntube.com and a few other adult-entertainment websites. Calista contends that this lack of familiarity led Mr. Morgan improperly to define an "adult streaming video" as a "video that can be viewed in real time." Mr. Morgan explained in his deposition testimony that when he used the phrase "real time" he meant that "what you see on those sites includes video that appears to be live streaming video where someone wants to talk to you." Shayefar Decl. Ex. 59, Morgan Depo. at 123:21-25, Dkt. 114-12 at 47. Mr. Morgan continued: "And so I was trying to define that category of websites that allows the consumer to see this streaming video that they can—I mean, it's real, it's live, in realtime." *Id.* at 124:1-6. When Calista brought to Mr. Morgan's attention that the definition of "adult streaming video" in this case does not include videos that can be viewed in

real time, Mr. Morgan explained "I think that I've defined things accurately, and I think the results are very scientific." *Id.* at 134:13-17. Calista argues that because neither the disputed domains nor Tenza's website actually display live video or provide an opportunity to interact with performers, Mr. Morgan's definition of "adult streaming video" was erroneous.

Tenza asserts that Mr. Morgan is sufficiently qualified to execute the consumer survey. Tenza, however, did not respond to the issue of Mr. Morgan defining an "adult streaming video" as something that occurs in "real time." This flaw may be sufficient to justify the exclusion of the Morgan survey under Rule 702, however, the Court need not resolve this issue at this time, because even if the Morgan survey were excluded, summary judgment would still be inappropriate.

### b. Morgan's Methodology

Calista also challenges the design of the Morgan survey on the basis that Mr. Morgan improperly defined the "'universe' to be studied"—that is, "that segment of the population whose perceptions and state of mind are relevant to the issues in the case." *McCarthy on Trademarks and Unfair Competition* § 32:159. In a case claiming "forward" confusion, "the proper universe to survey is the potential buyers of the *junior user's* goods or services."[6] *Id.* (emphasis in original); *see also AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 353 (9th Cir. 1979) ("In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution."), *abrogated in part on other grounds by Mattel Inc. v.*

---

[6] "The most common trademark actions are known as forward-confusion cases and involve instances of a junior user infringing upon a senior user, creating an impression that the junior user's goods are the same goods as the senior trademark holders." Christina P. Mott, *Multifactors, Multiconfusion? Refining "Likelihood of Confusion" Factors for Reverse-Confusion Trademark Infringement Claims to Achieve More Consistent and Predictable Results*, 47 SUFFOLK U. L. REV. 421, 423 (2014).

*Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003) ; *see also* Suzanne Bonamici, *The Use and Reliability of Survey Evidence in Deceptive Advertising Cases*, 62 OR. L. REV. 561, 596 (1983) ("If the wrong universe has been selected, the survey will provide information about a wholly irrelevant universe.").

Calista states that the Morgan survey used three qualifications to define the relevant "universe" of participants: a person needed to be 18 years or older, not be employed in the legal profession, and visit an adult-entertainment website four or more times per month. Morgan Depo. at 56:13-61:17. Calista argues that individuals who participate in the adult-entertainment industry should have been excluded. Calista further argues that Mr. Morgan erroneously failed to exclude the 176 respondents who stated they had not visited "adult entertainment streaming websites" in the past three months even after answering the relevant screening question. *Id.* at 137:16-138:11.

Regarding the proper "universe," Tenza argues that the relevant audience is individuals who visit adult-entertainment websites four or more times per month. Mr. Morgan explained in his deposition testimony that in his judgment, these individuals "were part of the total, the totality of the consumer base, and that their opinions with regards to that would be important." *Id.* at 57:24-58:7. Although Tenza did not respond to whether individuals in the adult-entertainment industry should have been excluded, the Court concludes that this challenge goes "to the weight of the survey rather than its admissibility." *See Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1038 (9th Cir. 2010) (quoting *Clicks Billiards*, 251 F.3d at 1263); *see also City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." (quoting *Daubert*, 509 U.S.

at 564)). Calista's argument that 176 respondents were erroneously included in the survey results because those individuals had not visited an adult-entertainment website in the last three months is an insufficient basis to exclude the Morgan survey. As Mr. Morgan explains, the fact that someone has not visited such a website in the past three months does not necessarily mean that individual does not generally visit such websites on a regular basis. Morgan Depo. at 139:1-5. Calista's objection goes to the weight that the factfinder should give the evidence, not to its admissibility. *See Pomona*, 750 F.3d at 1044.

The Court concludes that these potential weaknesses in the defined universe are not sufficient to exclude the survey. *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997) ("Challenges to survey methodology go to the weight given the survey, not its admissibility").

### c.   Order of Survey Questions

Calista's final challenge to the reliability of the Morgan survey is that immediately after asking, "Would you say PORNTUBE is a brand name or a common name," the survey asked "Which of the following are names of adult entertainment streaming video websites of which you have heard?" Shayefar Decl. Ex. 56, Dkt. 114-10 at 73-75. Calista argues that this juxtaposition of questions is guaranteed to inflate the number of respondents who claim to have heard of "PORNTUBE." *See McCarthy on Trademarks and Unfair Competition* § 32:172 ("A question 'What brand do you think of when you hear this slogan?' was held slanted where previous questions had already mentioned the critical brand name.") (citing *Ralston Purina Co. v. Quaker Oats Co.*, 169 U.S.P.Q. 508, 1971 WL 16472 (T.T.A.B. 1971)). Tenza argues that the order of the survey questions was a logical prompt to survey participants and did not bias the outcome of the survey results.

"[T]he wording of a question, open-ended or close-ended, can be leading or non-leading, and the degree of suggestiveness of each question must be considered in evaluating the

objectivity of a survey." *Reference Manual* at 393. Further, "[t]he order in which questions are asked on a survey and the order in which response alternatives are provided in a close-ended question can influence the answers." *Id.* at 395. The two general questions addressed by Calista are close-ended. The first general question (listed as individual questions 15 through 22) explains: "We would like to ask you a few questions regarding your understanding of some names or terms for various products or services." Shayefar Decl. Ex. 56, Dkt. 114-10 at 73. "Porntube" is the fifth name or term listed. The next question lists ten adult-entertainment streaming websites, including listing "porntube" last. Calista's criticisms may or may not carry weight, but the Morgan survey is not an example where the survey questionnaire "suggested its own answer." *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984) (rejecting leading questions that presented survey participants with a connection rather than allowing them to make their own connection). The Court notes that the first question, about recognizing certain words as brand names or common names, is not directly related to the next question, which asks survey participants if they are aware of certain adult-entertainment streaming video websites. As a result, the Court concludes that the survey evidence is sufficiently reliable to be admitted into evidence. *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 (9th Cir. 1997) (holding that objections based on the universe of survey participants and the use of leading questions went only to the weight, and not the admissibility, of the survey).

The Court finds that the Morgan survey, at least at this stage of the proceedings, is admissible.

## B.  Trademark Validity

Calista and Tenza each move and cross-move for summary judgment on the issue of whether Tenza owns a valid trademark. For a party successfully to assert a trademark

infringement claim under § 1114 of the Lanham Act, it must first show that it has a valid mark and next that the alleged violating use of the mark is "likely to cause confusion, or to cause mistake, or to deceive" the consumer. 15 U.S.C. § 1114(1)(a). Validity of the trademark is a threshold question because "[a] necessary concomitant to proving infringement is, of course, having a valid trademark; there can be no infringement of an invalid mark." *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir. 2002). Calista argues that the '197 Registration is invalid because it is a generic term. Tenza responds that the '197 Registration is suggestive or at least descriptive with acquired distinctiveness.

### 1. Legal Standards

"'Federal registration of a trademark endows it with a strong presumption of validity,'" including "'the specific presumption that the trademark is not generic.'" *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 604 (9th Cir. 2005) (quoting *Coca–Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1254 (9th Cir. 1982)). In order to overcome this presumption at the summary judgment stage, all inferences from the facts are drawn most favorably to the non-moving party and the challenger must show "by a preponderance of the evidence that the term was or has become generic.'" *Yellow Cab Co. v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 928 (9th Cir. 2005) (quoting *Anti-Monopoly, Inc. v. Gen. Mills Fun Grp., Inc.*, 684 F.2d 1316, 1319 (9th Cir. 1982). "The crucial date for the determination of genericness is the date on which the alleged infringer entered the market with the disputed mark or term." *Id.* Because trademark validity is "an intensely factual issue," "summary judgment is generally disfavored in the trademark arena." *KP Permanent Make-Up*, 408 F.3d at 602, 605 (citation and quotation marks omitted).

Section 45 of the Lanham Act, 15 U.S.C. § 1127, defines a trademark as including "any word, name, symbol, or device, or any combination thereof" used by any person "to identify and

distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." The existence and extent of trademark protection for a particular term depends on that term's inherent distinctiveness. 15 U.S.C. § 1052. "Distinctiveness measures 'the primary significance of the mark to the purchasing public.'" *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010) (citation omitted). Courts have identified five categories of terms: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). A court determining distinctiveness is "'required to consider standards of meaning not our own, but prevalent among prospective purchasers of the article.'" *Zobmondo*, 602 F.3d at 1113 (quoting *Bada Co v. Montgomery Ward & Co.*, 426 F.2d 8, 11 (9th Cir. 1970)).

Which category a mark belongs in is a "fact-intensive question." *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1204 (9th Cir. 2009); *Zobmondo*, 602 F.3d at 1113. Suggestive, arbitrary, and fanciful marks are deemed "inherently distinctive" and automatically entitled to federal trademark protection because "their intrinsic nature serves to identify a particular source of a product." *Two Pesos*, 505 U.S. at 768. In contrast, "generic" marks are the weakest category of a mark and receive no trademark protection. *Id.* A "descriptive" mark may be entitled to protection only if it has acquired distinctiveness through secondary meaning. *Id.* at 769.

Generic terms refer to "'the genus of which the particular product or service is a species,' *i.e.*, the name of the product or service itself." *Advertise.com, Inc. v. AOL Advertising, Inc.*, 616 F.3d 974, 977 (9th Cir. 2010) (quoting *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns Inc.*, 198 F.3d 1143, 1146 (9th Cir. 1999)). In other words, generic terms are "common descriptive" names for what a product is. *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 718 F.2d 327, 329

(9th Cir. 1983), *rev'd on other grounds*, 469 U.S. 189 (1985). "Whether a mark is generic is a question of fact." *Yellow Cab Co.*, 419 F.3d at 929 (citation and quotation marks omitted).

A suggestive mark, on the other hand, "is one for which 'a consumer must use imagination or any type of multistage reasoning to understand the mark's significance . . . the mark does not *describe* the product's features, but *suggests* them." *Zobmondo*, 602 F.3d at 1114 (emphasis and alteration in original) (quoting *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n.8 (9th Cir. 1998)). In contrast to a suggestive mark, descriptive terms "describe a particular quality, function, or characteristic of a product or service." *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1039-40 (D.C. Cir. 1989). Descriptive marks simply "define qualities or characteristics of a product in a straightforward way that requires no exercise of the imagination to be understood." *Zobmondo*, 602 F.3d at 1114 (quoting *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1141-42 (9th Cir. 2002)). The distinction between a suggestive or descriptive mark depends upon what the goods and services at issue are. *Entrepreneur Media*, 279 F.3d at 1142. As a result, courts evaluate a mark "by reference to the goods or services that it identifies and as it appears in the marketplace." *Id.* (citation and quotation marks omitted).

To distinguish between descriptive marks and generic marks, the Ninth Circuit uses its "who-are-you/what-are-you" test, which provides: "'A mark answers the buyer's questions 'Who are you?' 'Where do you come from?' 'Who vouches for you?' But the [generic] name of the product answers the question 'What are you?''" *Advertise.com*, 616 F.3d at 978 (alteration in original) (quoting *Filipino Yellow Pages*, 198 F.3d at 1147). Evidence that a challenger may use to prove genericness can include the following: (1) generic use by competitors of the mark that has not been contested by the owner of the mark; (2) generic use of the trademark by the

proponent of the trademark; (3) dictionary definitions to determine public usage; (4) generic

usage in the media of the trademark, such as in trade journals and newspapers; (5) testimony of

persons in the trade; and (6) consumer surveys. *McCarthy on Trademarks and Unfair*

*Competition* § 12:13; *Filipino Yellow Pages*, 198 F.3d at 1150-51.

### 2.  Component Parts of the '197 Registration

In cases where the putative mark is a combination of two words, also known as a

composite mark, a court may begin its "inquiry by separately viewing the component parts of the

mark." *Advertise.com*, 616 F.3d at 977. Even after looking at the constituent parts of the

composite mark, however, the "validity and distinctiveness of a composite trademark is

determined by viewing the trademark as a whole, as it appears in the marketplace." *Official*

*Airline Guides,* 6 F.3d at 1392; *see also Abercrombie & Fitch*, 486 F.3d at 636 (analyzing a mark

as it appears in the market place). The '197 Registration consists of two component parts: "porn"

and "tube." Calista contends that because these two constituent parts are generic, the composite

mark "PORNTUBE" must also be generic. *See Advertise.com*, 616 F.3d at 977; *In Re Audio*

*Book Club, Inc.*, 52 U.S.P.Q.2d 1042, 1999 WL 813965, at *2-3 (T.T.A.B. May 11, 1999)

(analyzing whether the "AUDIO BOOK CLUB" is a generic designation, finding the constituent

parts to be generic and the combination of the words to function in a generic manner).

Calista also asserted at oral argument that the Ninth Circuit's decision in *Surgicenters of*

*America, Inc. v. Medical Dental Surgeries, Co.*, 601 F.2d 1011 (9th Cir. 1979), is dispositive on

how this Court should analyze the '197 Registration. Calista argues that *Surgicenters* stands for

the proposition that the combination of two generic terms renders a composite mark that is also

generic. Calista further contends that because *Surgicenters* is closely analogous to this case, the

Court should find that the '197 Registration is generic. There are both factual and legal issues

with Calista's application of *Surgicenters*.

Factually, there is a dispute between the parties regarding how to interpret the component parts of the composite mark "PORNTUBE." Calista argues that the term "porn" is generic and cites to the expert report of Scott Rabinowitz who was retained in this matter by Tenza. Mr. Rabinowitz explained:

> '[P]orn', in contrast to its lengthier cousin 'pornography', has become a popular culture phenomenon; the term 'porn' is used more casually, in descriptions of highly pleasurable, entertaining and educational categories of everything from erotic videos to cuisine—'food porn' and even the expanded appreciation of the natural world via 'nature porn'.

Shayefar Decl. Ex. 23 ¶ 52, Dkt. 98-11 at 18.

Calista also argues that the word "tube" is generic and relies on Mr. Rabinowitz's expert report and the deposition of Mr. Cardone. Mr. Rabinowitz explained in his expert report that:

> What most consumers refer to categorically as 'tube sites' represents the largest segment (by popularity and traffic counts) of all known adult entertainment streaming video web sites online. A tube site, whether as primary or affiliate operator, will provide a searchable catalog of video clips from one or many video content providers or studios for consumers to watch. If the consumer is interested and seeks more of a particular variety of content from a specific film or studio, the tube site will typically link that user to an area online where the consumer can pay for access to watch, buy, or download the full movie for example, versus just sample clips.

Shayefar Decl. Ex. 23 ¶ 22, Dkt. 98-11 at 9. Mr. Rabinowitz also testified that "[c]hances are very likely at this point that the average consumer clearly understands that a tube site is at least a place to get free content samples in a video format." Shayefar Decl. Ex. 12a at 182:6-11, Dkt. 98-1 at 174. Mr. Rabinowitz concluded that "the definition of what people are saying is a porn tube has become generic." *Id.* at 181:21-23. Finally, Calista also cites to the deposition of Mr. Cardone and his acknowledgement that 'tube' is "a generally recognized name for a website

that streams videos," Shayefar Decl. Ex. 14 at 71:4-6, Dkt. 98-7 at 16, and that "porntube.com"

is a "tube site," *id.* at 72:17-23, Dkt. 98-7 at 17.

Tenza argues that Mr. Rabinowitz's report and use of the terms "tube site" and "porn" do

not indicate that the terms are generic. Specifically, Mr. Rabinowitz stated that the term "tube

site" is generic for adult-entertainment streaming websites, and he did not discuss the term

"tube" in isolation. Shayefar Decl. Ex. 23 ¶ 22, Dkt. 98-11 at 9. Because Mr. Rabinowitz did not

ascribe an independent meaning to the term "tube," Tenza argues that there is no evidence that

this term in isolation is generic. *Id.* ¶¶ 3, 7, 9, 22, 31, 42, 43, 50 (using the phrase "tube site" to

describe "an adult entertainment streaming video web site").

Further, Tenza argues that the quoted paragraph from Mr. Rabinowitz's report regarding

the term "porn" indicates that "porn" is suggestive. Tenza relies on Mr. Cardone's explanation of

the term "porn" versus "pornography," explaining that pornography "makes you feel a bit

uncomfortable . . . it is something that's done with—almost a malicious intent, it could be—it

could be said." Tauger Decl. Ex. O at 69:22-25, Dkt. 99-16 at 5. On the other hand, Mr. Cardone

described "porn" as "something indulgent," "a bit tongue in cheek," and as "a fun word." *Id.*

at 70:19-23. The distinction between "pornography" and "porn" was also noted by Calista's

expert witness Marc Randazza, who explained that the word "porn" is used in phrases such as

"food porn and nature porn," phrases that have "nothing to do with sexuality." Tauger Decl.

Ex. N at 86:18-19, Dkt. 99-15 at 4. Mr. Randazza concluded that "'porn' connotes something

that's more acceptable, more socially tolerable as opposed to 'pornography,' which would have

colloquially a more clinical or a more negative term understanding to it." *Id.* at 86:19-23. Finally,

Tenza notes that its expert, Mr. Rabinowitz, explained this conclusion in paragraph 52 of his

report and that Calista's reliance on this paragraph is misplaced. Tauger Decl. Ex. L ¶ 52,
Dkt. 99-13 at 3.

The parties' conflicting explanations of the meaning of the words "porn" and "tube"
distinguish this case from *Surgicenters*, where the court was not presented with similar
competing evidence on a motion for summary judgment. *See Surgicenters of Am., Inc. v. Med.
Dental Surgeries, Co.*, 1976 WL 21075, at *5 (D. Or. Aug. 24, 1976) *aff'd*, 601 F.2d 1011 (9th
Cir. 1979).

Legally, there also are several aspects of this case that distinguish it from *Surgicenters*.
First, and unlike the plaintiffs in *Surgicenters*, Tenza did not provide a definition of the
'197 Registration that is descriptive—instead, Tenza argues that the component parts and the
'197 Registration are suggestive or at least descriptive with secondary meaning. Second, the
Ninth Circuit, in upholding the district court's decision in *Surgicenters*, noted the significance of
the agreed upon dictionary definitions, the 45 exhibits the parties stipulated to and submitted as
evidence, and the fact that there were no "consumer surveys or extensive advertising campaigns
. . . presented to prove that consumers" connected the disputed mark with the plaintiff. 601 F.2d
at 1019. Here, the parties disagree as to relevant dictionary definitions, have not stipulated or
agreed to any particular exhibits, and provide competing consumer surveys.

Thus, although "generic individual terms can be combined to form valid composite
marks," *Filipino Yellow Pages, Inc.*, 198 F.3d at 1146 (citing *Surgicenters*, 601 F.2d at 1017),
there is no presumption that a court must always look at the component parts of a composite
mark when analyzing the issue of genericness. The danger in expanding *Surgicenters* in the way
advocated by Calista is that it would overlook the Ninth Circuit's "explicit recognition that
'words which could not individually become a trademark may become one when taken

together.'" *Id.* at 1148 (quoting *Surgicenters*, 601 F.2d at 1017). Further, even though dictionary

definitions may be helpful in assessing genericness, these dictionary definitions are "not

determinative" of "'how a term is understood by the consuming public.'" *Id.* at 1148 (quoting

*Surgicenters*, 601 F.2d at 1015 n.11). Even after the ruling in *Surgicenters*, a district court should

take a "holistic approach to evaluating composite terms." *Id.* at 1149. The key inquiry is whether

there is evidence "'that to the consuming public the primary significance of the term'" is to

denote the service or product and not its source. *Id.* (quoting *Park 'N Fly*, 718 F.2d at 330).

The Court concludes that there is a genuine dispute of material fact regarding whether the

terms "tube" and "porn" are, in isolation, generic terms. As such, the scenarios addressed in *In*

*Re Audio Book Club Inc.*, 52 U.S.P.Q.2d 1042, at *2-3, and *Surgicenters*, 601 F.2d at 1018-19,

are inapplicable. Moreover, even if the terms were generic individually, the factfinder would still

need to analyze the '197 Registration as a whole in the market place to determine if it is generic.

*See also Abercrombie & Fitch*, 486 F.3d at 636 (explaining that a court must look at the mark in

its entirety).

### 1. Genericness

#### a. Use by Competitors

Use of a putative mark by a party's competitors that has not been contested may evidence

genericness. *McCarthy on Trademarks and Unfair Competition* § 12:13; *Bos. Duck Tours, LP v.*

*Super Duck Tours, LLC*, 531 F.3d 1, 19 (1st Cir. 2008) (holding that "duck tours" is a generic

name of amphibious sightseeing tours and relying on the widespread generic use of "duck" and

"duck tours" by other companies around the country that provide the same amphibious sight-

seeing services); *Self-realization Fellowship Church v. Ananda Church of Self-Realization*, 59

F.3d 902, 909 (9th Cir. 1995) (finding that the term "self-realization" "describes the class of

Yoga spiritual organizations" and relying on declarations of officials in other Hindu-Yoga organizations).

Calista argues that the '197 Registration is generic because there are more than 3,200 registered domain names that use the term "porntube," 306 registered domain names use the hyphenated variant "porn-tube," and 800 registered domains use the inverted phrase "tubeporn." Fray-Witzer Decl. Exs. 1-3, Dkts. 97 at 5-42. Calista adds that in a "Google search" for the phrase "porn tube," it found more than 7.75 million hits for websites that use the phrase in their titles. Tenza's expert, Mr. Rabinowitz, explained that his "conservative" belief was that one-quarter to one-third of all free adult-entertainment websites describe themselves as being a "porn tube." Shayefar Decl. Ex. 12b at 326:4-14, Dkt. 98-1 at 219.

In response, Tenza disputes the weight of the evidence provided by Calista. Relating to the 3,200 domain names that allegedly use the term "porn tube," Tenza contends that there is no evidence of what use is made of the domain names and that there is no evidence that the source of the search, www.namedropper.com, is a reliable source of information or a recognized ICANN-certified register. Tauger Decl. Ex. 4, Dkt. 115-4. Tenza contends that the relevant universe of domain names using the character string 'porntube' is reflected in Calista's response to Tenza's Interrogatory No. 1, which identified 147 such domain names. Tauger Decl. Ex. 4, Dkt. 115-5 at 5-7. Of these listed domain names, Mr. Cardone explains that there are at most 45 unique registrants. Cardone Decl., Dkt. 116 ¶ 4. Tenza's expert, Mr. Rabinowitz opined that he has seen between three to four thousand adult-entertainment video streaming websites during the course of his career. Tauger Decl. Ex. 6 at 325:20-25, Dkt. 115-6. Based on these figures, Tenza estimates that there are approximately two percent of registrants for adult-entertainment video

streaming websites that may include the '197 Registration in their domain name.[7] Parsing of the mathematics aside, particularly what the correct numerator and denominator would be to determine the percentage of adult-entertainment video streaming websites that may use the '197 Registration, the Court concludes that Tenza's argument that this potential use is *de minimis* presents a question of fact that is inappropriate for resolution at summary judgment.

Tenza also critiques Calista's evidence of "Google 'hits.'" Tenza relies on the explanation of its expert Mr. Rabinowitz that a title search with an internet search engine such as Google relies on meta-data and tags that are only viewable "in the very topmost gray bar [of a web browser], but is above the URL address line where the average person looks and conducts their business with the web browser." Tauger Decl. Ex. 6 at 81:11-18, 83:7-11. Mr. Rabinowitz explained that competitors in the adult-entertainment steaming video website industry use these meta-tags to "coattail the broader reach and awareness and visibility of the brand in question" and specifically use the names of competitors in their meta-tags. *Id.* at 325:10-20. According to Tenza, these Google results are further tainted because Google tailors search results depending upon the computer used to conduct the search, although there are methods to control for such variations. Tauger Decl. Ex. 7, Dkt. 115-7 at 63: 13-64:6. The Court notes that Tenza's criticism of Calista's search engine methodology further creates a dispute of material fact that is inappropriate for the Court to resolve at summary judgment.

---

[7] The Court is not entirely clear on the basis for Tenza's calculations. Tenza notes in footnote 5 of its brief that "3,000 domains would represent 2.4%, and 4,000 domains would represent 1.8%." Tenza Opp'n, Dkt. 117-1 at 2. The Court notes that 2.4 percent of 3,000 and 1.8% of 4,000 would be 72. Calista's interrogatory identified 147 *domain names*, thus the percentage of domain names that Mr. Rabinowitz has personally observed during the course of his career would be 147 divided by 3,000, or 4.9 percent, or 147 divided by 4,000, or 3.7 percent.

### b. Generic Use by Tenza

"If the proponent of trademark status itself uses the term as a generic name, this is strong evidence of genericness." *McCarthy on Trademarks and Unfair Competition* § 12:13 (collecting cases); *Surgicenters*, 601 F.2d at 1013 n.5 ("If the plaintiffs used the mark from the very beginning in a way that the public connected the term with the service rather than with the server, then they have contributed to the genericness of the term."). Calista argues that Tenza, throughout its own website, repeatedly uses the phrase "porn tube" generically to describe a type of video and not to identify the source of the videos (*i.e.*, www.porntube.com).

This argument relates to the "who-are-you/what-are-you" test, where "a valid trademark answers the former question, whereas a generic product name or adjective answers the latter." *Rudolph Int'l, Inc. v. Realys, Inc.*, 482 F.3d 1195, 1198 (9th Cir. 2007) (citing *Filipino*, 198 F.3d at 1147). Calista's argument reduces to whether Tenza used the phrase "porn tube" as a generic adjective. Calista cites to Tenza's title description for the www.portube.com website, which reads: "Watch FREE porn videos at PornTube.com with new porn tube videos added daily." Fray-Witzer Decl. Ex. 7, Dkt. 97 at 62. Calista argues that because Tenza generated this content, *see* Shayefar Decl. Ex. 12a, Rabinowitz Depo. at 84:8-85:12, Dkt. 98-1 at 159-60, it is an indication that Tenza uses the phrase "porn tube" generically. Calista also notes several other instances where Tenza used the phrase "porn tube" in various captions of videos that depict specific sexual acts. *See* Shayefar Decl. Ex. 12b, Rabinowitz Depo. at 269:2-6, 270:22-25, 273:3-4, 274:5-12, 276:11-15, 277:13-17, 279:4-11, 280:7-12, Dkt. 98-1 at 202-213; *see also* Shayefar Decl. Ex. 29, Dkt. 98-12 at 50-63. Mr. Rabinowitz, when asked about these uses of the phrase "porn tube," stated that "[i]t looks to be an attempt to describe the content contained within this category of videos on the PornTube.com site" and was "written with the widest variety of high traffic catch phrase and search terms." *Id.* at 269:18-25.

PAGE 25 – OPINION AND ORDER

Tenza responds that Mr. Rabinowitz also noted that the references could be specific references to videos on PornTube.com. Tauger Decl. Ex. 6 at 318:9-20, Dkt. 115-6 at 10. Mr. Rabinowitz, however, explained that it was not clear whether these broadly-worded descriptions "are referring to their own material or to external material." *See* Shayefar Decl. Ex. 12b, Rabinowitz Depo. at 271:20-25. Moreover, Tenza argues that the use of the phrase "porn tube" in the caption for videos on Tenza's website, *see* Shayefar Decl. Ex. 29, Dkt. 98-12 at 50-63, were references to the source and were not meant to describe a type of product. Tenza argues that although these references should have been capitalized, used as one word, and noted with a registered trademark symbol, these small errors do not mean that Tenza meant to use the phrase "porn tube" to indicate the type of product rather than the source. Thus, it is unclear whether the use of "porn tube" in these video captions reference adult-entertainment streaming videos *generally* or the videos that stream specifically at Tenza's website. Upon examining the video descriptions, a jury could reasonably conclude that the use of this phrase was not specific to Tenza's website. Because a factfinder could, but need not, reasonably reach such a conclusion, this disputed material fact cannot be resolved on summary judgment.

### c. Dictionary Definitions

Although dictionary definitions are not determinative, they "are relevant and sometimes persuasive in determining public usage." *McCarthy on Trademarks and Unfair Competition* § 12:13. Dictionary definitions may be used to analyze component parts of a composite mark to determine if the composite mark is itself generic. *See Surgicenters*, 601 F.2d at 1015-20. Even where a composite term is not listed in a dictionary, it is still possible to find that composite term generic. *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 407 (6th Cir. 2002) (collecting cases).

Calista maintains that although there is no dictionary definition for the term "porntube," the www.dictionary.com definition of "porn" supports the proposition that "porn" is commonly understood as an abbreviation for "pornography" and "tube" is slang for "television." Calista also references a Wikipedia search for "porntube" that redirected the user to an entry on amateur pornography. Tenza argues that www.dictionary.com is not an authoritative dictionary, and that the Court should favor Webster's Third New International Dictionary, which does not mention "television" as a definition for tube. Tenza also criticizes Calista's reliance on Wikipedia as an inadmissible source of information.

Regarding the correct dictionary to use in defining the component parts of the '197 Registration, the parties' arguments establish that the terms "porn" and "tube" have competing definitions and, therefore, the "correct" definition for either term is in dispute. This genuine dispute of material fact precludes relying on the dictionary definitions of "porn" or "tube" as set forth in the record and precludes granting or denying either party's cross-motion for summary judgment on this issue. Regarding Tenza's challenge to Calista's reference to Wikipedia, the Court notes that for the purposes of the pending motions, it is further evidence that there may be a genuine dispute of material fact.[8] In short, the evidence from the parties does not establish that either party is entitled to summary judgment on their respective positions.

### d.  Generic Usage in Media

Usage of a putative mark "in the media such as in trade journals and newspapers" in a generic manner may establish a lack of trademark protection. *McCarthy on Trademarks and Unfair Competition* § 12:13. This evidence may establish that the consuming public associates

---

[8] Although the Court considers Calista's reference to Wikipedia for the purposes of the pending cross-motions for summary judgment, the Court does not resolve the issue of whether Calista would need to provide at trial further foundation and authentication in order for these documents to be admitted in evidence.

the term with a general product and not with the product's source. *See KP Permanent Make-Up*, 408 F.3d at 604; *see also Surgicenters*, 601 F.2d at 1017-18 (finding the term "surgicenter" to be generic based on evidence from statements from medical experts, news articles, and medical publications); *Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, 468 F. Supp. 2d 1181, 1189-94 (C.D. Cal. 2007) (finding the term "kettle" when used for potato chips to be generic based in part on evidence of 37 articles using the term "kettle" to refer to a cooking method for potato chips generally); *Warner Bros. Entm't v. Global Asylum, Inc.*, 2012 WL 6951315, at *20 (C.D. Cal. Dec. 10, 2012) (rejecting evidence that a few scientists and news outlets refer to a particular human sub-species as "hobbits" as evidence that "the consuming public associates the term with this subspecies rather than with the Tolkien characters"), *aff'd sub nom. Warner Bros. Entm't, Inc. v. Global Asylum, Inc.*, 544 F. App'x 683 (9th Cir. 2013).

Calista argues that it identified several dozen generic uses of the phrase "porn tube" in adult-entertainment news sources and magazines, television news shows, and academic journals. Shayefar Decl. Exs. 30-31, Dkts. 98-13 to 98-15. Further, Calista reviewed these articles with Tenza's expert, Mr. Rabinowitz, and asked whether the phrase "porn tube" was used "in a generic fashion, not as it refers to PornTube.com." *See* Shaeyfar Decl. Ex. 12a at 107:22-24, Dkt. 98-1 at 166. Although Mr. Rabinowitz answered the question differently when presented with different articles, he noted that these news sources "seem to be bouncing back and forth between [the phrase] tube sites and a couple of different environments as well as in this specific one ["porn tube"]." *Id.* at 108:8-14. Mr. Rabinowitz conceded that with some media sources, the phrases "tube site" and "porn tube" were used interchangeably. *Id.* at 109:5-19.

Tenza, in response, asserts that these references to "porn tube" constitute "hearsay quote[s]" or otherwise indicts the validity or relevance of the use of the phrase "porn tube."

Further, Tenza offers articles that reference the phrase "tube site" and that do not use the phrase "porn tube" when describing adult-entertainment video streaming content. Tauger Decl. Exs. 12-20, Dkts. 115-12 to 115-20. The competing evidence offered by the parties of media usage of the phrase "porn tube" versus the use of the phrase "tube site" is another example of competing evidence that is best resolved by a factfinder. The Court therefore declines to weigh the competing evidence from the parties on this point, particularly in light of the parties' arguments going to the relevance and weight that ought to be afforded to any particular source article. Moreover, the Court also declines to find that the examples provided by Calista may not evidence generic use of the phrase "porn tube." Evidence of media usage, combined with the public's understanding of '197 Registration, may be sufficient for the factfinder to conclude that the '197 Registration is generic. *Cf. KP Permanent Make-Up*, 408 F.3d at 606. As a result, this source of evidence does not favor grating either party's motion for summary judgment.

### e.  Persons in the Trade

"The understanding of those who are familiar with the marketplace usage of the designation in question can be helpful on the genericness issue." *McCarthy on Trademarks and Unfair Competition* § 12:13; *see also Self-realization Fellowship Church*, 59 F.3d at 909-10 (analyzing "declarations of officials in other Hindu-Yoga organizations that 'Self-realization' 'is the goal of all religious practice,' 'is a term used to describe the goal of Yoga,' and is 'the systematic process of unfolding who we really are.'").

Calista offers the expert testimony of Mr. Randazza, who explained in his report that "the industry regards the term 'porn tube' as a generic term for a tube site containing pornography." Shayefar Decl. Ex. 13 ¶ 27, Dkt. 98-2 at 8. Mr. Randazza further opines that "[w]hen used in conversation about members of the adult-entertainment industry, the term 'porn tube' does not identify any particular website, and refers generally to a site that displays a collection of

streaming pornographic videos." *Id.* ¶ 28. To undermine Mr. Randazza's expert opinion, Tenza

cites to a letter sent by Mr. Randazza to an adult-industry client that used the phrase "tube site"

but did not use the phrase "porn tube." Tauger Decl. Ex. U, Dkt. 22. Although Tenza believes

that this negates Mr. Randazza's professional opinion, it may also be evidence that the phrases

"porn tube" and "tube sites" are sometimes used interchangeably. In the same vein, Tenza's

reference to Mr. Zhukov's use of the phrase "tube site" rather than "porn tube" in his deposition

testimony is not necessarily dispositive, particularly in light of his explanation that because the

parties were only discussing porn sites during his deposition, he found it unnecessary to "spend

the time to say the extra word if we're not specifying whether its porn or not porn." Tenza's final

attempt to undermine Mr. Randazza is based on his experience in the industry as an attorney

rather than a business owner. This, however, does not necessarily eliminate the relevance of his

opinion, but instead goes to the weight of this evidence. Thus, Calista presents some evidence

that some people in the adult-entertainment profession consider the phrase "porn tube" to be

generic.

Calista also cites to the deposition of Mr. Rabinowitz, Tenza's expert, and his apparent

"back peddling" from statement that he had never encountered the phrase "porn tube" used in a

generic manner. The exact exchange between counsel for Calista and Mr. Rabinowitz is as

follows:

> Q:    When you were deposed last time, we spoke a little about
> whether or not the phrase "porn tube" was ever used in the
> industry. I believe that you said something to the effect of in 15
> years of being in the industry, you had never heard people inside
> the industry referring to these sites as "porn tube sites." Do you
> recall that?
>
> A:    I do recall that, and in context I'm referring to one-to-one
> discussions, not necessarily public statements, but I did actually go
> through—in fact, since the last deposition, I took a fairly extensive
> stock of thinking about all of the engagements and the clients and

> the like, and at no time, whether I was in a buyer or seller position
> as my primary roles related to adult Internet traffic, has there been
> a reference to "porn tube" as opposed to "tube site" in this context,
> not by myself to a prospective client or from a prospective client to
> me.

Shayefar Decl. Ex. 12b, Rabinowitz Depo. at 241:7-24, Dkt. 98-1 at 199. At most,

Mr. Rabinowitz's testimony about industry usage creates a conflict with the opinion given by

Mr. Randazza. Although Calista went on in that deposition to bring articles to Mr. Rabinowitz's

attention that purportedly use the phrase "porn tube" as a descriptive adjective and not as a

source identifier, the significance of these media sources is disputed by the parties.

Calista also argues that according to Mr. Rabinowitz, the website www.gfy.com is the

"single most popular sort of water cooler environment or message board that has existed to date"

for the adult-entertainment industry. Shayefar Decl. Ex. 45 at 41:5-10, Dkt. 114-8 at 4. Calista

then cites to a "message thread" that "generated more than 200 comments" on the UDRP

decision against Calista. Shayefar Decl. Ex. 36, Dkt. 114-3. Tenza's response to this evidence—

that the 200 comments are anonymous, a single user may make multiple comments under the

different names, and that this is a small fraction of total participants at gfy.com—goes to the

weight that ought to be afforded to the evidence. Like the other industry articles provided by the

parties, this evidence creates a genuine dispute of material fact.

### f.   Consumer Surveys

"Consumer surveys have become almost de rigueur in litigation over genericness."

*McCarthy on Trademarks and Unfair Competition* § 12:14. In order for a consumer survey to be

helpful, it must be "directed at the issue of consumer perception as to the significance and

meaning of the designation in issue." *Id.* Moreover, surveys "'in trademark cases may be

considered so long as they are conducted according to accepted principles.'" *Clicks Billiards,*

*Inc.*, 251 F.3d at 1262 (quoting *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc.*, 240 F.3d

832, 840 (9th Cir. 2001)). Any challenges regarding "'technical inadequacies,'" "'including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility.'" *Fortune Dynamic, Inc.*, 618 F.3d at 1036 (quoting *Keith*, 858 F.2d at 480).

Tenza argues that the Morgan survey evidence and the survey evidence from Calista's expert Thomas Maronick indicate that the '197 Registration is not generic. Mr. Maronick surveyed 247 qualified respondents and found that 49 percent of the respondents recognized "porn tube" as a brand name. Tauger Decl. Ex. W, Dkt. 99-24 at 7. Mr. Maronick concluded:

> [L]ess than half of all respondents (49%) saw the phrase 'porn tube' as a brand name, with the majority (51%) either seeing it as a common name or as 'don't know/not sure.' Thus, in comparison with other commonly-used terms in the world of adult-oriented websites and streaming video, the 'porn tube' mark must be considered as a very weak trademark source identifier.

*Id.* at 7-8. Tenza's expert, Mr. Morgan, found that 79 percent of the 840 qualified respondents identified "PORNTUBE" as a brand name. Tauger Decl. Ex. V, Dkt. 99-23 at 9. Mr. Morgan also found that 51 percent of survey respondents when asked if "PORNTUBE" was as an adult-entertainment website they had heard of responded in the affirmative. *Id.* at 10.

Calista argues that consumer surveys are not relevant in this case. Calista's argument that consumer surveys may only be considered where a court is analyzing a newly-coined or fanciful term, or in the context of a descriptiveness analysis, is unavailing. As discussed above, *see supra* Section A.1 (discussing the relevance of the Morgan survey) and Section B.2 (discussing the method by which to analyze a composite trademark), survey evidence is relevant in this case. The question is not whether Tenza "coined either the word 'porn' or the word 'tube," Calista's Memo., Dkt. 95 at 25, but what the primary significance of the '197 Registration is to the consuming public. *See Filipino Yellow Pages*, 198 F.3d at 1149. As noted above, the Morgan survey evidence is subject to criticism, which may affect the weight a factfinder will afford this

evidence. Moreover, the parties dispute whether the Maronick survey evidence supports the notion that Tenza has a protected mark or if it indicates that the '197 Registration is generic. This dispute of fact means that the relative weight of the survey evidence should be evaluated by a factfinder.

### g.   Conclusion

The competing evidence presented by the parties regarding whether the '197 Registration is generic creates a genuine dispute of material fact. Given this dispute, the Court declines to analyze whether the '197 Registration is descriptive or suggestive because the resolution of this issue also turns on disputed facts discussed above. The Court denies the parties' cross-motions on the validity of the '197 Registration and reserves the question for the jury.

## C.  Trademark Infringement

Both parties also move for summary judgment on the issue of whether there is a likelihood of confusion. "The likelihood of confusion is the central element of a trademark infringement action." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000). Courts in the Ninth Circuit typically apply the eight factors set out in *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979), *abrogated on other grounds* 353 F.3d 792 (9th Cir. 2003), to determine whether a defendant's use of a mark or name creates a likelihood of confusion. *See Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1199 (9th Cir. 2012); *Lahoti v. Vericheck, Inc.*, 636 F.3d 501, 507 (9th Cir. 2011). Those factors are: (1) the strength of the mark; (2) the proximity of the goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting its mark; and (8) likelihood of expansion into other markets. *Sleekcraft*, 599 F.2d at 348-49. This "eight-factor test for likelihood of confusion is pliant" and "the relative importance of each individual factor will be

case-specific." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999).

Three of the *Sleekcraft* test factors, colloquially referred to as the "Internet Troika," may be helpful in the context of Internet domain names: (1) the similarity of the marks; (2) the relatedness of the goods and services offered; and (3) simultaneous use of the Internet as a marketing channel. *Brookfield*, 174 F.3d at 1054. These three factors, however, are not forever enshrined as the test for trademark infringement on the Internet. *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1148 (9th Cir. 2011). "Depending on the facts of each specific case arising on the Internet, other factors may emerge as more illuminating on the question of consumer confusion." *Id.*

### 1.  Similarity of the Marks

The similarity of the marks is a critical question in the likelihood-of-confusion analysis. *GoTo.com*, 202 F.3d at 1204. The greater the similarity between the two marks at issue, the greater the likelihood of confusion. *Entrepreneur Media*, 279 F.3d at 1144. "[L]ess similarity between the marks will suffice when the goods are complementary, . . . the products are sold to the same class of purchasers, . . . or the goods are similar in use and function." *Sleekcraft*, 599 F.2d at 341 (citations omitted). A court assesses similarity in terms of a mark's sight, sound and meaning. *Official Airline Guides*, 6 F.3d at 1392.

Tenza argues that Calista has used its trademark "PORNTUBE" verbatim. This assertion is belied by the evidence. Calista's disputed domains use 14 different word combinations: freshporntube.com, goldporntube.com, lustporntube.com, bonusporntube.com, boxporntube.com, directporntube.com, largeporntube.com, pipeporntube.com, bookporntube.com, 69porntube.com, kissporntube.com, royalporntube.com, cubeporntube.com, and goldporntube.xxx. Calista argues that it has affixed arbitrary and suggestive words to the common phrase "porn tube" and that this

distinguishes the domain names in dispute. Calista also cites to the fact that Tenza entered into a consent and co-existence agreement with the owner of the "PORNOTUBE" trademark registration agreeing that "PORNOTUBE" and "PORNTUBE" are not confusingly similar. Shayefar Decl. Ex. 60, Dkt. 114-12 at 65-70. This co-existence agreement, however, was premised on differences in the services provided by the parties. *Id.* at 67.

The Court finds that although Calista's marks contain the word "PORNTUBE" in its entirety, its adaptation of the word by adding additional words and signifiers may change the sight and sound of the disputed domains and, therefore, may serve to distinguish Calista's use in the mind of the factfinder. Use of the term "PORNTUBE" in combination with other words, however, may tip this factor in favor of Tenza. The factfinder will have to decide this.

## 2. Proximity of the Goods

This factor concerns the proximity or relatedness of the good or services represented by the potentially infringing marks. "For related goods, the danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." *Sleekcraft*, 599 F.2d at 350. The proximity of goods is measured by whether the products are: (1) complementary; (2) sold to the same class of purchasers; and (3) similar in use and function. *Id.*

Tenza argues that it and Calista offer the same or identical content to identical consumers. The function of each website, however, is different. Calista argues that it is an "affiliate site" that categorizes video content and directs viewers to other websites. Tenza's website, according to Calista, is a "destination site" that provides video content and incentivizes "affiliates" to direct traffic towards the destination site. There is a distinction between the two business models. Yet Calista and Tenza direct their websites towards individuals interested in

visiting adult-entertainment websites, and this may support an inference that the goods are related. This factor is disputed and should be resolved by the factfinder.

### 3. Evidence of Actual Confusion

Actual confusion as to the source of a product is "persuasive proof that future confusion is likely." *Sleekcraft*, 599 F.2d at 352. "The focus is confusion with respect to the source of a product or service." *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 846 F. Supp. 2d 1063, 1079 (N.D. Cal. 2012), *appeal dismissed* (Apr. 18, 2012) (citation and quotation marks omitted). Given the difficulty in proving "actual confusion," "the absence of such evidence" is not noteworthy. *Brookfield*, 174 F.3d at 1050 ("The failure to prove instances of actual confusion is not dispositive against a trademark plaintiff, because actual confusion is hard to prove; difficulties in gathering evidence of actual confusion make its absence generally unnoteworthy.").

Tenza relies on the survey evidence from Mr. Morgan, which found that for Calista's prefixed websites using the phrase "PORNTUBE," between 24 and 34 percent of the consumers believed that the sites were associated with "the PORNTUBE brand." Tauger Decl. Ex. V, Dkt. 99-23 at 12. Tenza also cites to confusion in the trade, namely that it was served with a Digital Millennium Copyright Act of 1998 ("DMCA") take-down notice regarding the website www.largeporntube.com, which is a website owned by Calista. Tauger Decl. Ex. Z, Dkt. 99-27.

Calista responds that Mr. Morgan's report is only evidence, not dispositive proof of, a likelihood of confusion and that the survey itself has little probative value. Further, Calista's expert Mr. Maronick found that only 1.9 percent of qualified survey respondents considered the term "porn tube" to be a trademark or source identifier. Calista also argues that the DMCA take-down notice is *de minimis* because it is, at most, evidence of one instance of confusion.

Given the competing evidence laid out by the parties, the Court finds that this is a fact-intensive inquiry with disputed facts. *See Entrepreneur Media*, 279 F.3d at 1151 (evidence of one instance of actual confusion did not warrant summary judgment of infringement for plaintiff). Although a reasonable jury may find Tenza's evidence meaningful and more than *de minimis*, because the record involves factual matters subject to dispute, particularly the relative weight to be afforded to the parties' respective survey evidence, this factor cannot be resolved on summary judgment.

### 4. Marketing Channels Used

"'Convergent marketing channels increase the likelihood of confusion.'" *Official Airline Guides*, 6 F.3d at 1393. Yet, "this factor becomes less important when the marketing channel is less obscure." *Network Automation*, 638 F.3d at 1151. For example, in *Sleekcraft*, the products were sold in niche marketplaces. Given that both parties offer their services and advertise through the Internet, a ubiquitous system of commerce, this factor does not weigh strongly in favor of either party.

### 5. Types of Goods and Degree of Care by the Purchaser

"Low consumer care . . . increases the likelihood of confusion." *Playboy*, 354 F.3d at 1028. As explained by the Ninth Circuit in *Sleekcraft*,

> In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution . . . . When the buyer has expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely. Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely.

*Sleekcraft*, 599 F.2d at 353 (citations omitted).

Tenza argues that consumers of online adult-entertainment videos do not exercise a high degree of care because the goods offered are not particularly expensive. *See Au-Tomotive Gold,*

*Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1076 (9th Cir. 2006). Calista cites to *Network Automation* for the proposition that the degree of care is not always low for Internet consumers. Yet in *Network Automation*, the court noted that the court should still "consider the nature and cost of the goods, and whether 'the products being sold are marketed primarily to expert buyers.'" 638 F.3d at 1152 (citing *Brookfield*, 174 F.3d at 1060). Calista also attempts to rebut the dicta from *Playboy Enterprises* that "the average searcher seeking adult-oriented materials on the Internet is easily diverted from a specific product he or she is seeking if other options, particularly graphic ones, appear more quickly." 354 F.3d at 1028. Neither party presented evidence on the psychology or "divertability" of a consumer of adult-entertainment streaming videos on the Internet, thus *Playboy* is not particularly helpful to either party on this issue. The parties do agree, however, that the content offered at both parties' websites is free to consumers. Thus, the Court finds that this factor tips in favor of finding a likelihood of confusion.

### 6. Calista's Intent

"When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Sleekcraft*, 599 F.2d at 354. To the extent a party's intent is relevant, it is relevant "only insofar as it bolsters a finding that the use of the trademark serves to mislead consumers rather than truthfully inform them of their choice of products." *Network Automation*, 638 F.3d at 1153. The relevance of Calista's intent, however, is ambiguous because the parties dispute the validity of the '197 Registration. Calista argues that it used the term "porntube" because it is generic for, or at most descriptive of, adult-entertainment streaming videos online. If Calista is correct, it would not have knowingly adopted domain names that are similar to Tenza's mark. Thus, the disputed factual issues relating to validity mean that the weight of this factor cannot be resolved by the Court on summary judgment.

### 7.  Likelihood of Expansion Into Other Markets

"Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing. When goods are closely related, any expansion is likely to result in direct competition." *Sleekcraft*, 599 F.2d at 354 (citations omitted). Where two companies are direct competitors, this factor is unimportant. *Cf. Brookfield*, 174 F.3d at 1060. The Court finds, and both parties agree, that given the identity of the parties' respective services, this factor is unimportant.

### 8.  Conclusion

Upon consideration of the *Sleekcraft* factors, the Court finds that there is a genuine dispute of fact as to whether Tenza will be able to establish a likelihood of confusion, particularly in light of the factual issues related to the first, second, third, and sixth factors discussed. The Court denies the parties' cross-motions for summary judgment on this issue.

## D.  Counterfeiting

Tenza and Calista both move for summary judgment on Tenza's claim for counterfeiting under the Trademark Counterfeiting Act of 1984, 15 U.S.C. §§ 1116(d), 1117(b). Section 1114 of the Lanham Act prohibits the use of "any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(a). Section 1116 of the Lanham Act grants a court the authority to seize goods and counterfeit marks involved in violations of 15 U.S.C. § 1114, and records documenting the manufacture, sale, or receipt of things involved in such a violation. 15 U.S.C. § 1116(d)(1)(A). For purposes of injunctive relief under 15 U.S.C. § 1116(d), a counterfeit mark is defined as "a counterfeit of a mark that is registered on the

principal register of the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered," 15 U.S.C. § 1116(d)(1)(B)(i), or as "a spurious designation that is identical with, or substantially indistinguishable from, a designation as to which the remedies of this chapter are made available," 15 U.S.C. § 1116(d)(1)(B)(ii).

In order to prevail under § 1116(d), the mark in question must be "(1) a non-genuine mark identical to the registered, genuine mark of another, where (2) the genuine mark was registered for use on the same goods to which the infringer applied the mark." *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936, 946 (9th Cir. 2011); *see also Partners for Health & Home, L.P. v. Seung Wee Yang*, 2011 WL 5387075, at *8 (C.D. Cal. Oct. 28, 2011) ("Trademark infringement under 15 U.S.C. § 1114(1) [sic] also constitutes trademark counterfeiting when the infringer uses a 'counterfeit mark,' which is defined as 'a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use . . . .' 15 U.S.C. § 1116(d)(1)(B)(i).").

The Court denies the parties' cross-motions for summary judgment on this issue for two reasons.[9] First, there is a genuine dispute of fact as to whether Calista's domain names are "identical with" or "substantially indistinguishable from" the '197 Registration. *See supra*

---

[9] Calista analyzes factors different from what the Court finds to be the relevant elements of a counterfeiting claim under 15 U.S.C. § 1116. Calista argues that if the Court must consider whether Calista's use of the '197 Registration is "spurious" (that is, fake or false), Calista's use would not qualify as such because the term "porn tube" is generic or at best descriptive without secondary meaning. Tenza interprets this argument as a misinterpretation of a nominative fair use defense, for example, when "'the defendant has used the plaintiff's mark to describe the plaintiff's product for the purposes of, for example, comparing to the defendant's product.'" *See Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1150 (9th Cir. 2002). Calista provided no reply to Tenza's argument. The Court does not resolve the meaning of Calista's argument on this point because it is an irrelevant factor under Ninth Circuit precedent from *Louis Vuitton*.

Section C. Tenza argues that Calista is counterfeiting the '197 Registration by using the word "porntube" in the disputed domain names and the words "porn tube" in its meta-tags and in the body of its websites. Calista argues that its use of the term "porntube" is distinguishable from the '197 Registration because they contain additional arbitrary or suggestive words. Because the validity and strength of the mark are in dispute, the Court concludes that summary judgment is inappropriate. *See Coach, Inc. v. Siskiyou Buckle Co.*, 2012 WL 1532489, at *3 (D. Or. 2012); *cf. Playboy Enters. Inc. v. Asiafocus Int'l, Inc.*, 1998 WL 724000, at *6-9 (E.D. Va. Apr. 10, 1998) (ruling on summary judgment that there was a likelihood of confusion when *the valid mark*, "PLAYBOY," was used in two foreign domain names and that the defendant's intentional use of the mark subjected the defendant to treble damages); *Partners for Health & Home*, 2011 WL 5387075, at *7 (finding the plaintiff to have a valid trademark and concluding that the defendant copied the plaintiff's mark *exactly* and was liable for trademark infringement and counterfeiting); *Johnson v. Connolly*, 2007 WL 1151004 (N.D. Cal. Apr. 18, 2007) (explaining that a "colorable imitation" of a mark does not constitute counterfeiting under the Lanham Act).

Second, it is disputed whether the '197 Registration was "was registered for use on the same goods to which the infringer applied the mark." *Louis Vuitton*, 658 F.3d at 946. As noted above, the issue of "proximity of the goods" is in dispute—Calista distinguishes the type of websites it operates, *i.e.*, an "affiliate website," from the type of website operated by Tenza, *i.e.*, a "destination site." Although both websites offer clips of adult-entertainment streaming videos, there may be a meaningful distinction between the way in which these clips are offered to consumers. Because there are disputed facts on both *Louis Vuitton* factors, neither Tenza nor Calista is entitled to summary judgment on the issue of counterfeiting.

### E.  Cybersquatting

Tenza and Calista both move for summary judgment on the issue of Calista's alleged liability under 15 U.S.C. § 1125(d)(1)(A), the Anti–Cybersquatting Consumer Protection Act ("ACPA"). Pursuant to the ACPA, a person is civilly liable for cyberpiracy (also known as cybersquatting) to a trademark owner if that person (i) "has a bad faith intent to profit from a mark . . . and (ii) registers, traffics in, or uses a domain name that . . . in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark." 15 U.S.C. § 1125(d)(1)(A). As explained by the Ninth Circuit, "[c]ybersquatting is the Internet version of a land grab" and occurs when "[c]ybersquatters register well-known brand names as Internet domain names in order to force the rightful owners of the marks to pay for the right to engage in electronic commerce under their own name." *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 946 (9th Cir. 2002).

A party pursuing a cybersquatting claim under the ACPA must show that: "(1) the [alleged cybersquatter] registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant acted with bad faith intent to profit from that mark." *Rearden*, 683 F.3d at 1219 (quoting *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218-19 (9th Cir. 2010)) (quotation marks omitted).The statute lists nine non-exclusive factors to be considered in deciding whether the domain registrant acted in "bad faith." Those factors are:

> (I)    the trademark or other intellectual property rights of the person, if any, in the domain name;
>
> (II)   the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
> (III)  the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV)    the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V)    the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI)    the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII)    the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII)    the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX)    the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B).

The first of these three elements is not in dispute because Calista registered and began using the disputed domain names after Tenza filed its registration for the '197 Registration with the PTO. *See id.* The second element, as discussed above, is in dispute because Calista uses the term "porntube" in combination with various other word and number combinations. Thus, there is a genuine dispute of material fact as to whether Calista's domain names are "confusingly similar" to the '197 Registration. *See Rearden*, 683 F.3d at 1219.

PAGE 43 – OPINION AND ORDER

As to the third element, there are three separate analyses a district court should consider: (1) "surveying the nine-non-exclusive and permissive statutory factors that may be considered in determining whether a person has a bad faith intent, 15 U.S.C. § 1125(d)(1)(B)(i);" (2) "taking into account the unique circumstances of each case, which represent the most important grounds for finding bad faith, and which affect the examination (and weight) of the nine permissive factors as well as any other relevant considerations . . .;" and (3) "considering the availability of the safe harbor for any defendant who believed and had a reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful, 15 U.S.C. § 1125(d)(1)(B)(ii)." *Id.* at 1220 (citation and quotation marks omitted).

As relevant to this case, of the nine statutory factors, Tenza's ownership of a registered trademark slightly favors Tenza, although the validity of that trademark is in dispute. The third factor, addressing the timing of the alleged cybersquatter's use of a trademark also favors Tenza because Calista began using domain names with the word "porntube" after Tenza registered its mark. Regarding the fifth factor, it is disputed whether Calista had intent to divert consumers from Tenza's website. Calista's use of the disputed domains occurred before the initiation of the UDRP proceedings. After Tenza filed the UDRP action, Calista stopped referring consumers to Tenza's website because it was no longer an "affiliate." Calista argues it continued to use the disputed domains because it regards the term "porntube" as a generic description. Thus, and as previously concluded, there is a genuine dispute as to whether Calista's continued use of the word "porntube" would create "a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site." 15 U.S.C. § 1125(d)(1)(B)(V).

Regarding the eighth factor, although Tenza argues this factor favors finding Calista liable for cybersquatting, the Court finds that this factor goes to the very heart of the dispute

between the parties on the validity of the '197 Registration. In light of this dispute, the Court has concluded that there is a genuine dispute of material fact regarding validity, which in turn weighs heavily on Tenza's cybersquatting claim. Thus, the nine statutory factors do not support summary judgment. Further, Calista's contention that the phrase "porn tube" is common and that its use of the word "porntube" in combination with other arbitrary and suggestive words was merely an attempt to appeal to a consumers' search for adult-entertainment streaming videos on the Internet, as opposed to attempting to divert Tenza's customers, also disfavors summary judgment. *See Rearden LLC*, 683 F.3d at 1120. The Court denies the parties' cross-motions for summary judgment on the cybersquatting claims.

**F.  Laches**

Calista argues that Tenza's Lanham Act claims are barred by the equitable doctrine of laches. "Laches is an equitable defense to Lanham Act claims." *Internet Specialties W., Inc. v. Milon–Digiorgio Enters.*, 559 F.3d 985, 989 (9th Cir. 2009) (citing *GoTo.com*, 202 F.3d at 1209). "This defense embodies the principle that a plaintiff cannot sit on the knowledge that another company is using its trademark, and then later come forward and seek to enforce its rights." *Id.* at 989-90 (citing *Grupo Gigante S.A. de C.V. v. Dallo & Co.*, 391 F.3d 1088, 1102-03 (9th Cir. 2004)). "The test for laches is two-fold: first, was the plaintiff's delay in bringing suit unreasonable? Second, was the defendant prejudiced by the delay?" *Id.* at 990 (citing *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 838 (9th Cir. 2002); *Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*, 465 F.3d 1102, 1108 (9th Cir. 2006)). To determine if an owner of a trademark has acted diligently, a court must determine if they filed suit within the applicable statute of limitations period "thereby creating a presumption against laches," *id.*, or if they filed suit outside of the limitations period, creating a presumption that "laches is applicable." *Jarrow*, 304 F.3d at 835-36. In a trademark case, "[t]he limitations period

for laches starts from the time that the plaintiff 'knew or should have known about its potential

cause of action.'" *Internet Specialties*, 559 F.3d at 986 (quoting *Tillamook*, 465 F.3d at 1108).

Because "[t]he Lanham Act contains no explicit statute of limitations," a court borrows

the statute of limitations from an analogous state law. *Jarrow*, 304 F.3d at 836. The most

analogous action under state law is for fraud, Or. Rev. Stat. § 12.110(1), and provides for a two-

year statute of limitations. *adidas Am., Inc. v. Payless Shoesource, Inc.*, 540 F. Supp. 2d 1176,

1180 & n.1 (D. Or. 2008). A presumption of laches "does not arise if there are any disputed

issues of material fact as to when the plaintiff knew or should have known of the alleged

infringer's activity." *Id.* (citing *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020,

1037-38 (Fed. Cir. 1992)).

In support of its motion, Calista argues that Tenza unreasonably delayed in bringing suit

against Calista, this delay prejudiced Calista, and the six additional factors mentioned in *E-Sys.,

Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983), support finding a presumptive defense of

laches. Tenza responds that Calista is not entitled to summary judgment on its affirmative

defense of laches because there are disputed facts regarding when Tenza had knowledge of

Calista's infringing websites and because Tenza has consistently enforced its trademark rights.

###    1.    Unreasonable Delay

In determining if a party's delay in bringing a claim is unreasonable, a court may

consider: (1) "the length of the delay, measured from the time the plaintiff knew or should have

known about his potential cause of action"; and (2) "whether the plaintiff's delay was

reasonable, including whether the plaintiff has proffered a legitimate excuse for his delay."

*Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 997 (9th Cir. 2006). The presumption for

laches "runs from the time the plaintiff knew or should have known about" the cause of action.

*Jarrow*, 304 F.3d at 836.

Calista argues that Tenza's principal, Mr. Matthyssen, knew of Calista's tubepornmix.com website as early as October 2009 and knew about Calista's website goldporntube.com in June 2010. *See* Shayefar Decl. Ex. 3, Matthyssen Depo. at 34:3-8, Dkt. 98-1 at 84; Shayefar Decl. Ex. 2, Dkt. 98-1 at 59-60. During this time period, Mr. Matthyssen worked with Calista through the 4tube.com and fux.com affiliate programs.

Calista further argues that Mr. Matthyssen again referenced goldporntube.com on March 8, 2011 when sending Calista an error log report that mentioned the goldportube.com website in relation to porntube.com and the Tenza Webmaster Program. Shayefar Decl. Ex. 2, Dkt. 98-1 at 65. Calista also argues that because it was one of Tenza's top affiliates for more than two years, Tenza must have known of Calista's use of the disputed domain names. Shayefar Decl. Ex. 4, Dkt. 98-1 at 105 (documenting that Tenza paid Calista $132,140 through the affiliate program); Shayefar Decl. Ex. 6, Dkt. 98-1 at 139 (documenting that Calista sent traffic from "premium countries"); Matthyssen Depo. at 97:4-24 (Matthyssen believed that Calista was a "great & honest webmaster" based on relevant metrics). Calista also contends that Tenza's other principal, Mr. Cardone, who was also the principal of Tenza's predecessor EMC, did not make efforts to protect the alleged rights in the '197 Registration beginning in May of 2005. Shayefar Decl. Ex. 14, Cardone Depo. at 76:9-78:24.

Tenza responds that it did not have constructive knowledge of Calista's allegedly infringing use. Regarding the communications from Mr. Matthyssen from October 2009 and June 2010, Tenza argues that these communications are irrelevant because they occurred before Mr. Matthyssen's involvement with Tenza. *See* Shayefar Decl. Ex. 2, Dkt. 98-1 at 59-60. Tenza also argues that the evidence cited by Calista from October of 2009 was not a conversation between Mr. Zhukov and Mr. Matthyssen because the relevant chat handle "CoolNess 4tube"

communicating with Mr. Zhukov was not Mr. Matthyssen's chat handle. Dkt. 98-1 at 84.

Matthyssen Depo. at 34:13-16.[10]

Regarding the communication from Mr. Matthyssen from March 8, 2011, Tenza argues

that this is not sufficient notice of Calista's infringing use, and even if it was, such notice should

only be applied to the goldporntube.com domain, and not the other disputed domains.

Mr. Matthyssen also stated in his deposition testimony that this reference to goldporntube.com

was limited to and the result of an error log brought to his attention by one of Tenza's

developers. Tauger Decl. Ex. 1, Matthyssen Depo. at 68:10-72:18, Dkt. 115-1 at 14. Even

assuming Tenza was on notice from March 8, 2011, which Tenza disputes, Tenza filed its UDRP

action on March 25, 2013, 17 days past the two-year laches time period. Tenza's responses to

Calista's laches argument create a genuine dispute of material fact because it is not clear when

Mr. Matthyssen knew of Calista's alleged use of the '197 Registration in its domain names or

when such knowledge should be imputed to Tenza.

Tenza also argues that an obligation diligently to enforce its marks does not mean that

Tenza should have known of Calista's use. Tenza argues that the case cited by Calista, *E-Sys.,

Inc. v. Monitek, Inc.*, does not support the application of laches because Calista and Tenza did

not "advertise[] in the same magazines and exhibit[] at the same trade fairs." 720 F.2d at 607.

Further, Tenza argues that Calista's "encroachment [was] minimal, and its growth slow and

steady," meaning that laches should not apply. *Id.* The Court agrees that the structure of the

Tenza Webmaster Program and the alleged mention by Mr. Matthyssen of the term

"goldporntube.com" on March 8, 2011, Shayefar Decl. Ex. 2, Dkt. 98-1 at 64-65, is insufficient

---

[10] In Tenza's response, Tenza cites to portions of the Matthyssen deposition that were not
provided to the Court. Tenza cited to Calista's Shayefar Decl. Ex. 3, 32:12-34:16, Dkt. 98-1. The
Court, however, was only provided with page 34 of that deposition transcript.

to show that Tenza necessarily had "ample opportunity to discover" Calista's activities before Calista developed its business. *See E-Sys., Inc.*, 720 F.2d at 607. Tenza's explanation of its affiliate program and Mr. Matthyssen's allegedly limited knowledge of participating domain names in the Tenza Webmaster Program create a genuine dispute of material fact as to when Tenza had knowledge of Calista's infringing use. In addition, Tenza provided evidence of its efforts more generally to protect its mark through its filing of a separate ICANN UDRP proceeding in 2012, Tauger Decl. Ex. 22, Dkt. 115-22, filing complaints with Twitter in 2013, Tauger Decl. Ex. 23, Dkt. 115-23, sending cease-and-desist letters to infringers in 2013, Tauger Decl. Ex. 24, Dkt. 115-24, and sending correction demands to an industry publication "XBIZ" in 2012 and 2013, Tauger Decl. Ex. 25, Dkt. 115-25. This evidence also serves to rebut Calista's contention that Tenza does not enforce its mark.

In sum, the Court concludes that Calista is not entitled to summary judgment on its laches defense because there are "disputed issues of material fact as to when [Tenza] knew or should have known of the alleged infringer's activity." *See adidas Am., Inc.*, 540 F. Supp. 2d at 1181.

### 2. Prejudice

The party "asserting laches must demonstrate that it has 'suffered prejudice as a result of the plaintiff's unreasonable delay in filing suit.'" *Tillamook Country Smoker, Inc.*, 465 F.3d at 1108 (quoting *Jarrow*, 304 F.3d at 835). Evidentiary prejudice may arise by reason of an alleged infringing party's "inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts." *A.C. Aukerman*, 960 F.2d at 1033. An alleged infringing party may also establish prejudice by "showing that during the delay, it invested money to expand its business or entered into business transactions based on his presumed rights." *Miller*, 454 F.3d at 999; *Whittaker Corp. v. Execuair Corp.*, 736 F.2d 1341, 1347 (9th

Cir. 1984) (explaining that a party may be prejudice when expanding its "existing practices" because it "incur[s] additional potential liability").

Calista argues that it expanded its business during the time Tenza should have acted to protect the '197 Registration. Specifically, Calista argues that before January of 2011, it owned and operated 15 websites with domain names contain the terms "porn" and "tube" in various combinations. Between January of 2011 and August of 2013, Calista expanded to operating at least 17 new websites. Zhukov Decl. ¶¶ 3, 4. During the time Calista was a Tenza affiliate, Calista argues it was encouraged to direct as much traffic through its domains to Tenza's website as possible. Citing *Grupo Gigante SA De CV v. Dallo & Co., Inc.*, 391 F.3d 1088, 1105 (9th Cir. 2004), Calista argues that Tenza's delay caused Calista prejudice because it was building a valuable business around the disputed domains.

Because the degree of prejudice that Calista allegedly suffered based on its expansion of business argument is predicated on when Tenza was on constructive notice, the resolution of this issue is also precluded by a genuine dispute of material fact. Assuming Tenza only had knowledge of Calista's use shortly before it filed its UDRP proceeding on March 25, 2013, or that any notice to Mr. Matthyssen was limited and at the earliest occurred on March 8, 2011, the prejudice Calista suffered may be limited. For this reason, the Court denies Calista's motion for summary judgment on this issue.

### G.  Calista's Damages

Tenza moves for summary judgment on Calista's claim for damages. Tenza argues that Calista is not entitled to recover money damages. Calista's prayer for relief requests "damages sustained by Plaintiff as a result of Defendant's wrongful actions as alleged herein, including attorney's fees and costs as provided by law." Pl.'s Compl. at 18. The specific claims in Calista's complaint, however, are for: (1) declaratory and injunctive relief pursuant to the

anticybersquatting consumer protection act (Count I); (2) declaration of non-infringement of trademark (Count II); (3) declaration of no unfair competition (Count III); and (4) cancellation of trademark registration (Count IV). *Id.*

During the course of discovery, Tenza posed the following interrogatory to Calista: "describe in detail, all damages YOU contend you have sustained from unlawful conduct YOU attribute to Tenza, including the nature of the damage, the DATE the damage was sustained, the dollar amount of the damage, and the specific conduct of Tenza that resulted in the damage." Tauger Decl. Ex. 5, Dkt. 115-5 at 25. Calista's response to this interrogatory included four alleged bases for damages: (1) "Calista suffered loss of revenues that Calista would have otherwise enjoyed from its participating in Tenza's PornTube.com Affiliate Program, starting on the date of the filing of the UDRP Complaint and arising out of Tenza's filing of the UDRP Complaint"; (2) "Calista suffered further losses as a result of the incurral [sic] of legal fees and other expenses related to Tenza's improper and extra-legal attempt on or about July 16, 2013 to force the registrar for the domains in dispute in the instant litigation to transfer Calista's Domains, despite the pending litigation before this Court"; (3) "The value of Calista's Websites and domain names is also undermined and decreased as the result of Tenza's actions and Calista will not be able to sell these assets to a third party because of the cloud cast over them by Tenza." *Id.* at 25-26. Calista did not provide to the Court any response to Tenza's motion for summary judgment on this issue.

As a matter of law, Calista is not entitled to recover money damages on the legal claims alleged in its complaint. The Court grants Tenza's motion for summary judgment on this issue without prejudice as to Calista's right, if it prevails on its Lanham Act claims, to move within 14 days after judgment for a statutory award of attorney's fees.

## CONCLUSION

The Court DENIES Calista's motion for partial summary judgment (Dkt. 94) and

GRANTS IN PART and DENIES IN PART Tenza's motion for partial summary judgment

(Dkt. 100). Calista is not entitled to recover any money damages on its claims against Tenza. To

that extent, the Court grants Tenza's motion for partial summary judgment. The Court denies

Tenza's motion in all other respects.

**IT IS SO ORDERED**.

DATED this 8th day of August, 2014.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge